IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
Case No. 1:16-cv-262

DAVID RAY GUNTER,                              )
                                               )
            Plaintiff,                         )
                                               )
v.                                             )
                                               )
SOUTHERN HEALTH PARTNERS,                      )
INC., JASON JUNKINS, Medical                   )
Director, DEPARTMENT OF HEALTH                 )        **MEDICAL DEFENDANTS'**
AND HUMAN SERVICES, RICK                       )        **MEMORANDUM IN SUPPORT OF**
BRAJER or his predecessors, DAVIE              )        **MOTION FOR SUMMARY JUDGMENT**
COUNTY, DAVIE COUNTY BOARD                     )
OF COMMISSIONERS, ANDY                         )
STOKES, WENDELL SAIN,                          )
CAMERON SLOAN, STOKES                          )
COUNTY, STOKES COUNTY BOARD                    )
OF COMMISSIONERS, MIKE                         )
MARSHALL, ERIC CONE, SANDRA                    )
HUNT, FRAN JACKSON, MARSH USA                  )
INCORPORATED, WESTERN SURETY                   )
COMPANY, MANUEL MALDONADO,                     )
ET AL.                                         )
                                               )
            Defendants.                        )

Defendants Southern Health Partners, Inc., Jason Junkins, Sandra Hunt, Fran Jackson, and

Manuel Maldonado (collectively "Medical Defendants") submit this memorandum in support of

their motion for summary judgment on all of Plaintiff's claims.

## STATEMENT OF THE NATURE OF THE MATTER

Plaintiff commenced the present action in the Randolph County Superior Court Division

of the State of North Carolina on November 6, 2015, by filing an Application Extending Time to

File Complaint (Doc. No. 1–2), and a Motion Extending Statute of Limitations in Medical

Malpractice Action, which was granted extending the limit to March 4, 2016 (Doc. No. 1–3).

On November 25, 2015, Plaintiff filed his Complaint in the General Court of Justice, Superior Court Division, Randolph County, North Carolina.  (Doc. No. 23.)  On March 3, 2016, Plaintiff filed his Amended Complaint, adding Defendant Maldonado and adding a Medical Malpractice claim (Doc. No. 26 at 5, 40–43).  The Amended Complaint contained a "9(j) Medical Malpractice Certification."  (Id. at 87.)

On April 1, 2016, the County Defendants removed the case to this Court (Doc. No. 1).  On December 27, 2016, with leave of the Court, Plaintiff filed his Second Amended Complaint, substituting a defendant (Doc. No. 57).  In the Second Amended Complaint, Plaintiff brings claims against the Medical Defendants for medical malpractice, 42 U.S.C. § 1983, negligence, negligent supervision, false imprisonment, and torture and intentional infliction of emotional distress.  On January 9, 2017, the Medical Defendants answered Plaintiff's Second Amended Complaint (Doc. No. 61).  On February 22, 2017, the Medical Defendants filed a Motion for Partial Judgment on the Pleadings, seeking dismissal of Plaintiff's medical malpractice claim for failure to comply with Rule 9(j) of the North Carolina Rules of Civil Procedure and failure to allege certain claims against specific defendants (Doc. No. 63), which the Court denied on September 20, 2017 (Doc. No. 87).

## STATEMENT OF FACTS

The crux of the case against the Medical Defendants is for medical malpractice and section 1983.  Plaintiff was incarcerated at both the Davie and Stokes County jails for a total of fourteen consecutive days in November 2012.  [Exh. 1, Davie County Medical Records; Exh. 2, Stokes County Medical Records.]  The Medical Defendants' role at the jails is limited to medical services alone.  [Exh. 3, Health Services Agreements, GUNTER-SHP000067-93.]  SHP is headquartered in Tennessee and contracts with county jails to provide medical services.  Fran Jackson is a nurse

employed by SHP who worked at Davie and Sandra Hunt is a nurse employed by SHP who worked at Stokes. [Exh. 4, Deposition of Fran Jackson 12:21-23; Exh. 5, Deposition of Sandra Hunt 12:4-11.] Manuel Maldonado is a Physician's Assistant who served as Medical Director at both Davie and Stokes. [Exh. 6, Deposition of Manuel Maldonado 30:6-24.] Mr. Maldonado was an independent contractor with SHP. [Exh. 6, Maldonado 20:4-18.] Dr. Jason Junkins resides in Alabama. He served as the corporate medical Director for SHP. [Exh. 7, Deposition of Jason Junkins 17:17-21.] Dr. Junkins never treated Plaintiff and did not supervise the providers who did treat him. [*Id.* at 22:3-20, 93:4-6.] He is an independent contractor to SHP. [*Id.* at 97:14-19.]

Both Davie and Stokes are small county jails. Both had nursing coverage for one-half day Monday through Friday. [Exh. 5, Hunt 10:19-21; Exh. 4, Jackson 12:23-25.] Nurse Jackson and Nurse Hunt were the only nurses at each jail. [Exh. 4, Jackson 13:18-22; Exh. 5, Hunt 18:5-10.] PA Maldonado visited each jail every other week. [Exh. 6, Maldonado 23:2-5.] Both nurses and the PA were available on call 24/7. [Exh. 7, Junkins 26:17-25.] Importantly, these jails do not have the resources of a hospital or medical clinic. [Exh. 4, Jackson 65:19-24, 84:24-85:15.] There is no pharmacy, medications for inmates are ordered by the PA, requested from a pharmacy contracted with SHP and delivered the next day. [*Id.* at 72:4-25.] The nurses package the medicine for the inmates [Exh. 6, Maldonado 110:7-21] and if the nurse is not present in the jail at the appropriate time, the medication is provided by a correctional officer [*Id.* at 103:21-104:3].

Plaintiff self described his memory as "not great." [Exh. 8, Deposition of David Gunter 11:23-12:7.] Plaintiff was diagnosed with aortic stenosis at birth. [*Id.* at 35:11–36:11.] As a result, Plaintiff has a mechanical heart valve ("MHV") and has been taking Coumadin since he

3

was 15 years old.[1]  [*Id.*]  When arrested, Plaintiff was 37 years old and had been taking Coumadin for 22 years.  [*Id.* at 18:6-9.]  Coumadin is typically taken once per day in the evening.  This was Plaintiff's practice.  [*Id.* at 80:9.]

It is undisputed that patients with a MHV have a higher risk for a blood clot compared to a person without a MHV.  [Exh. 9, Deposition of Virginia Yoder 201:16-18.]  Therefore, MHV patients are treated with Coumadin to thin their blood to reduce the risk of clotting while minimizing the risk of bleeding which is more likely when the blood is thin and lacks clotting factors.  [*Id.* at 78:3-20.]  Failing to take one or two doses of Coumadin for a MHV patient does not cause a blood clot.  [Exh. 6, Maldonado 117:10-16; Exh. 9, Yoder 209:1-8.]  Please see the affidavit of Julie Sease, attached hereto as Exhibit 10, for an explanation of how and why Coumadin is used to treat these patients and when bridging with Lovenox or Heparin is necessary.

Coumadin patients must be followed by a medical provider and have their INR checked regularly, at least once per month.  INR measures the blood's bleeding time, thickness and clotting factors.  [Exh. 9, Yoder 82:1-21.]  As a result, INR measures the effectiveness of Coumadin for the previous seven days.  [*Id.* at 204:5-12.]  The goal of Coumadin therapy is to maintain a therapeutic INR which for Plaintiff was 2.5-3.5 which is done by monitoring their INR and making adjustments as necessary.  [Exh. 6, Maldonado 9:11-15; Exh. 8, Yoder 77:24-78:2.]  Maintaining a therapeutic INR level can be difficult for any patient for many factors effect INR including diet, alcohol use, and changes in smoking habits.  [Exh. 9, Yoder 82:22-83:7, 117:16-118:19.]  As a result, providers regularly change and tweak Coumadin dosage to maintain a therapeutic level. Therefore, having a regular physician or attending a Coumadin clinic is critical for a patient to

---

[1] Coumadin is the brand name and Warfarin is the generic name for the same drug.  The parties and witnesses have used the terms interchangeably.

maintain a therapeutic INR and reduce the risk of a blood clot. [*Id.* at 77:24-78:20.] Coumadin clinics have been shown to provide better results at maintaining patients in a therapeutic range which will result in less adverse effects from the drug. [*Id.*at 76:15-24.]

Plaintiff became addicted to opioids in 2008 and sought treatment in 2010 and after. Apparently, his addiction to opioids effected his willingness to maintain the discipline required for a long-term Coumadin patient. In 2012, Plaintiff was being treated by Virginia Yoder, Pharm D, at the Coumadin Clinic in Forsyth County. On May 31, 2012, Ms. Yoder discharged Plaintiff from the Coumadin clinic for non-adherence which she testified is the same thing as noncompliance. [Exh. 11, May 29, 2012 Office Note; Exh. 9, Yoder 201:4-6.] There is no record of Plaintiff having a provider or an INR test from May 31, 2012 until his incarceration in November 2012.

When discharged from the Clinic in May 2012, Plaintiff lost the benefit of that continuing treatment which is critical for a Coumadin patient. It is unclear if Plaintiff's Coumadin prescription was 6 or 7 mg per day. [Ex. 10, Sease Affidavit; Exh. 9, Yoder 144:3-19.] Ms. Yoder testified that her general practice was to give a thirty-day prescription with two refills. [*Id.* at 134:21-135:2.] After discharge, Plaintiff was able to refill his Coumadin prescription of thirty 5mg pills and thirty 1mg pills on June 25, July 24, and August 23. [Exh. 12, Walgreens Records, WAL000099, 000102.] Based on the regularity of his refills, Plaintiff took his Coumadin prescription each day in the summer of 2012 and he filled his refills to continue to take his dosage.

Plaintiff's prescription apparently expired after the August 23 refill which would be consistent with Ms. Yoder's general practice. There were no refills in September. In October 2012, Plaintiff sought a refill of his 5mg prescription that was denied. [Exh. 13, October 22, 2012 Telephone Encounter.] A week later, he was able to obtain thirty 1mg pills with no refills. [Exh. 12, WAL000107.] Therefore, between August 23, 2012 and his arrest on November 6, 2012,

5

Plaintiff did not have enough pills to take 6 or 7mg of Coumadin every day. While not known to the Medical Providers at the time of his arrest, we now know Plaintiff was non-compliant with his Coumadin therapy when arrested—a fact admitted by his former and current provider, Ms. Yoder. [Exh. 9, Yoder 171:25-172:7.]

Having a medical provider to manage one's Coumadin and taking the Coumadin prescription as prescribed is only part of the patient's responsibility. It is critical for a patient to obtain regular INRs so the provider can properly monitor the patient's therapeutic range and make adjustments as necessary. [Exh.14, Deposition of Raymond Mooney, 75:15-76:2.] Plaintiff did not have his INR checked from May 18, 2012 until his incarceration. This means Plaintiff had no idea whether he was in the therapeutic range for five months. This failure by Plaintiff is not from a lack of knowledge. Plaintiff had obtained regular INR checks since he was 15 years old. He knew that eating greens and vegetables containing vitamin K negatively affects his INR level. [Exh. 8, David Gunter 74:7–15, 119:2-24.] Plaintiff still chose to eat foods containing vitamin K, [Exh. 15, Deposition of Kayla Gunter 76:20–22; Exh. 16, Deposition of Barbara Klein 151:6–10], and he was "really bad" about eating foods containing vitamin K around Thanksgiving, which "messes up" his INR level [Exh. 8, David Gunter 74:7–15, 119:2-24]. Drinking alcohol affects blood thickness, and Plaintiff has a history of drinking alcohol when he goes out. [Exh. 16, Klein 29:4–13; 34:23–35:4, 35:18–25.] At the conclusion of discovery, there is no basis to conclude that Plaintiff had a therapeutic INR for at least thirty days before he was arrested.

Plaintiff was arrested on November 6, 2012 in Forsyth County on a bench warrant. [Exh. 8, David Gunter 53:25-54:15.] After one night at Forsyth County[2], Plaintiff was transferred to

---

[2] The medical provider at Forsyth was not sued and is a different entity with no connection to SHP or the individual Defendants.

Davie County on November 7, 2012. Plaintiff contends that he took his Coumadin on November 6, 2012 because he was not arrested until 9:00 PM [Exh. 8, David Gunter 80:4-13], but there is no evidence to support that fact other than his statement and he gave the amount as 5mg, not 6 or 7 mg. [*Id.*] Plaintiff was incarcerated at Davie from November 7 to 16, 2012. Plaintiff was initially screened on his arrival by nurse Jackson. [Exh. 1, GUNTER-SHP000023–24.] Importantly, Plaintiff refused to sign the release form allowing nurse Jackson to contact his providers because he told her that he was going home that day which was not an uncommon occurrence. [*Id.*; Exh. 4, Jackson 30:19-32:1.]

Plaintiff did not go home on November 7, 2012. On November 8, nurse Jackson arrived at the jail in the morning and saw that Plaintiff was still there. [Exh. 4, Jackson 37:21-38:15.] She had him brought to medical and he agreed to sign the medical release forms. [Exh. 1, GUNTER-SHP000035.] With Plaintiff sitting there, she called Maplewood Family Practice and Walgreens, the two providers he disclosed to her. [Exh. 4, Jackson 23:22-24:2, 38:16-39:8.] Maplewood said that Plaintiff was last there in June 2012 for a sick visit and "no showed" an appointment in July. [Exh. 1, GUNTER-SHP000024.] Maplewood reported that his last INR was in 2010. [*Id.*] Walgreens said that Plaintiff's Coumadin 5mg prescription was last filled on August 23, 2012 and that Plaintiff's Coumadin 1mg prescription was last filled on October 19, 2012 with no refills. [*Id.*] Walgreens also said that Plaintiff's provider had refused a 5mg refill request in October 2012 because Plaintiff was no longer her patient. [*Id.*] Plaintiff never told nurse Jackson the name of the provider who had the most knowledge about his Coumadin treatment, Ms. Yoder at the Coumadin Clinic. [*Id.*] When nurse Jackson informed Plaintiff what she had been told by Maplewood and Walgreens, he called her the most offensive racial slur that can be spoken and as

a result, nurse Jackson has a vivid memory of Plaintiff.[3][4]  After his racial insult, Plaintiff was removed from the medical room and nurse Jackson called PA Maldonado and received an Order for Coumadin 5mg and for Plaintiff to have an INR check on November 13, 2012.  Nurse Jackson called the order for Coumadin to the pharmacy [Exh. 1, GUNTER-SHP000019, 000024], received the medicine on November 9 [Exh. 4, Jackson 45:19-21] and Plaintiff received 5mg of Coumadin each day through November 14, 2012.  [Exh. 1, GUNTER-SHP000028.]

Also on November 8, 2012, Plaintiff's family delivered six pills in Coumadin bottles to Davie.  [Exh. 1, GUNTER-SHP000031.]  The medicine was delivered late in the day after nurse Jackson had left.  [Exh. 15, Kayla Gunter 49:6-9.]  The jail record reflects that the family delivered two 5mg pills and four 1mg pills.  [Exh. 1, GUNTER-SHP000031.]  Since Plaintiff's medicine from the pharmacy arrived on November 9, it is believed that nurse Jackson never dispensed the pills from the family.

As ordered by PA Maldonado, on November 13, Plaintiff was transported to the Hospital for an INR test.  The score was 1.07.  [Exh. 1, GUNTER-SHP000019, 000029.]  At that time, Plaintiff had received four 5mg doses at the jail.  [Id. at GUNTER-SHP000028.]  Nurse Jackson informed PA Maldonado of the INR result and PA Maldonado increased Plaintiff's prescription to 7.5mg on Thursday, Saturday and Monday and 5mg on the remaining four days.  [Id. at GUNTER-SHP000019.]  Nurse Jackson had the 7.5 mg dose given to Plaintiff on Thursday November 15 [Exh. 4, Jackson 46:22-47:1.]

On November 15, 2012, nurse Jackson was told that Mr. Gunter would be going to court

---

[3] Plaintiff called nurse Jackson a "Liar" and a Ni***r Black Bi**h."  [Exh 4, Jackson 24:3-4.]

[4] When asked to describe nurse Jackson in his deposition, Plaintiff said she was a "colored lady." [Exh. 8, David Gunter 84:7-17.]

and she completed a form with a summary of his medical condition. Nurse Jackson had no other information about Mr. Gunter's release; however, that fact is not unusual. Inmates at the jail are often released on bond or serve short sentences. Medical usually has no knowledge when an inmate will be released unless told by an inmate or correctional officer. [Exh. 4, Jackson 55:6-57:22.]

On Friday November 16, 2012, presumably after a court hearing, Plaintiff was released from Davie and transported to the Stokes County jail because he owed child support. Plaintiff had received Coumadin seven straight days he was incarcerated at Davie County as ordered by PA Maldonado. [Exh. 1, GUNTER-SHP000028.]

When Plaintiff arrived at Stokes on Friday afternoon, nurse Hunt had left for the day and was not scheduled back at the jail until Monday November 19, 2012. [Exh. 5, Hunt 27:23-28:2.] The officers called her about Plaintiff but the Coumadin pills that Plaintiff had from his family had expired and she cannot give inmates medication brought from home that is expired. [*Id* at 28:24-29:13, 32:5-33:18, 35:7-10.] She was not aware of Maldonado's order for Coumadin. [*Id* at 29:14-23, 34:22-35:3.] When nurse Hunt arrived at the jail on Monday morning, she learned that PA Maldonado had ordered Coumadin for Plaintiff at Davie. She arranged for an emergency supply from a local pharmacy and Plaintiff received his Coumadin on Monday, November 19 and Tuesday, November 20. [*Id* at 39:25-40:2, 56:13-57:13.] It is undisputed that Plaintiff was released from Stokes on Wednesday November 21, 2012.

During his entire 14-day incarceration at both facilities, Plaintiff never requested to see medical, never completed a sick call slip, never complained to a correctional officer about his medication, never showed any sign or symptom of a blood clot or any medical injury or condition. Simply stated, Plaintiff was medically stable the entire time. [Exh. 4, Jackson 95:13-17, 96:18-

99:1; Exh. 5, Hunt 72:3-75:14.]

After his release on Wednesday November 21, 2012, Plaintiff did not seek an appointment with a medical provider. He made no effort regarding his Coumadin therapy or health in general. He did immediately go to the gas station upon his release to buy cigarettes. [Exh. 15, Kayla Gunter 77:23-78:4.]

Assuming Plaintiff left the jail with the six Coumadin pills his family brought to the jail, he did not have enough Coumadin to continue his prescription for more than two days. He did go to Walgreens on November 25, 2012 but he only obtained thirty 1mg pills – not enough to maintain his prescription or maintain a therapeutic INR; a fact that is his responsibility. [Exh. 9, Yoder 216:22-217:22.]

Eight days after his release from jail on November 29, 2012, Plaintiff went to the hospital and was admitted with a blood clot. The medical record states he began showing symptoms two days before admission. [Exh. 17, November 29, 2012 Medical Record.]

Plaintiff was discharged from the hospital on December 11, 2012 with a therapeutic INR of 3.14. The clot had been successfully removed and all his effected organs were viable. There was no resection. [*Id.*]

After his release from the hospital, Plaintiff's INRs quickly fell below a therapeutic range suggesting that he remained non-compliant. From December 14–January 2 (longer than the time incarcerated), Plaintiff had six sub-therapeutic INRs and only one therapeutic INR. [Exh. 18, January 2, 2013 Medical Record.] On January 18, 2013, Plaintiff was diagnosed with a second blood clot and part of his bowel was resected.

While Plaintiff has continued to have hospitalizations, none of his experts attributed any medical events after the January blood clot to his incarceration. Specifically, all experts agreed

10

that his stroke in 2014 was not related to his Coumadin dosage. [Exh. 19, Deposition of Laber 84:25-86:9.]

## QUESTIONS PRESENTED

Are the Medical Defendants entitled to summary judgment

I. on Plaintiff's medical malpractice claim because Plaintiff has failed to establish a breach of the standard of care or proximate cause?

II. on Plaintiff's medical malpractice claim because the undisputed evidence shows that Plaintiff was contributorily negligent?

III. on Plaintiff's § 1983 claim because the Medical Defendants were not deliberately indifferent or had the requisite intent?

IV. because Plaintiff failed to comply with Rule 9(j) in regards to Defendant Maldonado?

V. on Plaintiff's negligence claim because it is merely a recitation of Plaintiff's § 1983 claim and Plaintiff has failed to distinguish the negligence claim from medical malpractice?

VI. on Plaintiff's negligent supervision claim because Plaintiff failed to establish incompetence or unfitness or knowledge by an employer or agent?

VII. on Plaintiff's false imprisonment claim because Medical Defendants do not detain inmates?

VIII. on Plaintiff's torture/intentional infliction of emotional distress claim because Medical Defendants did not engage in "extreme and outrageous" conduct?

## ARGUMENT

### I. Standard for Summary Judgment

Pursuant to Fed. R. Civ. P. 56(c), a district court must enter judgment against a party who, "after adequate time for discovery ... fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). To overcome summary judgment, a plaintiff must point to admissible evidence in the record creating a "genuine" issue as to a "material" fact, i.e. facts that might affect the outcome of the

11

suit. Fed. R. Civ. P. 56 (c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986). Factual disputes that are irrelevant or unnecessary will not be counted. *Id.*

## II.  Plaintiff's Medical Malpractice Claim Fails as a Matter of Law

In a medical malpractice action a plaintiff has the burden of showing (1) the applicable standard of care; (2) a breach of such standard of care by the defendant; (3) the injuries suffered by the plaintiff were proximately caused by such breach; and (4) damages resulting to the plaintiff. *Purvis v. Moses H. Cone Mem'l Hosp. Serv. Corp.*, 175 N.C. App. 474, 477, 624 S.E.2d 380, 383 (2006). A medical negligence plaintiff must rely on expert opinion testimony to establish proximate causation of the injury. *Hawkins v. Emergency Medicine Physicians of Craven County, PLLC*, 240 N.C.App. 337, 342, 770 S.E.2d 159, 162 (2015). An expert is not competent to testify as to a causal relation which rests upon mere speculation or possibility. *Id.* Plaintiff has failed to establish the necessary elements against any of the Medical Defendants and so summary judgment must be granted to all Medical Defendants.

### a.  Plaintiff has failed to establish a breach of the applicable standard of care.

In malpractice cases, a plaintiff must show by testimony from a qualified expert that treatment administered by the defendant was in negligent violation of the accepted standard of medical care in the same or similar communities under the same or similar circumstances and that the defendant's treatment proximately caused the plaintiff's injury. N.C. Gen. Stat. Ann. § 90-21.12; *See Lewis v. N. Carolina Dep't of Pub. Safety*, No. 1:15-CV-284-FDW, 2019 WL 177480, at *2 (W.D.N.C. Jan. 11, 2019) (unpublished) (applying standard of care "consistent with community standards at their prisons" to medical defendants in malpractice action by inmate).

Plaintiff presented four experts who opined in the following areas:

- Tammy Banas: Registered Nursing;

- Virginia Yoder, Pharm D: Pharmacology and Coumadin;

- Raymond Mooney, PA: Physician Assistant; and

- Damien Laber, MD: Hematology.

As shown in the deposition testimony, none of Plaintiff's experts opined that nurse Hunt, Dr. Junkins or SHP breached the standard of care:

- Exh. 20, Deposition of Banas: 110:1-18 (Nurse Hunt did not breach the standard of care); 141:20-142:8 (no complaints against the company SHP); 75:2-16 (not qualified to opine about Maldonado or proximate cause);

- Exh. 9, Yoder: 238:25–239:19 (no opinion about negligence of the nurses); 240:25–242:20 (no opinion about policies, protocols, contracts, or scope of practice);

- Exh. 19, Laber: 108:13-24 (no opinions about the nurses or Dr. Junkins); 111:17-115:6 (no opinions about standard of care for Maldonado, policies, procedures, protocols, or contracts); and

- Exh. 14, Mooney: 151:1-17 (only opining about Maldonado, "nobody else.").

Accordingly, summary judgment must be granted in favor of nurse Hunt, Dr. Junkins, and SHP.

The criticism of nurse Jackson is not a breach of the standard of care. Nurse Jackson does not have authority to diagnose patients or prescribe medication so at these jails, she follows orders received from the physician assistant. [Exh. 20, Banas 64:15-22.] Nurse Banas, who has never worked in a jail or a prison, provided two complaints against nurse Jackson—neither of which is a breach of the standard of care. First, she testified that nurse Jackson did not act with urgency to obtain Plaintiff's medications. [*Id.* at 82:23-83:3.] Second, she testified that nurse Jackson wrote down the incorrect INR result on the form she created when she learned that Plaintiff was going to court. [*Id.* at 104:18-21.] The uncontroverted testimony was that on the initial day at Davie,

Plaintiff refused to sign the release forms to allow nurse Jackson to contact his providers and seek to verify his medications. [Exh. 4, Jackson 30:22-31:19.] On the second day when she learned he had not been released, she sought him out and had him sign the release form. She then contacted the providers, contacted PA Maldonado, received an order, called the order into the pharmacy, obtained Coumadin the next day and had it dispensed to the Plaintiff the day it arrived. [*Id.* at 37:23-39:14] [Exh. 1, GUNTER-SHP000019, 000024, 000028, 000035.] That is sufficient and is certainly not a breach of the standard of care. In regards to the form, Defendants concede that nurse Jackson wrote 1.7 on the form instead of 1.07. Both PA Maldonado and nurse Hunt testified that the typo on the form had no effect on Plaintiff's treatment. [Exh. 5, Hunt 23:24-24:7; Exh. 6, Maldonado 161:15-162:5.] None of the other experts presented by the Plaintiff opined about nurse Jackson. Accordingly, summary judgment must be granted in favor of nurse Jackson.

The crux of Plaintiff's claim against PA Maldonado is that he should have bridged Plaintiff with Lovenox or Heparin while he was incarcerated. Lovenox is a short-term drug to rapidly "bridge" a patient to being anticoagulant until the patient is therapeutic with Coumadin. [Exh. 10, Sease Affidavit p. 4 ¶11.] It is a dangerous drug that can cause bleeding. [*Id.*] Plaintiff's expert, Ms. Yoder, a pharmacist who works in a Coumadin clinic said that whether to bridge with Lovenox a medium risk patient like Plaintiff was a "gray area." [Exh. 9, Yoder 108:1-8, 113:5-14.] Ms. Yoder specifically opined that it was not a breach of the standard of care for Mr. Maldonado not to order bridge therapy for Plaintiff. [*Id.* at 174:3-9.] Ms. Sease explains that the CHEST Guidelines suggest against bridging with Lovenox with only one sub-therapeutic INR and it was not a breach of the standard of care to decline to bridge Plaintiff. [Exh 10, Sease Affidavit, pp. 4-5 ¶12.] The two experts who have worked in a Coumadin Clinic and treat Coumadin patients

every day have opined that PA Maldonado did not breach the standard of care for failing to bridge with Lovenox.

It is clear that the decision whether to bridge Plaintiff was a judgment call with providers having different opinions. "Courts are required only to make certain that professional judgment in fact was exercised. It is not appropriate for the courts to specify which of several professionally acceptable choices should have been made." *Boryla-Lett v. Psychiatric Sols. of N. Carolina, Inc.*, 200 N.C. App. 529, 536, 685 S.E.2d 14, 20 (2009). In response to the sub-therapeutic INR, PA Maldonado exercised his judgment and decided to increase Plaintiff's Coumadin dosage and not to bridge Plaintiff with Lovenox. [Exh. 6, Maldonado 96:21-97:6.] His exercise of professional judgment did not breach the standard of care.

### b. There is no genuine issue of material fact as to proximate cause.

Initially, for a MHV patient, no expert opined that missing a few doses of Coumadin would be the proximate cause of the patient later having a blood clot. Plaintiff's proximate cause expert Dr. Laber testified that Plaintiff's blood clot was caused by a "lack of anticoagulation for the cardiac valve" and that the "longer they remain without proper anticoagulation, the higher the risk"; "[T]he risks go exponentially higher for each time he remained below the therapeutic range. So it is not just skipping the dose. It's basically the time he's below the therapeutic range." [Exh. 19, Laber 56:24-57:1, 124:1-5.] Therefore, the missed dose of Coumadin did not cause the clot. Rather, the longer the time the patient is not properly within the therapeutic range, the greater the risk of developing a clot. Importantly, the increase in risk for a blood clot from a sub-therapeutic INR cannot be quantified. [*Id.* at 66:21-67:12.] Finally, Plaintiff cannot establish when the blood clot formed. [*Id.* at 54:7-21.]

Plaintiff did not have a valid prescription for two months before incarceration, and from May 2012 until incarceration, he did not have a provider treating him for Coumadin therapy and he did not have an INR test. For the eight days after his release from jail, he did not seek medical advice or an INR test and did not have enough Coumadin medication. Plaintiff has presented no evidence that he was therapeutic in the 30 days before his arrest and in the eight days after his release. Further, his INR level upon admission to the hospital was 1.7 [Exh. 17]; well below the therapeutic range. Accordingly, Plaintiff's contention that his being below the therapeutic range at the jail was the proximate cause of his blood clot is pure speculation.

Plaintiff was anticoagulated when discharged from the hospital on December 11, 2012 with an INR of 3.14. Within three days, his INR was down to 1.6 and he remained sub-therapeutic for two more weeks. On January 2, 2013, he was sub-therapeutic again. [Exh. 17, 18.] As a result, Plaintiff cannot establish that he was therapeutic for the multi-week period prior to his admission for a second blood clot in January 2013.

The North Carolina courts have defined proximate cause as a natural and continuous sequence, unbroken by any new and independent cause that produced the plaintiff's injuries which would not have occurred. *See Hawkins v. Emergency Medicine Physicians of Craven County*, PLLC, 240 N.C. App. 337, 346, 770 S.E.2d 159, 165 (2015). *Hawkins* shows the difficulty for physicians when making decisions about powerful medicines like Coumadin and Lovenox. In *Hawkins*, the physicians were criticized for prescribing Lovenox which the plaintiff alleged led to a brain bleed causing the death of the patient. In the present case, the PA Maldonado is criticized for failing to prescribe Lovenox for a patient who developed a blood clot. In short, in both cases, the experts opine that the prescription or failure to prescribe increased the risk of the injury. None of the experts, however, can opine that the medication or failure to provide the medication caused

16

the actual event. In *Hawkins*, the Court affirmed summary judgment after finding no proximate cause. This Court should likewise find in this case.

In *Edwards v. Nelson*, the North Carolina Court of Appeals rejected proximate cause when experts testified that 25-30 percent of patients with a TIA will go on to have a stroke in a case when Plaintiff presented with signs and symptoms of a TIA and the physician failed to seek a CT test to see if it had occurred. 158 N.C. App. 743, 582 S.E.2d 82 (2003) (unpublished). Here, while the experts may agree that not being therapeutic increases the risk of a blood clot, the experts cannot provide a mathematical percentage of a direct nexus link between failing to be therapeutic and developing a blood clot. Simply increasing the risk of something by an uncertain mathematical percentage does not establish proximate cause.

In addition, Plaintiff's conduct breaks the nexus. Plaintiff's failure to obtain INRs, seek out a physician, or maintain a reliable prescription both before and after incarceration, creates a new and independent cause which negates any alleged action or inaction at the jail. In addition, Plaintiff created a new and independent cause in the time between his first blood clot in November/December 2012 and his clot in January 2013. Having sub-therapeutic INRs between his hospitalizations makes it more likely he will have another blood clot. [Exh. 19, Laber 79:18-23.] Plaintiff's sub-therapeutic INRs in December/January is a separate event unrelated to his incarceration in November 2012.

Finally, North Carolina courts have established that expert opinion testimony in a medical malpractice case cannot be based on speculation and conjecture. *Campbell v. Duke University Health System, Inc.*, 203 N.C. App. 37, 691 S.E.2d 31 (2010). There is no evidence to support that Plaintiff was anticoagulated in the thirty days before incarceration or the eight days from release from jail until admission to the hospital for his blood clot. Further, after release from the hospital

17

on December 11, 2012, Plaintiff quickly became sub-therapeutic and remained so for weeks. Simply put, Plaintiff's expert assumes that Plaintiff was therapeutic outside the jail solely because Plaintiff said he was. [Exh 19, Laber 117:12-22.] That is insufficient and leaves the Court with no choice but to find the opinion is based on speculation. *See also Franklin v. Britthaven, Inc.*, 179 N.C. App. 863, 635 S.E.2d 537 (2006) (unpublished) (failure to link negligence and death made summary judgment appropriate) *Barbee v. WHAP, P.A.*, 255 N.C. App. 214, 803 S.E.2d 701 (2017) (unpublished) (failure to offer causation testimony beyond mere speculation made summary judgment proper); *Jeffress v. Reddy*, 77 F. App'x 627, 632 (4th Cir. 2003) (unpublished) (plaintiff failed to establish a "causal link" between the defendant's treatment and the alleged injury).

### c. **Plaintiff was contributory negligent—a fact confirmed by his experts.**

The defense of contributory negligence applies to medical malpractice claims. *Cobo v. Raba*, 347 N.C. 541, 542, 495 S.E.2d 362, 363 (1998). This is the unusual case where Plaintiff's conduct towards his illness and his failure so seek treatment is so blatant, long-term and intertwined with the blood clot, the Medical Defendants have established contributory negligence as a matter of law. In 2012, Plaintiff had taken Coumadin for 22 years and was well aware of the risks associated therewith. Despite this knowledge, for five months prior to his incarceration, Plaintiff did not have a physician or medical provider following him for Coumadin therapy, did not have a valid prescription for Coumadin, and did not have an INR test. After his release from jail, Plaintiff did not seek medical care, did not obtain an INR test, did not have a valid prescription for Coumadin, and did not have enough Coumadin pills to last more than two days. While he was incarcerated, Plaintiff never fully disclosed his conduct and never told the nurses that he had been discharged from the Coumadin clinic and that he had failed to regularly take the correct dosage of

18

Coumadin for more than thirty days. When confronted with information from Maplewood Family Practice and Walgreens and his poor history towards himself, instead of coming clean, he chose to unload the worst possible racial insult towards nurse Jackson.

Finally, and most importantly, Plaintiff's experts testified that his conduct was reckless and not prudent:

> Q. Do you think it's reckless for a Coumadin patient to not have a physician, a treating physician or a pharmacist?
> A. Yes.
>
> Q. So wouldn't it have been prudent for him to seek out his -- a physician shortly after his release?
> A. Yes.

[Exh. 19, Laber 87:23-88:1, 118:3-6.]

> Q. And my question is: For him to fail to seek any medical care during that eight-day period, did he act in a careful and prudent manner?
> A. I would say no.

[Exh. 14, Mooney 160:21-25.]

Likewise, Defendant's expert pharmacist establishes that Plaintiff was negligent. [Ex. 10, Sease Affidavit.]

It is settled that a "[p]laintiff may be contributorily negligent if his conduct ignores unreasonable risks or dangers which would have been apparent to a prudent person exercising ordinary care for his own safety." *Ward v. United States*, No. 5:07-CV-383-BO, 2008 WL 4772189, at *4 (E.D.N.C. Oct. 23, 2008), aff'd, 326 F. App'x 143 (4th Cir. 2009). As a result, Plaintiff's contributory negligence is undisputed and apparent and summary judgment is appropriate.

19

**III.** **Plaintiff Cannot Establish the Elements Necessary for a Section 1983 Claim Against the Medical Defendants**

To withstand summary judgment on his section 1983 claim, Plaintiff must forecast sufficient evidence that the Medical Defendants were deliberately indifferent to his medical needs, that the Medical Defendants acted with the requisite intent, and that the Medical Defendants' actions cause Plaintiff substantial harm. Plaintiff cannot do so.

**a.** **No Deliberate Indifference to Plaintiff's Medical Needs**

Deliberate indifference is a very high standard. A showing of negligence, incorrect diagnosis or malpractice is not enough to prevail. *Estelle v. Gamble*, 429 U.S. 97, 105–06, 97 S. Ct. 285, 292 (1976). Similarly, a prisoner's mere disagreement with the care he was provided does not meet the standard. *Russell v. Sheffer*, 528 F.2d 318, 319 (4th Cir. 1975).

As shown herein, Plaintiff received medical care and Coumadin at both jails. PA Maldonado reacted to his INR test by ordering a change in dosage on the same day. When nurse Hunt became aware of Plaintiff being incarcerated at Stokes County jail, she screened him and promptly obtained an emergency dose of Coumadin for Plaintiff.

None of Plaintiff's experts opined about deliberate indifference or section 1983. Plaintiff cannot create a genuine issue of fact with his own, unsupported beliefs. *Petersen v. Davis*, 551 F.Supp. 137, 146 (D. Md. 1982) aff'd 729 F.2d 1453 (4th Cir. 1984).

**b.** **No Requisite Intent**

While the foregoing deficiency renders Plaintiff's case fatal, another required element is lacking. Plaintiff cannot establish the requisite state of mind for a deliberate indifference claim. Deliberate indifference describes a state of mind more blameworthy than negligence, requiring (1) that a defendant have been personally aware of facts from which the inference could be drawn that

Plaintiff would suffer a substantial risk of serious harm, and (2) that the defendant had actually drawn the inference and recognized the existence of such a risk. *Farmer v. Brennan*, 511 U.S. 825, 837, 114 S.Ct. 1970, 1979 (1994). There is no evidence that Defendants had such a state of mind.

Based on the foregoing, there is no evidence of deliberate indifference or requisite intent as a matter of law. Summary judgment is warranted.

## IV. Defendant Maldonado should be dismissed because Plaintiff failed to comply with Rule 9(j).

Medical Defendants briefed the issue of Plaintiff's noncompliance with Rule 9(j) in their Motion for Partial Judgment on the Pleadings. (Doc. No. 87.) In its Order denying the motion, the Court noted that "if discovery subsequently establishes that the 9(j) certification statement is not supported by the facts, then dismissal will be appropriate." (Doc. No. 87, p. 26, n. 6.) As shown herein, Plaintiff's medical history both before incarceration and after incarceration is highly relevant. Plaintiff's experts Mooney and Yoder only read the jail medical records. Neither expert read Plaintiff's medical history. [Exh. 14, Mooney 19:5-24, 20:9-14; Exh. 9, Yoder 41:5-16.] Dr. Laber was hired in 2019, well after the case was filed, and has only read "very, very few" of Plaintiff's medical records predating his incarceration. [Exh. 19, Laber 14:10-13, 15:1-4.] Plaintiff's remaining expert, Nurse Tammy Banas cannot opine on Mr. Maldonado's standard of care. [Exh. 20, Banas 75:2-10.] Because Plaintiff's 9(j) certification statement as to Defendant Maldonado is inadequate, dismissal of Mr. Maldonado is appropriate under 9(j).

## V. Plaintiff's negligence claim fails as a matter of law.

Plaintiff's negligence claim alleges that Medical Defendants "acted with deliberate indifference to the medical needs of plaintiff." (Doc. 57, p. 36.) This is a recitation of Plaintiff's

section 1983 claim, styled as a negligence claim. It should be dismissed for the same reasons as Plaintiff's section 1983 claim.

In the alternative, Plaintiff's negligence claim is actually a claim for medical malpractice, and should be dismissed for the same reasons as his medical malpractice claim. "Whether an action is treated as a medical malpractice action or as a common law negligence action is determined by our statutes[.]" *Smith v. Serro*, 185 N.C. App. 524, 529, 648 S.E.2d 566, 569 (2007). A medical malpractice action is defined in relevant part as "[a] civil action for damages for personal injury or death arising out of the furnishing or failure to furnish professional services in the performance of medical, dental, or other health care by a health care provider." N.C. Gen. Stat. § 90–21.11(2)(a) (2015). Plaintiff has not alleged any negligence against the Defendants that does not arise out of providing medical care. Accordingly, Plaintiff has only alleged a medical malpractice claim and the negligence claim should be dismissed.

## VI. **Plaintiff's negligent supervision claim must be dismissed for lack of evidence.**

North Carolina law recognizes a cause of action for negligent supervision against an employer when the plaintiff establishes (1) the specific negligent act on which the action is founded, (2) incompetency, by inherent unfitness or previous specific acts of negligence, from which incompetency may be inferred, (3) either actual notice to the master of such unfitness or bad habits, or constructive notice, by showing that the master could have known the facts had he used ordinary care in oversight and supervision, and (4) that the injury complained of resulted from the incompetency proved. *Doe v. Diocese of Raleigh*, 242 N.C. App. 42, 50, 776 S.E.2d 29, 36 (2015).

Plaintiff has not established incompetency or unfitness of the medical providers and no notice of such by SHP. PA Maldonado and Dr. Junkins are independent contractors. SHP does not supervise them. Therefore, this cause of action fails as a matter of law.

## VI. <u>Plaintiff's False Imprisonment Claim Fails as a Matter of Law.</u>

The elements of a false imprisonment claim are (1) the defendant intentionally detained the plaintiff against the plaintiff's will and (2) the detention was unlawful. *Rousello v. Starling*, 128 N.C. App. 439, 495 S.E.2d 725, *rev. den.*, 505 S.E.2d 876 (1998). Plaintiff's claim fails because the Medical Defendants do not detain the inmates at the jail.

## VII. <u>Plaintiff's torture/intentional infliction of emotional distress claim fails as a matter of law.</u>

The elements for a claim for intentional infliction of emotional distress are (1) the defendant engaged in extreme and outrageous conduct and (2) the defendant intended to and, does in fact, cause (3) severe emotional distress to the plaintiff. *Dickens v. Puryear*, 302 N.C. 437, 276 S.E.2d 325 (1981). Conduct is "extreme and outrageous" when it exceeds all bounds usually tolerated by decent society. *Id.* at 447, 276 S.E.2d at 331. Whether the defendant's conduct is "extreme and outrageous" is initially a question of law for the trial court. *Lennins v. K-Mart Corporation*, 98 N.C. App. 590, 599, 391 S.E.2d 843, 848 (1990).

Plaintiff received treatment during his incarceration and the providers acted professionally at all times. Therefore, this claim must be dismissed.

## <u>CONCLUSION</u>

Based on the foregoing, the Medical Defendants respectfully request that their Motion for Summary Judgment be granted and they be dismissed from any further involvement herein.

Respectfully submitted, this 6th day of July, 2020.

*s/ Christopher R. Hampton*
Christopher R. Hampton
N.C. State Bar No. 50128
James G. Long, III
Fed. ID No. 5877
NEXSEN PRUET, PLLC
701 Green Valley Road, Suite 100
Greensboro, NC 27408
Tel.: 336.387.5114
Fax: 336.387.8194
CHampton@nexsenpruet.com
JLong@nexsenpruet.com
*Attorneys for Defendants Southern Health Partners,*
*Jason Junkins, Sandra Hunt, Fran Jackson, and*
*Manuel Maldonado*

## <u>CERTIFICATE OF WORD COUNT</u>

I certify that this brief complies with L.R. 56.1(c) and does not exceed the 7000 word limit set forth in the proposed Order granting Leave to exceed the word count specified in LR 7.3(d), with consent of the other parties.

/s/ Christopher R. Hampton
Christopher R. Hampton

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that he electronically filed a copy of the foregoing with the Clerk of Court using the Court's CM/ECF system and thereby served this document upon the following counsel:

David W. McDonald
William E. Mitchell
Hicks McDonald Noecker, LLP
100 South Elm Street, Suite 510
Greensboro, NC 27401
*Counsel for Plaintiff*

Bradley O. Wood
Womble Carlyle Sandridge & Rice, LLP
One West Fourth Street
Winston-Salem, North Carolina 27101
*Counsel for Davie County, Davie County*
*Board of Commissioners, Andy Stokes,*
*Cameron Sloan, Stokes County, Stokes*
*County Board of Commissioners, Mike*
*Marshall, Eric Cone, Marsh USA*
*Incorporated and Western Surety Company*

Francis M. "Brink" Hinson, IV
William Padget
 Finkel Law Firm LLC
1201 Main St., Suite 1800
Columbia, SC  29201
*Counsel for Plaintiff*

This the 6th day of July, 2020.

/s/ Christopher R. Hampton
Christopher R. Hampton