IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

DAVID RAY GUNTER,                )
                                 )
            Plaintiff,           )
                                 )
    v.                           )        1:16CV262
                                 )
SOUTHERN HEALTH PARTNERS, INC.,  )
et al.,                          )
            Defendants.          )


**MEMORANDUM OPINION AND ORDER**

**OSTEEN, JR., District Judge**

        Presently before this court is a Motion for Summary
Judgment filed by Defendants Southern Health Partners, Inc.,
Jason Junkins, Sandra Hunt, Fran Jackson, and Manuel Maldonado
(collectively, the "Medical Defendants"), (Doc. 123), to which
Plaintiff has responded, (Doc. 137), and Medical Defendants have
replied, (Doc. 144).

        Further, Medical Defendants have filed a related Motion to
Strike, (Doc. 142), the Affidavit of Michael Teal from
Plaintiff's response to Medical Defendants' Motion for Summary
Judgment. Plaintiff has responded, (Doc. 153), and Medical
Defendants have replied, (Doc. 156).

        These motions are ripe for adjudication. For the reasons
stated herein, this court will grant in part and deny in part

Medical Defendants' Motion for Summary Judgment and grant
Medical Defendants' Motion to Strike.

I.  **FACTUAL AND PROCEDURAL BACKGROUND**

    A.  **Parties**

Plaintiff was incarcerated at the Davie County and Stokes
County jails over fourteen consecutive days in November 2012.
(Medical Defs.' Mem. in Supp. of Mot. for Summ. J. ("Med. Defs.'
Br.") (Doc. 124) at 2.) Defendant Southern Health Partners, Inc.
("SHP") is a corporation that contracts with county jails to
provide medical services, including at Davie County and Stokes
County jails. (Id.) Defendant Jackson is a nurse employed by SHP
who worked at Davie County jail. (Id. at 2-3.) Defendant Hunt is
a nurse employed by SHP who worked at Stokes County jail. (Id.
at 3.) Defendant Maldonado is an independent contractor with SHP
and a Physician's Assistant who served as Medical Director at
both Davie and Stokes County jails. (Id.) Defendant Junkins is
an independent contractor with SHP who served as the company's
corporate medical Director during the applicable time period.
(Id.) Defendant Junkins resides in Alabama and neither treated
Plaintiff nor supervised the providers who did treat Plaintiff.
(Id.)

- 2 -

## B.  **Procedural History**

Plaintiff commenced the present action in the Randolph County Superior Court Division of the State of North Carolina on November 6, 2015, by filing an Application Extending Time to File Complaint (Petition for Removal, Ex. B (Doc. 1-2)), and a Motion Extending Statute of Limitations in Medical Malpractice Action. (Id., Ex. C (Doc. 1-3).) Plaintiff was granted permission to file a complaint up to and including November 26, 2015, by order of the Assistant Clerk of Superior Court. (Doc. 1-2.) By order of the Superior Court Judge, the statute of limitations for Plaintiff's medical malpractice action was extended to and including March 4, 2016. (Doc. 1-3.)

Plaintiff filed his original Complaint on November 25, 2015, against Southern Health Partners, Inc., Jason Junkins, Sandra Hunt, Fran Jackson, and others. (Complaint ("Compl.") (Doc. 23).) On March 3, 2016, Plaintiff filed his Amended Complaint, adding Defendant Manuel Maldonado and adding a Medical Malpractice claim. (Doc. 26.) The Amended Complaint contained a "9(j) Medical Malpractice Certification." (Id. at 87.)

A Petition for Removal to this court was filed on April 1, 2016. (Doc. 1.) On December 27, 2016, with leave of court, (Doc. 56), Plaintiff filed a Second Amended Complaint to substitute a

- 3 -

defendant. (Second Amended Complaint ("Second Am. Compl.") (Doc. 57).) In the Second Amended Complaint, Plaintiff brings claims against Medical Defendants for medical malpractice, violations of 42 U.S.C. § 1983, negligence, negligent supervision, false imprisonment, and torture and intentional infliction of emotional distress. (Id.) On January 9, 2017, Medical Defendants answered Plaintiff's Second Amended Complaint. (Doc. 61.) On February 22, 2017, Medical Defendants filed a Motion for Partial Judgment on the Pleadings, seeking dismissal of Plaintiff's medical malpractice claim for failure to comply with Rule 9(j) of the North Carolina Rules of Civil Procedure and failure to allege certain claims against certain defendants. (Doc. 63.) This court denied that motion on September 20, 2017. (Doc. 87.)

On December 14, 2018, this court approved the Amended Joint Rule 26(f) Report, (Doc. 99), prepared by the parties, (Doc. 101). Discovery was scheduled to close on July 10, 2019. (Id.). On December 3, 2019, the parties filed a Joint Motion for Extension of Time to Complete Discovery, (Doc. 107), which this court granted in part, extending discovery until March 16, 2020. (Text Order 02/25/2020.) Plaintiff filed a Consent Motion for Extension of Time to Complete Discovery on March 13, 2020, (Doc. 111), which this court granted, (Text Order 03/23/2020.) Discovery closed on June 15, 2020. (Id.)

- 4 -

Following the close of discovery, Medical Defendants filed the instant Motion and Memorandum for Summary Judgment, (Docs. 123, 124), on July 6, 2020. Plaintiff filed a response on July 30, 2020, (Pl.'s Resp. to Med. Defs.' Mot. for Summ. J. ("Pl.'s Resp.") (Doc. 137)), and Medical Defendants filed a reply on August 10, 2020, (Med. Defs.' Reply in Supp. of Mot. for Summ. J. ("Med. Defs.' Reply") (Doc. 144)).

On August 10, 2020, Medical Defendants filed a related Motion to Strike, (Doc. 142), and Memorandum, (Med. Defs.' Mem. in Supp. of Mot. to Strike Affidavit of Michael Teal ("Med. Defs.' Mot. to Strike Br.") (Doc. 143)). Plaintiff responded on August 31, 2020, (Pl.'s Opp'n to Med. Defs.' Mot. to Strike ("Pl.'s Resp. to Mot. to Strike") (Doc. 153)), and Medical Defendants replied on September 2, 2020, (Reply in Supp. of Med. Defs.' Mot. to Strike ("Med. Defs.' Reply in Supp. of Mot. to Strike") (Doc. 156)).

On March 2, 2021, Medical Defendants filed a Motion for Relief from Local Rule 83.1(d)(2), (Doc. 169), which the court denied on March 3, 2021. (Doc. 170 at 2.) This court also ordered the parties to "stand down from the presently scheduled trial preparation deadlines," and ordered the Clerk to set a scheduling and status conference in this matter after April 1, 2021. (Id. at 1.) This court ordered that the trial not commence

- 5 -

on April 5, 2021, as scheduled, but instead, for a date at least 30 days thereafter. (Id.)

## C. **Factual Background**

A majority of the facts are described here, but additional relevant facts will be addressed as necessary throughout the opinion. The majority of facts are not disputed, and any material factual disputes will be specifically addressed in the relevant analysis. The facts described in this summary are taken in a light most favorable to Plaintiff. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

Plaintiff was diagnosed with aortic stenosis, a heart condition, at birth. ((Ex. 8, Excerpts from the Dep. of David Ray Gunter ("Gunter Dep.") (Doc. 124-8) at 6.)[1] To address the condition, Plaintiff's aortic valve was replaced with a mechanical heart valve ("MHV") when he was fifteen years old. (Id. at 7.) Because patients with an MHV have a higher risk for a blood clot compared to a person without an MHV, (Dep. of Virginia Glover Yoder ("Yoder Dep. Part II") (Doc. 172-1) at

---

[1] All citations in this Memorandum Opinion and Order to documents filed with the court refer to the page numbers located at the bottom right-hand corner of the documents as they appear on CM/ECF.

56), individuals with an MHV are treated with Coumadin,[2] which thins their blood and reduces the risk of clotting, (Dep. of Virginia Glover Yoder ("Yoder Dep. Part I") (Doc. 172) at 78). At the same time, too much Coumadin can create a risk of bleeding, as thin blood lacks clotting factors. (Id.) Providers monitor a patient's "INR" level, which indicates the blood's bleeding time, thickness, and clotting factors. (See id. at 82.) A patient's INR can vary, and medical providers must monitor a patient's INR regularly and adjust their medication, as needed. (See id. at 77-78.) Through medication and monitoring, the goal of Coumadin therapy is to maintain a therapeutic INR level, which is defined as being between 2.5 and 3.5. (Ex. 6, Excerpts from the Dep. of Manuel Maldonado ("Maldonado Dep.") (Doc. 124-6) at 3.) A patient's diet, alcohol use, and smoking habits can affect a patient's INR level. (Yoder Dep. Part I (Doc. 172) at 117.)

Plaintiff has been taking Coumadin since he was 15 years old. (Gunter Dep. (Doc. 124-8) at 7.) At the time he was incarcerated at the Davie and Stokes County jails, Plaintiff was 37 years old. (See id. at 5.) Plaintiff typically took Coumadin

---

[2] Coumadin is the brand name and Warfarin is the generic name for the same medication, and the names are used interchangeably in this opinion. (See Med. Defs.' Br. (Doc. 124) at 4 n.1.)

once per day in the evening. (See id. at 11.) In 2012, Plaintiff was being treated by Virginia Yoder, PharmD at the Coumadin Clinic in Forsyth County, but on May 29, 2012, Dr. Yoder discharged Plaintiff from the clinic for failing to show up for his appointments. (Doc. 124-11) at 2; see also Yoder Dep. Part II (Doc. 172-1) at 55-56.)

Dr. Yoder's general practice is to give patients a thirty-day prescription with two refills. (Yoder Dep. Part I (Doc. 172) at 135.) Plaintiff's prescribed dosage prior to his incarceration is not known but was likely 6 or 7 milligrams daily. (See id. at 144; Doc. 124-3 at 4.) After his discharge from Dr. Yoder's clinic, Plaintiff was able to use his Coumadin prescription from Dr. Yoder to obtain thirty 5 mg pills and thirty 1 mg pills on June 25, July 24, and August 23. (Doc. 124-12 at 2-3.) Consistent with Dr. Yoder's practice, Plaintiff's prescription expired after the August 23 refill. (Id.) On October 22, 2012, Plaintiff sought a refill of his 5 mg prescription, but it was denied because he was no longer a patient of the Coumadin Clinic where Dr. Yoder was a practitioner. (See Doc. 124-13 at 3.) On October 19, 2012, Plaintiff obtained thirty 1 mg pills of Coumadin from the pharmacy. (Doc. 124-12 at 4.)

Plaintiff was arrested on November 6, 2012, in Forsyth County on a bench warrant, and after one night at the Forsyth County jail, Plaintiff was transferred to the Davie County jail on November 7, 2012.[3] At 8:00 a.m. on November 7, 2012, upon his arrival at Davie County jail, Plaintiff was screened by Defendant Jackson. (Doc. 124-1 at 6.) Plaintiff told Defendant Jackson that he had heart problems and took Coumadin, which she noted in his medical record. (Id. at 6-7.) Plaintiff's medical records indicate that he told Defendant Jackson that he would have his medications brought to the jail if he was not released. (Id. at 7.)

Plaintiff was not released on November 7, 2012, and on November 8 at 9:40 a.m., Defendant Jackson noted in the medical records that she contacted his primary care physician and pharmacy to verify the information Plaintiff had provided about his medication and conditions. (Id.) Defendant Jackson's notes in the medical records indicate that Plaintiff's last filled his prescription for 1 mg of Coumadin on October 19, 2012, and that he did not have any refills remaining. (Id.) Defendant Jackson

---

[3] Both parties address this fact as though it is not disputed, (see Med. Defs.' Br. (Doc. 124) at 6-7; Pl.'s Resp. (Doc. 137) at 4), although there is no citation to an affidavit, deposition, or other necessary evidentiary foundation as required by Rule 56. Nevertheless, in the absence of any dispute or objection, the court will treat the fact as undisputed.

contacted Maplewood Family Practice, which Plaintiff had indicated was where his primary care physician worked. (Id.) Maplewood Family Practice indicated that they had last seen Plaintiff in June 2012 for a sick visit, but they had last managed Plaintiff's INR levels in 2010. (Id.) Defendant Jackson's notes do not indicate that she was aware of any medical practitioner who had been managing Plaintiff's Coumadin medication between 2010 and 2012. (Id.)

On November 8, 2012, following her conversation with Plaintiff, Defendant Jackson consulted with Defendant Maldonado, who ordered a prescription for 5 mg of Coumadin and for Plaintiff to have an INR check on November 13, 2012. (Id. at 2, 7.) Plaintiff received 5 mg of Coumadin each day on November 9 through November 14, 2012. (Id. at 11.) Plaintiff did not receive any Coumadin on November 7 or 8. (Id.)

Later in the day on November 8, 2012, Plaintiff's family delivered two 5 mg pills and four 1 mg pills in bottles labeled as Coumadin to the Davie County jail. (Id. at 14.) The pills

arrived after Defendant Jackson had left, and Plaintiff was not dispensed this medication while at the Davie County jail.[4]

On Tuesday, November 13, 2012, Plaintiff was transported to the hospital for an INR test, which showed that Plaintiff's INR levels were 1.07. (Id. at 12.) Defendant Jackson notified Defendant Maldonado of the INR test result, and Defendant Maldonado ordered that Plaintiff's dosage be increased to 7.5 mg for Thursday, November 15; Saturday, November 17; and Monday, November 19, and remain at 5 mg on Tuesday, November 13; Wednesday, November 14; Friday, November 16; and Sunday, November 18. (Id. at 2.) Defendant Jackson gave Plaintiff his medication according to this schedule on November 13-15. (Id. at 11.)

On November 15, 2012, Defendant Jackson completed a "Medical Information Transfer Form" summarizing Plaintiff's medical condition and indicating the medication plan. (Id. at 13.) On Friday, November 16, 2012, Plaintiff was transferred to the Stokes County jail. (Doc. 124-5 at 11.) Plaintiff arrived at

---

[4] Medical Defendants assert this in their brief, but there is no accurate citation to an affidavit, deposition, or other necessary evidentiary foundation as required by Rule 56. (Med. Defs.' Br. (Doc. 124) at 8). Plaintiff does not contest this fact. (See Pl.'s Resp. (Doc. 137) at 5.) In the absence of any dispute or objection, the court will treat the fact as undisputed.

the jail in the afternoon after Defendant Hunt, the nurse, had left for the day. (Id. at 9-10.) Defendant Hunt was not scheduled to return until Monday, November 19, 2012. (Id. at 15-16.) Plaintiff did not receive any Coumadin until November 19, 2012, when Defendant Hunt returned. (Id.; Doc. 137-11 at 4.) Officers at the jail called Defendant Hunt about the pills Plaintiff's family had previously brought to the Davie County jail, but Plaintiff was not permitted to take the medication because the pills were expired. (Doc. 124-5 at 14.) When Defendant Hunt returned to work on Monday, she learned about Defendant Maldonado's order for Coumadin, and arranged for Plaintiff to receive his Coumadin doses on Monday, November 19, and Tuesday, November 20. (Id. at 15-16; Doc. 137-11 at 4.)

Plaintiff was released from Stokes County jail on Wednesday, November 21, 2012.[5] Upon his release, Plaintiff possessed only the six Coumadin pills his family had brought to the jail, which were insufficient to maintain a dosage of 6 or 7

---

[5] Both parties address this fact as though it is not disputed, (see Med. Defs.' Br. (Doc. 124) at 9; Pl.'s Resp. (Doc. 137) at 6), although there is no citation to an affidavit, deposition, or other necessary evidentiary foundation as required by Rule 56. Nevertheless, in the absence of any dispute or objection, the court will treat the fact as undisputed.

- 12 -

mg for more than two days.[6] Plaintiff went to Walgreens on November 25, 2012, where he obtained thirty 1 mg pills. (Doc. 124-12 at 4.)

On November 29, 2012, Plaintiff was admitted to Wake Forest Baptist Medical Center for a blood clot. (Doc. 124-17 at 2.) Plaintiff's medical record from his admission states that he began experiencing abdominal pain two days before seeking admission. (Id. at 2-3.) At the time of admission, his INR level was 1.7, and his medical record indicates that he had been "off of his Coumadin since earlier [in the] week." (Id. at 5.) Plaintiff was discharged from the hospital on December 11, 2012, with a therapeutic INR of 3.16. (Id. at 4.) At that time, the clot had been surgically removed, his organs were viable, and there was no medical need for a bowel resection. (Id. at 3-4.)

Plaintiff's INR levels were tested five times between December 14, 2012, and January 2, 2013, and were sub-therapeutic on four of the five tests, including on December 14, 2012, three days after his release from the hospital. (See Doc. 124-18 at 2.) On January 18, 2013, Plaintiff was diagnosed with a second

---

[6] Medical Defendants assert this in their brief, but there is no accurate citation to an affidavit, deposition, or other necessary evidentiary foundation as required by Rule 56. (Med. Defs.' Br. (Doc. 124) at 10). Plaintiff does not contest this fact. (See Pl.'s Resp. (Doc. 137) at 6-7.) In the absence of any dispute or objection, the court will treat the fact as undisputed.

- 13 -

blood clot, which required surgeons to resection part of
Plaintiff's bowel. (Dep. of Damian A. Laber, M.D. ("Laber Dep.")
(Doc. 174) at 121.)[7]

## II.  **STANDARD OF REVIEW**

"Under the familiar <u>Erie</u> doctrine, [courts] apply state
substantive law and federal procedural law when reviewing state-
law claims." <u>Kerr v. Marshall Univ. Bd. of Governors</u>, 824 F.3d
62, 74 (4th Cir. 2016). "[W]hether there is sufficient evidence
to create a jury issue of those essential substantive elements
of the action, as defined by state law, is controlled by federal
rules." <u>Fitzgerald v. Manning</u>, 679 F.2d 341, 346 (4th Cir.
1982).

Summary judgment is appropriate when "there is no genuine
dispute as to any material fact and the movant is entitled to
judgment as a matter of law." Fed. R. Civ. P. 56(a); <u>see</u> <u>Celotex</u>
<u>Corp. v. Catrett</u>, 477 U.S. 317, 322–23 (1986). This court's
summary judgment inquiry is whether the evidence "is so one-
sided that one party must prevail as a matter of law." <u>Anderson</u>

---

[7] Medical Defendants assert this in their brief, but there
is no accurate citation to an affidavit, deposition, or other
necessary evidentiary foundation as required by Rule 56. (Med.
Defs.' Br. (Doc. 124) at 10). Plaintiff does not contest this
fact. (<u>See</u> Pl.'s Resp. (Doc. 137).) In the absence of any
dispute or objection, the court will treat the fact as
undisputed.

- 14 -

v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986). The moving party bears the initial burden of demonstrating "that there is an absence of evidence to support the nonmoving party's case." Celotex Corp., 477 U.S. at 325. If the "moving party discharges its burden . . ., the nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." McLean v. Patten Cmtys., Inc., 332 F.3d 714, 718-19 (4th Cir. 2003) (citing Matsushita Elec. Indus. Co., 475 U.S. at 586-87). Summary judgment should be granted "unless a reasonable jury could return a verdict in favor of the nonmoving party on the evidence presented." Id. at 719 (citing Liberty Lobby, 477 U.S. at 247-48).

When considering a motion for summary judgment, courts must "construe the evidence in the light most favorable to . . . the non-moving party. [Courts] do not weigh the evidence or make credibility determinations." Wilson v. Prince George's Cnty., 893 F.3d 213, 218-19 (4th Cir. 2018) (internal citations omitted).

## III. **ANALYSIS**

### A. **Medical Defendants' Motion to Strike**

In support of Plaintiff's response to Medical Defendants' motion for summary judgment, Plaintiff attached the Affidavit of Michael Teal ("Teal Affidavit"). (Pl.'s Resp., Ex. 15 ("Teal

Affidavit") (Doc. 137-15).) Medical Defendants move to strike
the affidavit. (Doc. 142.) Plaintiff argues in his response to
the motion to strike that Dr. Teal's testimony rebuts Medical
Defendants' asserted affirmative defenses "by explaining the
proper interpretation of Plaintiff's pharmacy records." (Pl.'s
Resp. to Mot. to Strike (Doc. 153) at 1.) Because "[a] party
asserting that a fact cannot be or is genuinely disputed must
support the assertion by . . . citing to particular parts of
materials in the record, including . . . affidavits," Fed. R.
Civ. P. 56(c)(1)(A), this court accordingly considers Medical
Defendants' motion to strike as an initial matter.

Medical Defendants argue that the Teal Affidavit should be
struck for several reasons. First, Medical Defendants argue that
Dr. Teal "is not an expert witness," and "has no personal
knowledge of Plaintiff," and that his testimony "includes
inadmissible hearsay as Mr. Teal admits he consulted with
unnamed colleagues." (Med. Defs.' Mot. to Strike Br. (Doc. 143)
at 2.) Medical Defendants argue that to include his affidavit
would violate Federal Rules of Evidence 801, 802, and 803. (Id.)

Second, Medical Defendants argue that inclusion of the
affidavit violates Federal Rule of Civil Procedure 37(c), (id.),
which states that "[i]f a party fails to . . . identify a
witness as required by Rule 26(a) or (e), the party is not

- 16 -

allowed to use that . . . witness to supply evidence on a motion
. . . unless the failure was substantially justified or is
harmless." Fed. R. Civ. P. 37(c)(1). Medical Defendants argue,
and Plaintiff does not contest, that Dr. Teal was not identified
as a witness during discovery, in violation of Federal Rule of
Civil Procedure 26(a). (Med. Defs.' Mot. to Strike Br. (Doc.
143) at 2; see Pl.'s Resp. to Mot. to Strike (Doc. 153).)
Medical Defendants argue that the affidavit is prejudicial
because they did not have an opportunity to depose or challenge
Dr. Teal's testimony and that Plaintiff has not offered a
justification or sought court approval to include the affidavit
after failing to identify Dr. Teal as a witness during
discovery. (Med. Defs.' Mot. to Strike Br. (Doc. 143) at 2-3.)

    Plaintiff argues that a district court's decision in
Syngenta Crop Protection, LLC v. Willowood, LLC, No. 1:15-CV-
274, 2017 WL 3309699 (M.D.N.C. Aug. 2, 2017), counsels denying
Medical Defendants' motion. (Pl.'s Resp. to Mot. to Strike (Doc.
153) at 1-2.) Applying the factors used in Syngenta, Plaintiff
argues that the Teal Affidavit does not present any previously
undisclosed evidence. (Id. at 2.) Plaintiff argues that Medical
Defendants "had the ability and opportunity through counter
affidavits to take issue with Dr. Teal's conclusions or

citations to entries in the pharmacy records," but instead, chose to file the instant motion. (Id.)

Moreover, Plaintiff argues that Medical Defendants' actions necessitated the inclusion of the Teal Affidavit, asserting that Medical Defendants provided witnesses with an "unauthenticated (and incorrect) summary" of the pharmacy records and questioned several witnesses about this summary during depositions. (Id. at 3.) Plaintiff argues that the Teal Affidavit is submitted "solely" to rebut Medical Defendants' affirmative defense that Plaintiff was contributorily negligent in failing to take his medication regularly, (id. at 5), as Plaintiff argues that the Teal Affidavit "demonstrate[s] that Plaintiff continued to have a sufficient and timely supply of warfarin in the weeks and months prior to his arrest . . . ." (Id.) Because it is used solely for this purpose, "Plaintiff has not violated any Rule or Order relating to the disclosure of witnesses." (Id.)

This court disagrees. In Southern States Rack and Fixture, Inc. v. Sherwin-Williams Co., the Fourth Circuit held that, when determining whether information or witnesses should be excluded under Rule 37(c), courts must consider:

> (1) the surprise to the party against whom the evidence would be offered; (2) the ability of that party to cure the surprise; (3) the extent to which allowing the testimony would disrupt the trial; (4) the importance of the evidence; and (5) the

- 18 -

nondisclosing party's explanation for its failure to
disclose the evidence.

318 F.3d 592, 597 (4th Cir. 2003) (internal quotations omitted).

The first four factors of this test "relate primarily to the

harmlessness exception, while the last factor, addressing the

party's explanation for its nondisclosure, relates mainly to the

substantial justification exception." Bresler v. Wilmington Tr.

Co., 855 F.3d 178, 190 (4th Cir. 2017). Applying these factors,

this court finds that Plaintiff's failure to disclose Dr. Teal

as a witness is neither substantially justified nor harmless.

### 1. __Plaintiff's failure to disclose is not substantially justified__

Plaintiff argues that the Teal Affidavit is necessary to

rebut Medical Defendants' affirmative defense that Plaintiff was

contributorily negligent in failing to take his medication

regularly. (Pl.'s Resp. to Mot. to Strike (Doc. 153) at 4.) Yet,

Plaintiff had notice long before the close of discovery on

June 15, 2020, that Medical Defendants intended to argue that

Plaintiff was contributorily negligent based on the pharmacy

records.

For example, Plaintiff's counsel received the pharmacy

records at issue by correspondence on September 20, 2017. (Doc.

156-1 at 1-2.) Moreover, Medical Defendants served their expert

report of Dr. Julie M. Sease on October 18, 2019, in which

- 19 -

Dr. Sease opined that, based on the prescription records she had reviewed, Plaintiff "most likely ran out of his Warfarin 5 mg tablets around the end of September 2012 or at least by mid-October when he called requesting a refill of those tablets," and as a result, "it is most likely that Mr. Gunter's INR value was subtherapeutic for a number of weeks before he was ever under the care of Southern Health Partners." (Doc. 156-2 at 3.) Despite Plaintiff's awareness of Medical Defendants' use of the testimony and pharmacy records, Plaintiff did not supplement his disclosures or discovery to include Dr. Teal as a witness. (Med. Defs.' Reply in Supp. of Mot. to Strike (Doc. 156) at 3.)

As the court found in Syngenta, Medical Defendants were "entitled to rely on [the plaintiff]'s disclosures as to who its witnesses were likely to be." 2017 WL 3309699, at *4. Indeed, in Hoyle v. Freightliner, LLC, the Fourth Circuit upheld a district court's decision to exclude a newly disclosed witness even where there were references to the witness in deposition testimony and discovery responses, because the new witness had not been identified in response to discovery requests that expressly sought identification of potential witnesses. 650 F.3d 321, 329-30 (4th Cir. 2011). Here, as in Hoyle, Plaintiff failed to identify Dr. Teal as a potential witness, despite knowing far before the close of discovery that Plaintiff might seek to

introduce Dr. Teal's testimony to rebut Medical Defendants' argument. For these reasons, Plaintiff's explanation for why it failed to disclose Dr. Teal's testimony is unpersuasive, and this court finds that Plaintiff's failure is not substantially justified under Rule 37(c)(1).

## 2. **Plaintiff's failure to disclose is not harmless**

This court further finds that Plaintiff's failure to disclose is not harmless. Under the first factor identified in Southern States, 318 F.3d at 597, Dr. Teal's affidavit is a surprise to Medical Defendants, as Plaintiff did not identify Dr. Teal in his Rule 26 disclosures or in response to Medical Defendants' interrogatory in which they requested Plaintiff identify his witnesses. (Med. Defs.' Reply in Supp. of Mot. to Strike (Doc. 156) at 2.)

Courts have discretion under Rule 37(c) to determine appropriate sanctions, including excluding the evidence, "payment of the reasonable expenses . . . caused by the failure," "inform[ing] the jury of the party's failure," or "impos[ing] other appropriate sanctions . . . ." Fed. R. Civ. P. 37(c)(1)(A)-(C). Here, to cure the surprise to Medical Defendants, this court considered requiring Plaintiff to produce Dr. Teal for deposition at a place selected by Medical Defendants and at Plaintiff's expense, reopening discovery,

- 21 -

informing the jury at any trial of Plaintiff's failure to timely disclose Dr. Teal as a witness, or a combination of these sanctions. Yet, each of these alternative sanctions would have serious negative consequences.

First, as the court found in Syngenta, 2017 WL 3309699, at *5, and as Medical Defendants argue, (Med. Defs.' Reply in Supp. of Mot.to Strike (Doc. 156) at 2), affidavits are of limited value and do not allow the parties to evaluate a witness's demeanor, which is an important aspect of credibility, or to identify weaknesses or gaps in the affidavit. Second, this matter has already been delayed several times due to extensions requested by the parties. Reopening discovery would further delay resolution of this matter. Third, notwithstanding this court's decision to grant Medical Defendants' motion for summary judgment in part, see discussion infra Section III.B., if the remaining claims were to go to trial, "an instruction to the jury is likely to interject additional confusing issues related to discovery into the trial." Syngenta Crop Protection, 2017 WL 3309699 at *5. None of these alternatives would address the harm to Medical Defendants arising from its reliance on Plaintiff's pretrial disclosures in formulating its trial and discovery strategy.

- 22 -

For the reasons stated therein, this court finds that Dr. Teal's affidavit is neither harmless nor substantially justified under Rule 37(c) or the factors indicated by the Fourth Circuit in Southern States. Accordingly, this court will grant Medical Defendants' motion to strike.

**B.    Medical Defendants' Motion for Summary Judgment**

Having considered Medical Defendants' motion to strike, this court will now consider Medical Defendants' motion for summary judgment.

### 1.    Plaintiff's State Law Claims

#### a.    Medical Malpractice

Medical Defendants first move for summary judgment as to Plaintiff's Medical Malpractice claim. (Med. Defs.' Br. (Doc. 124) at 12-19; see also Pl.'s Second Am. Compl. (Doc. 57) ¶¶ 213-20.)

Under North Carolina law, a plaintiff must show: "(1) the applicable standard of care; (2) a breach of such standard of care by the defendant; (3) the injuries suffered by the plaintiff were proximately caused by such breach; and (4) the damages resulting to the plaintiff." Weatherford v. Glassman, 129 N.C. App. 618, 621, 500 S.E.2d 466, 468 (1998). Medical Defendants argue that Plaintiff has failed to establish the

- 23 -

necessary elements for medical malpractice against any of the
Medical Defendants. (Med. Defs.' Br. (Doc. 124) at 12.)

### i.  Duty of Care Owed to Plaintiff

Plaintiff argues that Medical Defendants owed two duties of
care to Plaintiff: (1) a duty to "act in accordance with the
customary practice of other similarly situated health care
professionals," under N.C. Gen. Stat. § 90-21.12(a); and (2) the
"standard of care specific to medical care for inmates," under
N.C. Gen. Stat. § 153A-225(a). (Pl.'s Resp. (Doc. 137) at 11.)
Plaintiff argues that medical experts opined that Medical
Defendants breached both duties. (Id. at 11-12).

This court finds that, contrary to Plaintiff's assertions,
Medical Defendants did not owe a statutory duty to Plaintiff
pursuant to N.C. Gen. Stat. § 153A-225(a). Under the statute,
"[e]ach unit that operates a local confinement facility shall
develop a plan for providing medical care for prisoners in the
facility." N.C. Gen. Stat. § 153A-225(a) (emphasis added). North
Carolina courts have found that the statute creates a
nondelegable duty on sheriffs operating county jails to provide
medical services to jail inmates. See, e.g., State v. Wilson,
183 N.C. App. 100, 104, 643 S.E.2d 620, 623 (2007) (emphasis
added). This court does not find precedent in North Carolina
law, nor does Plaintiff identify such precedent, for the

- 24 -

proposition that an agent of the State can be held liable for the State's nondelegable duty. Moreover, this court does not find that Medical Defendants, as agents of the State, can be held liable for any possible breach of N.C. Gen. Stat. § 153A-225(a) in this action against Medical Defendants.

Accordingly, this court will consider only whether the evidence presented creates a genuine dispute of material fact as to whether Medical Defendants committed medical malpractice in violation of their statutory duty under N.C. Gen. Stat. § 90-21.12(a).

### ii. __Breach of the Standard of Care__

Medical Defendants argue that the expert testimony does not establish that Medical Defendants breached the accepted standard of medical care owed to Plaintiff. (Med. Defs.' Br. (Doc. 124) at 12-15.)

Under N.C. Gen. Stat. § 90-21.12(a), a defendant health care provider shall not be found to have breached the standard of care unless "the action or inaction of such health care provider was not in accordance with the standards of practice among similar health care providers situated in the same or similar communities under the same or similar circumstances . . . ." N.C. Gen. Stat. § 90-21.12(a). Under North Carolina law, "[p]laintiffs must establish the relevant standard of care

- 25 -

through expert testimony." Hawkins v. SSC Hendersonville Operating Co., 202 N.C. App. 707, 710, 690 S.E.2d 35, 38 (2010), writ denied, review denied, 365 N.C. 87, 706 S.E.2d 248 (2011) (internal quotations omitted).

Ordinarily, an expert who testifies as to the applicable standard of care under N.C. Gen. Stat. § 90-21.12 must qualify as an expert under North Carolina Rule of Evidence 702. See Wood v. United States, 209 F. Supp. 3d 835, 842 (M.D.N.C. 2016) (noting that claims raising a North Carolina medical malpractice claim must comply with North Carolina Rule of Civil Procedure 9(j), which in turn requires an expert to qualify under Rule 702). Compliance with the expert witness requirement "is a substantive element of a medical malpractice claim" under North Carolina law. Lauer v. United States, Civil No. 1:12cv41, 2013 WL 566124, at *3 (W.D.N.C. Feb. 13, 2013) (citing Camalier v. Jeffries, 340 N.C. 699, 460 S.E.2d 133 (1995)). Because this court must consider state substantive law when considering state law claims, Kerr, 824 F.3d at 74, this court must determine whether the witness testimony complies with North Carolina Rule of Evidence 702. See, e.g., Huntley v. Crisco, No. 1:18-CV-744, 2020 WL 4926636, at *3-4 (M.D.N.C. Aug. 21, 2020) (analyzing whether the expert witness's testimony was compliant with North

Carolina Rule of Evidence 702); <u>Wood</u>, 209 F. Supp. 3d at 842 (same).

Rule 702(d) states that a physician "who by reason of active clinical practice . . . has knowledge of the applicable standard of care for nurses . . . or other medical support staff may give expert testimony in a medical malpractice action with respect to the standard of care of which he is knowledgeable." N.C. Gen. Stat. § 8C-1, Rule 702(d). "Although it is not necessary for the witness . . . to have actually practiced in the same community as the defendant, the witness must demonstrate that he is familiar with the standard of care in the community where the injury occurred, or the standard of care in similar communities." <u>Billings v. Rosenstein</u>, 174 N.C. App. 191, 194, 619 S.E.2d 922, 924 (2005) (internal citations omitted).

The North Carolina Court of Appeals[8] has clarified that "the plain language" of N.C. Gen. Stat. § 90-21.12 indicates that the

---

[8] This court must apply the jurisprudence of North Carolina's highest court. <u>See</u> <u>Private Mortg. Inv. Servs., Inc. v. Hotel & Club Assocs., Inc.</u>, 296 F.3d 308, 312 (4th Cir. 2002). Although courts "defer to a decision of the state's intermediate appellate court to a lesser degree than [they] do to a decision of the state's highest court," courts still "do defer" and "a federal court must present persuasive data when it chooses to ignore a decision of a state intermediate appellate court that is directly on point." <u>Assicurazioni Generali, S.p.A. v. Neil</u>, 160 F.3d 997, 1002 (4th Cir. 1998) (internal citations and quotations omitted).

- 27 -

"similar community" standard is not a statewide standard, <u>Henry</u> <u>v. Se. OB-GYN Assocs., P.A.</u>, 145 N.C. App. 208, 212, 550 S.E.2d 245, 248 (2001), and that "the concept of an applicable standard of care encompasses more than mere physician skill and training; rather, it also involves the physical and financial environment of a particular medical community," <u>id.</u> at 211, 550 S.E.2d at 247.

For example, in <u>Henry</u>, the court found that the expert's testimony did not establish that there was a breach of the standard of care because "the record indicate[d] [the medical expert] failed to testify in any instance that he was familiar with the standard of care in Wilmington or similar communities," and that "there [was] no evidence in the record that the standard of care practiced in Wilmington is the same standard that prevails in Durham or Chapel Hill, or that these communities are the 'same or similar.'" <u>Id.</u> at 210, 550 S.E.2d at 246-47. Similarly, in <u>Smith v. Whitmer</u>, the court held that an expert did not testify as to a breach of the standard of care because although the doctor "stated that he was familiar with a uniform or national standard of care, there was no evidence that a national standard of care is the same standard of care practiced in defendants' community." 159 N.C. App. 192, 197, 582 S.E.2d 669, 673 (2003).

- 28 -

There is no particular method by which a medical expert must become familiar with a given community. Grantham ex rel. Tr. Co. of Sterne, Agee & Leach, Inc. v. Crawford, 204 N.C. App. 115, 119, 693 S.E.2d 245, 248 (2010). Book and internet research "may be [] perfectly acceptable," id., 693 S.E.2d at 249, so long as the expert "demonstrate[s] specific familiarity with and expresse[s] unequivocal opinions regarding the standard of care," Crocker v. Roethling, 363 N.C. 140, 146, 675 S.E.2d 625, 630 (2009). An expert is not required "to have actually practiced in the community in which the alleged malpractice occurred, or even to have practiced in a similar community." Id. at 151, 675 S.E.2d at 633; see also Huntley, 2020 WL 4926636, at *4 (finding that the expert witness had "extensive experience working in correctional medicine," and that "[w]hile his experience has principally been in larger correctional facilities, it is in the same field of correctional medicine as is at issue here").

During discovery, Plaintiff presented four experts to present expert testimony regarding whether each of the Medical Defendants breached the applicable standard of care: Tammy Banas, Virginia Yoder, Raymond Mooney, and Damien Laber. Tammy Jo Banas is a Registered Nurse in North Carolina who holds a Bachelor of Science in Nursing. (Dep. of Tammy Jo Banas ("Banas

- 29 -

Dep.") (Doc. 171) at 32, 46-48.) Virginia Glover Yoder is a Doctor of Pharmacy who works in a Pharmacy Care Clinic in North Carolina where she manages patients' Coumadin treatment. (Yoder Dep. Part I (Doc. 172) at 5, 53.) Raymond P. Mooney is a Physician's Assistant. (Dep. of Raymond P. Mooney ("Mooney Dep. Part I") (Doc. 173) at 8.) Damien Laber is a Medical Doctor who works at the Moffitt Cancer Center in Tampa, Florida, who specializes in hematology and oncology. (Laber Dep. (Doc. 174) at 22, 24-25.)

Plaintiff argues that these experts "opined as to multiple breaches of the standard of care by the Medical Defendants," including "failure to timely administer anticoagulant testing and medication, failure to communicate Plaintiff's medical needs to a physician/physician assistant, mis-documenting of INR testing levels, the failure to order/administer anticoagulant bridge therapy, failure to ensure continuity of care for the chronic condition, and the failure to conduct proper discharge planning." (Pl.'s Resp. (Doc. 137) at 11-12.) Medical Defendants argue that the experts' testimony does not create a genuine issue of material as to whether Medical Defendants' conduct breached the applicable standard of care. (Med. Defs.' Br. (Doc. 124) at 12-15.) This court addresses the expert testimony regarding each of the Medical Defendant's conduct, in turn.

- 30 -

## (a)  **Defendant Hunt**

This court finds that Plaintiff has not presented evidence through expert testimony that Defendant Hunt breached the standard of care. Ms. Banas, when asked as to whether she had an opinion as to whether Defendant Hunt breached the standard of care, answered, "No." (Banas Dep. (Doc. 171) at 110.) Although Ms. Banas expressed, referring to Defendant Hunt's conduct, that "it's unfortunate for the patient" that someone could be "in a jail on a Friday and not have a nurse available until a Monday," Ms. Banas ultimately agreed with counsel that Defendant Hunt "handled that the way it should be handled." (Id.)

Dr. Yoder and Dr. Laber declined to provide an opinion as to whether Defendant Hunt breached the standard of care for nurses. (Yoder Dep. Part II (Doc. 172-1) at 94; Laber Dep. (Doc. 174) at 108.) Similarly, Mr. Mooney stated that he would opine only as to whether Defendant Maldonado breached the standard of care. (Mooney Dep. Part II (Doc. 173-1) at 50.)

Because "[o]ne of the essential elements of a claim for medical negligence is that the defendant breached the applicable standard of medical care owed to the plaintiff," Hawkins, 202 N.C. App. at 710, 690 S.E.2d at 38 (internal citation omitted), and none of the experts opined that Defendant Hunt breached the duty of care, this court finds that a reasonable jury could not

- 31 -

return a verdict in favor of Plaintiff on the evidence presented. See McLean, 332 F.3d at 719. Accordingly, this court will grant Medical Defendant's motion for summary judgment regarding Plaintiff's medical malpractice claim against Defendant Hunt.

### (b) **Defendant Junkins**

This court finds that Plaintiff has not presented evidence through expert testimony that Defendant Junkins breached the standard of care owed to Plaintiff. Dr. Laber did not offer an opinion as to whether Defendant Junkins breached the standard of care, stating, "I don't know his role." (Laber Dep. (Doc. 174) at 108.) Similarly, when asked whether Defendant Junkins breached the standard of care, Mr. Mooney stated, "I don't even know who he is." (Mooney Dep. Part II (Doc. 173-1) at 51.) Neither Ms. Banas nor Dr. Yoder were asked directly about whether they had an opinion about Defendant Junkins' conduct. (See Banas Dep. (Doc. 171); Yoder Dep. Part I (Doc. 172); Yoder Dep. Part II (Doc. 172-1).)

Accordingly, this court finds that a reasonable jury could not return a verdict in favor of Plaintiff on the evidence presented, see McLean, 332 F.3d at 719, and will grant Medical Defendant's motion for summary judgment with regard to Plaintiff's medical malpractice claim against Defendant Junkins.

- 32 -

### (c)  **Defendant SHP**

This court also finds that Plaintiff has not presented evidence through expert testimony that Defendant SHP violated a standard of care owed to Plaintiff. Ms. Banas indicated in her deposition that her "complaints" were only against Defendants Jackson and Hunt, and not against SHP. (Banas Dep. (Doc. 171) at 142.) When asked whether she was qualified or intended to give an opinion as to whether the SHP protocols used at the Davie and Stokes County jails met the standard of care, Dr. Yoder declined to state an opinion. (Yoder Dep. Part II (Doc. 172-1) at 96.) Similarly, Dr. Laber declined to state an opinion as to whether the process or procedure that was in place at Stokes and Davie County jails were adequate to obtain and dispense medications to inmates. (Laber Dep. (Doc. 174) at 114-15.) Finally, Mr. Mooney stated that he would offer an opinion only as to whether Defendant Maldonado breached the standard of care. (Mooney Dep. Part II (Doc. 173-1) at 51.)

Accordingly, this court finds that a reasonable jury could not return a verdict in favor of Plaintiff on the evidence presented, see McLean, 332 F.3d at 719, and will grant Medical Defendant's motion for summary judgment with regard to Plaintiff's medical malpractice claim against Defendant SHP.

- 33 -

**(d)  Defendant Jackson**

This court further finds that Plaintiff has not presented evidence through expert testimony that Defendant Jackson violated a standard of care owed to Plaintiff

Neither PA Mooney, (Mooney Dep. Part II (Doc. 173-1) at 51), Dr. Laber, (Laber Dep. (Doc. 174) at 108), nor Dr. Yoder, (Yoder Dep. Part II (Doc. 172-1) at 96), offered an opinion about Defendant Jackson's conduct. Only Ms. Banas opined whether Defendant Jackson breached the standard of care owed to Plaintiff, stating that,

> the standard of care would be to be able to communicate and give [Plaintiff] the proper care based on the medications and the needs that he had as a patient. Because of his heart valve, he needed certain medications and labs done that were not done. And that's just the standard of care for his diagnosis. Those are basic things that needed to be done.
>
> . . . .
>
> They didn't do it. They didn't do what was the basic standard of care for him. They knew that he had a mechanical valve, and the basic things that they should have done, they did not.

(Banas Dep. (Doc. 171) at 61.) Ms. Banas opined specifically that, based on her review of the medical records, Defendant Jackson was aware when Plaintiff arrived that Plaintiff had an MHV, that it is a "known fact" that individuals with an MHV must maintain a therapeutic INR level and that "there was no urgency" to obtain the medications necessary to maintain a therapeutic

- 34 -

INR level. (Id. at 82-83.) When asked to "identify . . . every way in which Nurse Jackson acted or failed to act that breached the standard of care," (id. at 104), Ms. Banas replied that, first, "[Defendant Jackson] did not start the medication on the evening of [November] 8th, and she had plenty of time to do that," (id.), and second, Defendant Jackson documented Plaintiff's INR levels as 1.7, when they were 1.07. (Id.) Ms. Banas stated that "whatever their agency is, however they get their medications, I feel like they did not communicate the needs to the doctor efficiently . . . ." (Id. at 83.)

Medical Defendants characterize Ms. Banas' testimony as "criticism" that does not rise to the level of a breach of the standard of care. (Med. Defs.' Br. (Doc. 124) at 13.) First, Medical Defendants argue that Ms. Banas "has never worked in a jail or a prison," (id.), and that Defendant Jackson "follows orders received from the physician assistant" because, as a nurse, she "does not have authority to diagnose patients or prescribe medication." (Id.) Medical Defendants also argue that, rather than acting inefficiently or slowly, when Defendant Jackson learned Plaintiff had not been released from the jail, "she sought [Plaintiff] out," and "had him sign the release form," "then contacted the providers, contacted PA Maldonado, received an order, called the order into the pharmacy, obtained

- 35 -

Coumadin the next day and had it dispensed to the Plaintiff the day it arrived." (Id. at 14.) Medical Defendants argue that this conduct is "sufficient and is certainly not a breach of the standard of care." Second, Medical Defendants argue that although Defendant Jackson incorrectly documented Plaintiff's INR levels, "[b]oth PA Maldonado and nurse Hunt testified that the typo on the form had no effect on Plaintiff's treatment." (Id.)

In response, Plaintiff argues that Ms. Banas' testimony establishes that Defendant Jackson breached the standard of care by failing to identify and communicate Plaintiff's medical needs to a physician in a timely manner and by mis-documenting Plaintiff's INR testing levels. (See Pl.'s Resp. (Doc. 137) at 11-12.)

This court finds that Plaintiff has not presented expert testimony from which a reasonable jury could conclude that Defendant Jackson breached a standard of care because Ms. Banas's testimony does not "demonstrate[] specific familiarity with and express[] unequivocal opinions regarding the standard of care" at Davie County jail. Crocker, 363 N.C. at 146, 675 S.E.2d at 630.

First, this court finds that Ms. Banas' personal experience cannot form the basis of her expertise, as Ms. Banas testified

- 36 -

that she has never worked in a jail, (Banas Dep. (Doc. 171) at 62), had education or experience with correctional nursing, (id.), or even been inside a jail, (id. at 70).

Second, this court finds that Ms. Banas did not indicate in her deposition testimony how she became familiar with the standard of care for correctional nursing. Although she indicates that she reviewed Plaintiff's medical records from his incarceration at the jails and from Wake Forest Baptist Medical Center, (id. at 32-33), Ms. Banas confirmed that she had not reviewed or was aware of "any standards, either by the state or national organizations, regarding correctional nursing," (id. at 80).

Third, this court finds that Ms. Banas was unfamiliar with basic aspects of jail operations, as well as the "physical and financial environment" of correctional medicine for pre-trial detainees in rural North Carolina jails. See Henry, 145 N.C. App. at 211, 550 S.E.2d at 247. Banas stated that she did not know if there was a difference between a jail and a prison. (Id. at 69.) Ms. Banas opined that she was unaware as to how Davie County jail and correctional facilities in North Carolina obtained their medication:

> Q.   All right. You don't know how the medication is handled at the jail, though, do you?
>
> A.   No, I do not.

Q. Okay. So you don't know what is typically expected in a correctional facility in the state of North Carolina in regards to obtaining meds, do you?

A. No sir.

(Id. at 74.) Moreover, in an exchange with counsel about whether "a jail has the same resources and nursing staff available to it" as a hospital, (id. at 70), Ms. Banas' stated that, based on her time working at larger hospitals, "[t]here's probably an on-call physician. There's probably an on-call nurse for the LPN. There would have to be those set up or your jail wouldn't be functioning," (id. at 71 (emphasis added)).

This court finds that Plaintiff has not provided evidence that Ms. Banas is sufficiently familiar with the standard of care in correctional nursing for pre-trial detainees in North Carolina jails such that she could testify to any possible breach by Defendant Jackson, in accordance with North Carolina Rule of Evidence 702 and N.C. Gen. Stat. § 90-21.12. See, e.g., Hawkins, 202 N.C. App. at 714-15, 690 S.E.2d at 40 ("But the witnesses did not testify to any familiarity with the Brian Center or the community in which it is located. They did not testify regarding whether its standards of practice were in fact the same or different from the national standard. In short, they did not demonstrate any level of familiarity with defendant's community or a similar community . . . .").

- 38 -

Accordingly, this court finds that a reasonable jury could not return a verdict for Plaintiff on his medical malpractice claim against Defendant Jackson, and this court will grant Medical Defendants' motion for summary judgment with regard to Plaintiff's medical malpractice claim against Defendant Jackson.

### (e)  Defendant Maldonado

Plaintiff alleges that Defendant Maldonado breached the standard of care by failing to order anticoagulant bridge therapy, failing to ensure continuity of care for Plaintiff's chronic condition, and failing to conduct proper discharge planning. (Pl.'s Resp. (Doc. 137) at 12.) Medical Defendants argue that the expert testimony demonstrates that "the decision whether to bridge Plaintiff was a judgment call with providers having different opinions," and Defendant Maldonado's decision not to administer bridge therapy was an exercise of professional judgment that did not breach the standard of care. (Med. Defs.' Br. (Doc. 124) at 15.) Defendants argue that "[c]ourts are required only to make certain that professional judgment was in fact exercised," and "[i]t is not appropriate for the courts to specify which of several professionally acceptable choices should have been made." (Id. (quoting Boryla-Lett v. Psychiatric Sols. of N. Carolina, Inc., 200 N.C. App. 529, 536, 685 S.E.2d 14, 20 (2009)).)

During discovery, Ms. Banas and Dr. Laber did not express an opinion as to whether Defendant Maldonado breached the applicable standard of care. (Banas Dep. (Doc. 171) at 75; Laber Dep. (Doc. 174) at 111.) Dr. Yoder testified that it was not a breach of the standard of care for a physician to not provide Plaintiff with anticoagulant bridge therapy, as he was a "medium-risk patient" in a "gray area." (Yoder Dep. Part II (Doc. 172-1) at 29.) Mr. Mooney testified that he believed that there was a breach of the standard of care because Plaintiff did not receive anticoagulant bridge therapy. (See Mooney Dep. Part I (Doc. 173) at 88; Mooney Dep. Part II (Doc. 173-1) at 23.)

Contrary to Medical Defendants' assertions, this court finds Medical Defendants' citation of Boryla-Lett to be inapposite, as that case concerned professional judgment within the context of liability from immunity under N.C. Gen. Stat. § 122C-210.1, see Boryla-Lett, 200 N.C. App. at 451, 685 S.E.2d at 23, a statute which expressly applies to the provision of healthcare for individuals who are mentally ill, a substance abuser, or who are dangerous to themselves or others, see N.C. Gen. Stat. § 122C-210.1 et seq.

Instead, this court finds that competing testimony of Dr. Yoder and Mr. Mooney regarding whether Defendant Maldonado breached a standard of care have created a genuine issue of

- 40 -

material fact from which a reasonable jury could return a verdict for Plaintiff on the evidence presented under the first element of a medical malpractice claim.[9] See McLean, 332 F.3d at 718-19. Accordingly, this court finds that Plaintiff has carried his burden with regard to the element of breach of the applicable standard of care.

### iii. **Proximate Cause**

Having found that Plaintiff created a genuine dispute of material fact as to whether Defendant Maldonado breached the standard of care owed to Plaintiff, this court will consider Medical Defendant's arguments regarding proximate causation.

### (a) **North Carolina Law**

North Carolina courts define proximate cause as (1) "a cause which in natural and continuous sequence, unbroken by any new and independent cause, produced the plaintiff's injuries," and (2) "one from which a person of ordinary prudence could have reasonably foreseen that such a result, or consequences of a

---

[9] Medical Defendants do not argue that the treatment required to meet the standard of care for a patient in the jail differed from that due to a patient in a different community or setting. (See Med. Defs.' Br. (Doc. 124) at 12-15). Accordingly, this court need not find that Defendant Maldonado breached a specialized standard of care specific to pre-trial detainees. See Kovari v. Brevard Extraditions, LLC, 461 F. Supp. 3d 353, 374-75 (W.D. Va. 2020) (finding that the expert witness's testimony on standards of care in prison-transport industry was relevant to help jury understand a specialized industry).

generally injurious nature, was probable under all the facts as
they existed." Hawkins, 240 N.C. App. at 341-42, 770 S.E.2d at
162-63. "Only when the facts are all admitted and only one
inference may be drawn from them will the court declare whether
an act was the proximate cause of an injury or not." Adams v.
Mills, 312 N.C. 181, 193, 322 S.E.2d 164, 172 (1984).

"[E]xpert opinion testimony is required to establish
proximate causation of the injury in medical malpractice
actions," Cousart v. Charlotte-Mecklenburg Hosp. Auth., 209 N.C.
App. 299, 303, 704 S.E.2d 540, 543 (2011), because "the exact
nature and probable genesis of a particular type of injury
involves complicated medical questions far removed from the
ordinary experience and knowledge of laymen." Azar v.
Presbyterian Hosp., 191 N.C. App. 367, 372, 663 S.E.2d 450, 453
(2008) (internal quotations omitted); see also Seraj v.
Duberman, 248 N.C. App. 589, 599, 789 S.E.2d 551, 558 (2016)
("The plaintiff must present at least some evidence of a causal
connection between the defendant's failure to intervene and the
plaintiff's inability to achieve a better ultimate medical
outcome." (internal quotations omitted)).

Federal courts recognize that expert testimony is necessary
to establish the element of proximate cause under North Carolina
law. See, e.g., Taylor v. Shreeji Swami, Inc., 820 F. App'x 174,

- 42 -

178 (4th Cir. 2020) (holding that, under North Carolina law, expert testimony is necessary to establish causation "when a plaintiff's alleged injury involves a complex medical question or manifests in a manner that is not obvious or otherwise apparent to persons without medical expertise"); <u>Warden v. United States</u>, 861 F. Supp. 400, 402-03 (E.D.N.C. 1993) (holding that, under North Carolina law, a "plaintiff must present expert testimony" to prove all elements of a medical malpractice claim, including causation). However, "whether there is sufficient evidence to create a jury issue" regarding proximate cause, "as defined by state law, is controlled by federal rules." <u>Fitzgerald v. Manning</u>, 679 F.2d 341, 346 (4th Cir. 1982); <u>see also</u> <u>Riggins v. SSC Yanceyville Operating Co.</u>, 800 F. App'x 151, 155 (4th Cir. 2020) ("[W]hether there is sufficient evidence to create a jury issue regarding the element of causation is controlled by federal rules." (internal quotations omitted)).

"Under binding Fourth Circuit precedent, for the question of causation to reach the jury in a medical malpractice case, a medical expert's causation opinion must 'rise[] to the level of a "reasonable degree of medical certainty" that it was more likely that the defendant's negligence was the cause than any

- 43 -

other cause.'"[10] Riggins, 800 F. App'x at 155 (quoting Fitzgerald, 679 F.2d at 346). Fourth Circuit cases establish "two distinct requirements for a medical expert's causation testimony to reach a jury: (1) the likelihood that defendant's conduct caused plaintiff's injury (which must be more probable than not), and (2) whether the expert expressed this 'more likely than not' opinion to a reasonable degree of medical certainty." Id. at 156-57.

Courts look to the "entire substantive evidence of causation" to determine the sufficiency of the expert's causation opinion. See Fitzgerald, 679 F.2d at 354-56 (finding that, where the expert explicitly and repeatedly refused to state that he held his causation opinion to a reasonable degree of medical certainty, a directed verdict for the defendant was appropriate). "[M]edical opinion that is inconsistent with the entirety of an expert's testimony is not sufficient to raise a jury question." Owens By Owens v. Bourns, Inc., 766 F.2d 145, 150 (4th Cir. 1985).

---

[10] The admissibility of expert testimony Federal Rule of Evidence 702 is a separate question, which this court need not decide at this time. See In re Lipitor (Atorvastatin Calcium) Mktg., Sales Practices & Prods. Liab. Litig. (No II) MDL 2502, 892 F.3d 624, 646 (4th Cir. 2018).

Medical Defendants first argue that there is no genuine issue of material fact because "no expert opined that missing a few doses of Coumadin would be the proximate cause of the patient later having a blood clot." (Med. Defs.' Br. (Doc. 124) at 15.) Citing Dr. Laber's testimony, Medical Defendants argue that "the increase in risk for a blood clot from a sub-therapeutic INR cannot be quantified," and that "Plaintiff cannot establish when the blood clot formed." (Id.) Medical Defendants argue that "[s]imply increasing the risk of something by an uncertain mathematical percentage does not establish proximate cause" under North Carolina law. (Id. at 17.)

Second, Medical Defendants argue that Plaintiff's "failure to obtain INRs, seek out a physician, or maintain a reliable prescription both before and after incarceration, creates a new and independent cause which negates any alleged action or inaction at the jail," that may have led to his first blood clot in November 2012. (Id.) Medical Defendants also argue that Plaintiff "created a new and independent cause in time between his first blood clot in November [] 2012 and his clot in January 2013" because he had several sub-therapeutic INRs in December and January which were unrelated to his incarceration in November 2012. (Id.)

Citing the testimony of Dr. Laber and Dr. Yoder, Plaintiff argues that "[m]ultiple experts have testified that [Defendant Maldonado's] negligent actions were the proximate cause of Plaintiff's injuries," (Pl.'s Resp. (Doc. 137) at 12), and thus, they have met their burden in creating a genuine issue of material fact, (id. at 13).

### (c) Dr. Yoder's Testimony does not Forecast Proximate Causation

Contrary to Plaintiff's assertions, this court finds that Dr. Yoder's testimony that the "missed doses in the jail were the proximate cause" of Plaintiff's blood clots, (Yoder Dep. Part II (Doc. 172-1) at 62-63), does not forecast proximate cause as she did not testify with a reasonable degree of medical certainty.

First, this court finds that Dr. Yoder's testimony reflects impermissible speculation that Plaintiff had been properly anticoagulated prior to entering the jail. An opinion is not held to the requisite degree of medical certainty where it is grounded in "speculation or conjecture." Young v. United States, 667 F. Supp. 2d 554, 562 (D. Md. 2009) (citing Crinkley v. Holiday Inns, Inc., 844 F.2d 156, 165 (4th Cir. 1988)); see also Fitzgerald, 679 F.2d at 356 (rejecting expert opinion evidence as insufficient where experts could not say with certainty that the negligence was a likely cause of the injury). Dr. Yoder

- 46 -

stated that her opinion assumed that Plaintiff had been properly anticoagulated prior to entering the jail, (Yoder Dep. Part II (Doc. 172-1) at 66), and that Plaintiff had taken his prescribed medication "on all the other days in November that he's not incarcerated," (id.), although she had "no evidence to back up that assumption." (Id.)

This court finds that the evidence on the record does not support Dr. Yoder's assumption. Although Plaintiff argues in his brief that he "performed free tree services for a physician in the area, and, in exchange, the doctor wrote him Coumadin prescriptions and checked his INR levels," (Pl.'s Resp. (Doc. 137) at 3-4), Plaintiff cites only his only deposition for this proposition, (id. at 3-4 (citing Pl.'s Resp., Ex. 6 (Doc. 137-6) at 8-10, 15)), in which Plaintiff stated generally that "Dr. O checked [his] blood a bunch over that period of time" and "wrote . . . out prescriptions," (Doc. 137-6 at 15). Plaintiff has not provided records indicating what his INR levels were prior to his incarceration or records of the prescriptions that this physician wrote for him. Even taking Plaintiff's testimony in the light most favorable to Plaintiff, this court does not find that this testimony establishes that Plaintiff's INR levels were at a therapeutic level prior to his incarceration, the dosage of Coumadin he was taking, or whether he took the medication in a

- 47 -

manner which would have caused his INR to be at a therapeutic
level.

Moreover, in contrast to Plaintiff's testimony that his
neighbor wrote him prescriptions for Coumadin, the only pharmacy
prescriptions on the record are those written by Dr. Yoder,
(Doc. 124-12 at 2-3), which Plaintiff used to obtain thirty 5 mg
pills and thirty 1 mg pills on June 25, July 24, and August 23.
(Doc. 124-12 at 2-3.) On October 22, 2012, Plaintiff sought a
refill of his 5 mg prescription, but it was denied because he
was no longer a patient of the Coumadin Clinic where Dr. Yoder
was a practitioner. (See Doc. 124-13 at 3.) On October 19, 2012,
Plaintiff obtained thirty 1 mg pills of Coumadin from the
pharmacy. (Doc. 124-12 at 4.) Taking the facts in the light most
favorable to Plaintiff, this court finds that the thirty 1 mg
pills would not have been enough to maintain Plaintiff's
established daily dose of 6 or 7 mg. For these reasons, this
court does not find that the evidence supports Dr. Yoder's
assumptions that Plaintiff had taken his medication at a dosage
that would maintain a therapeutic INR level.

Second, this court finds that Dr. Yoder was aware that
Plaintiff's compliance prior to entering the jail would affect
his risk for clotting, but Dr. Yoder could not assess the extent
to which changing her underlying assumption about Plaintiff's

- 48 -

compliance would change her assessment as to whether Plaintiff
was liable for his injury:

>        THE WITNESS: I don't – I don't think that there's
> a 50/50 split in blame just based on the number of
> days in a month. That's the problem with
> anticoagulation, is that one day, one week –- I mean,
> it's all about trends, and unfortunately, I don't –-
> like you said, we don't have all of the data in –-
>
> BY MR. LONG:
>
>        Q.   Well, what percentage would he be at fault
> for –- if you're saying –-
>
>        A.   I don't know.
>
>        Q.   -- that the jail not giving him his medicine
> on these five days is the cause of that clot, what
> percentage is he at fault for the cause of that clot
> because of his failures in adhering to - - in being
> compliant?
>
>        . . . .
>
>        THE WITNESS: I -- I don't know how to assess
> that.

(Yoder Dep. Part II (Doc. 172-1 at 67-68.) When counsel asked

Dr. Yoder to clarify whether the jail was "more than 50 percent

at fault," given that she could not assess the impact of any

noncompliance by Plaintiff, (id. at 68), Dr. Yoder stated that,

with regard to her medical certainty, it was "the timing that

makes it suspect, because he did miss so many doses, and we do

only have one INR that was not even close to a target. And then

he has an onset of symptoms and this blood clot, like you said,

a week after," (id. at 69 (emphasis added)).

- 49 -

This exchange was not the sole instance during her testimony in which Dr. Yoder indicated that she was considering the timing of Plaintiff's injury when forming her opinion and was disregarding other potential factors. In another exchange, Dr. Yoder stated, "I would say that the -- the <u>temporal relationship</u> of the <u>known factors</u> that happened in the preceding . . . three weeks prior to his hospital presentation are <u>consistent</u> with not being therapeutically anticoagulated." (<u>Id.</u> at 61 (emphasis added).) Later in her deposition, when asked to explain the basis of belief that improper anticoagulation at the jail resulted in the blood clot, Dr. Yoder stated,

> Well, he wasn't therapeutically anticoagulated in the jail. <u>We know that</u>. And we <u>know</u> that they didn't do a Lovenox bridge in order to protect him from an event happening down the road.
> And the thing is, is that an event doesn't happen after one missed warfarin dose, usually. It's this consistency of inconsistent dosing and the timing of the missed doses and the presentation of symptoms and the subsequent admission that -- that <u>paints this picture that that was the precipitating event</u>.

(<u>Id.</u> at 63 (emphasis added).) At other points during her deposition, Dr. Yoder described the clot resulting from the missed doses at the jail as something that "fit," (<u>id.</u> at 69), and the missed doses at the jail as "the straw that broke the camel's back." (<u>Id.</u>)

Dr. Yoder's testimony can best be characterized by the maxim <u>post hoc, ergo propter hoc</u>, meaning "after this, therefore

- 50 -

because of this." This maxim denotes the fallacy of confusing correlation with causation by drawing a conclusion from a temporal relationship. <u>See</u> <u>In re Lipitor (Atorvastatin Calcium)</u> <u>Mktg., Sales Practices & Prods. Liab. Litig.</u>, 150 F. Supp. 3d 644, 657 (D.S.C. 2015). The Fourth Circuit advises courts to proceed cautiously when using temporal relationships as evidence of causation because "the mere fact that two events correspond in time does not mean that the two necessarily are related in any causative fashion." <u>Westberry v. Gislaved Gummi AB</u>, 178 F.3d 257, 265 (4th Cir. 1999). An expert opinion that relies solely on temporal connections is not an opinion that is held to a reasonable degree of medical certainty. <u>See, e.g.</u>, <u>Rohrbough v.</u> <u>Wyeth Lab'ys, Inc.</u>, 916 F.2d 970, 974 (4th Cir. 1990) ("[A]ll Dr. Cox established was that a <u>temporal</u> link existed . . . Dr. Cox did not testify that the literature supported a <u>causal</u> link . . . .").

This court finds that Dr. Yoder's opinion was impermissibly based on speculation and conjecture such that it was not held to a reasonable degree of medical certainty. For these reasons, this court finds that Dr. Yoder's testimony does not forecast evidence of proximate causation.

During his deposition, Dr. Laber opined that "[t]he lack of anticoagulation for the cardiac valve," was the cause of Plaintiff's blood clots for which Plaintiff was hospitalized in November/December 2012 and January 2013. (Laber Dep. (Doc. 174) at 56, 121.) However, as with Dr. Yoder's testimony, this court finds that Dr. Laber did not testify with the requisite level of medical certainty, and thus, his testimony does not forecast evidence of proximate cause.

First, this court finds that Dr. Laber's testimony was the product of conjecture. Not only did Dr. Laber state that he could not quantify the increase in risk where a patient misses three consecutive days of Coumadin, (Laber Dept. (Doc. 174) at 66-67), but Dr. Laber also opined that all patients with an MHV have at least some risk of a clot, "and that's why we give them the anticoagulation, to prevent that." (Id. at 56.) Dr. Laber confirmed that he was unable to state to a reasonable degree of medical certainty when the blood clot that injured Plaintiff formed. (Id. at 55-56.) When asked how long a patient would need to be improperly anticoagulated before they would be at risk for a blood clot, Dr. Laber stated generally that, "[i]t could be anything. But the longer they remain without their proper anticoagulation, the higher the risk." (Id. at 56-57 (emphasis

- 52 -

added).) Dr. Laber did not provide any context to explain what "higher" risk meant. Accordingly, this court finds Dr. Laber's testimony did not indicate "that it was more likely that [Defendant Maldonado's conduct] was the cause than any other cause," Owens, 766 F.2d at 150 (citing Fitzgerald, 679 F.2d at 350), and thus, if Dr. Laber, as "plaintiff's medical expert cannot form an opinion with sufficient certainty so as to make a medical judgment, there is nothing on the record with which a jury can make a sufficient certainty so as to make a legal judgment," Fitzgerald, 679 F.2d at 350-51 (internal citations and quotations omitted).

Second, even if Dr. Laber had articulated his testimony using "with sufficient certainty," id., his expert testimony would be insufficient to support a causal connection because there is additional evidence or testimony that shows that his opinion is a guess or mere speculation. For example, Dr. Laber opined that Plaintiff's diet during his incarceration could have affected Plaintiff's INR levels, and thus, would have contributed to his risk for a blood clot:

> it also depends on the food intake that he's taking.
> So if he take[s] a lot of Vitamin K, so let's say
> you're not on your usual diet because you're
> incarcerated or something like that, maybe the whole
> level of anticoagulation will be reversed within 24
> hours. But it really depends on many factors. So if
> you stop the warfarin and you -- and you take the
> wrong foods, then your level goes back to like -- like

- 53 -

normal. So, basically, you lose all the effect of the anticoagulation.

(Laber Dep. (Doc. 174) at 126-27.) Despite acknowledging that Plaintiff's diet at the jail could have affected his INR levels, Dr. Laber did not explain how this other factor compared to the alleged risk created by Defendant Maldonado's medical treatment decisions. Dr. Laber's opinion is that "what happened in the jail caused everything," (id. at 116), but his testimony identifies at least one other cause at the jail, beyond the medical treatment Defendant Maldonado provided, which could have caused Plaintiff's risk for a blood clot to increase.

Moreover, Dr. Laber indicated that, in forming his opinion, he assumed that Plaintiff was properly anticoagulated upon arrival at the jail and that he took his medication every day upon release from the jail. (Id. at 86-87, 116-17.) Yet, Dr. Laber recognized that he had "no way" to assess whether Plaintiff took his medication every day before his incarceration, (id. at 100), that it would be "speculation" as to his INR upon arrest, (id. at 86), and that there was no way he could "quantify how many days [of medication] he missed or didn't" while not in the care of the jail, (id. at 101). "While [this court] view[s] evidence in the light most favorable to the nonmoving party . . . mere conclusory or speculative allegations are insufficient to withstand summary judgment." Riggins, 800

- 54 -

F. App'x at 155 (internal quotations omitted); see also
Fitzgerald, 679 F.2d at 348 ("A mere possibility of such
causation is not enough; and when the matter remains one of pure
speculation or conjecture . . . it becomes the duty of the court
to direct a verdict for the defendant."). This court finds that
Dr. Laber's testimony was explicitly premised on impermissible
speculation, for which there is no basis in the evidentiary
record. See discussion supra Part III.B.1.a.iii.(c).

Finally, this court finds that Dr. Laber, like Dr. Yoder,
relied on the temporal connection between the blood clot and
Plaintiff's incarceration as evidence of proximate cause. When
asked to clarify why he "believe[d] that what happened in the
jail caused everything," Dr. Laber stated, "[b]ecause of the
timing, because of the documentation, because of the lack of
proper care, because of the risk that this patient had because
of his heart valve." (Laber Dep. (Doc. 174) at 116.) Again,
correlation is not causation, and when viewed in light of
Dr. Laber's other testimony, this court finds that Dr. Laber's
testimony is speculative in nature. See Rohrbough, 916 F.2d at
974. For these reasons, this court finds that Dr. Laber did not
testify with a reasonable degree of medical certainty and thus,
his testimony does not forecast evidence of proximate cause.

- 55 -

Accordingly, this court finds that Plaintiff has not "come forward with specific facts showing that there is a genuine issue for trial," McLean, 332 F.3d at 718-19, and this court will grant Medical Defendants' motion for summary judgment with regard to Plaintiff's claim of Medical Malpractice against Defendant Maldonado.[11]

### b. Plaintiff's Negligence Claim

The elements for common law negligence are similar to those for medical malpractice: The plaintiff must show (1) defendant owed plaintiff a duty of care; (2) breach of that duty; (3) causation; and (4) damages. See, e.g., Parker v. Town of Erwin, 243 N.C. App. 84, 110, 776 S.E.2d 710, 729-30 (2015) (stating these elements). Medical Defendants move for summary judgment on Plaintiff's claim of negligence. (Med. Defs.' Br. (Doc. 124) at 21-22.)

### i. Duty

The parties first contest whether Medical Defendants owed a duty of care to Plaintiff. Medical Defendants argue that this court should grant summary judgment in their favor because

---

[11] Because this court will grant Medical Defendants' Motion for Summary Judgment as to each Defendant on other grounds, this court declines to consider Medical Defendant's arguments regarding contributory negligence, (see Med. Defs.' Br. (Doc. 124) at 18-19), or Plaintiff's compliance with Rule 9(j), (see id. at 21).

Plaintiff's negligence claim "is actually a claim for medical malpractice," and "Plaintiff has not alleged any negligence against the Defendants that does not arise out of providing medical care." (Med. Defs.' Br. (Doc. 124) at 22.)

Plaintiff argues that Medical Defendants' negligence arose out of the "intra-system transfer of Plaintiff from the Davie County Detention Center to the Stokes County Detention Center," in which "Plaintiff did not receive Coumadin for three days in violation of its own medical provider's order . . . ." (Pl.'s Resp. (Doc. 137) at 19.) Plaintiff argues that Medical Defendants had a statutory duty to ensure continuity of care under N.C. Gen. Stat. § 153A-225(a)(2). (Id.) Because, Plaintiff argues, "[t]he physical transfer of paperwork and medicine between jails does not involve a specialized knowledge and skill beyond the manual dexterity," Medical Defendants committed a tort of ordinary negligence, in addition to that of medical malpractice. (Id. at 20.) Plaintiff argues, and Medical Defendants do not contest, that "[h]ad Defendants transferred Plaintiff's health records and medications properly and in such manner than [sic] ensured continuity of care, then Plaintiff would not have suffered a three-day disruption in his anticoagulation therapy," and that the disruption of medication

- 57 -

was the proximate cause of the injuries that Plaintiff
sustained. (<u>Id.</u> at 19.)

### (a) <u>Medical Defendants did not have a duty under N.C. Gen. Stat. § 153A-225</u>

Contrary to Plaintiff's assertions, this court finds that
N.C. Gen. Stat. § 153A-225(a) does not create a statutory duty
for continuity of care to which Medical Defendants were bound.
As this court has held, the statute's plain text binds "unit[s]
that operate[s] a local confinement facility," and Medical
Defendants, as agents of the state, are not bound by this duty.
<u>See</u> discussion <u>supra</u> Section II.B.1.a. Accordingly, this court
does not find that any violation of N.C. Gen. Stat. § 153A-
225(a) can form the basis of Plaintiff's ordinary negligence
claim against Medical Defendants.

### (b) <u>Medical Defendants did owe Plaintiff an ordinary duty of care</u>

Any statutory duty, or lack thereof, under N.C. Gen. Stat.
§ 153A-225(a) notwithstanding, this court finds that Plaintiff
has articulated an ordinary duty of care under common law
negligence principles.

Whether an action is treated as a medical malpractice
action or as a common law negligence action is determined by
statute. <u>Smith v. Serro</u>, 185 N.C. App. 524, 529, 648 S.E.2d 566,
569 (2007). A medical malpractice action is "[a] civil action

- 58 -

for damages for personal injury or death arising out of the furnishing or failure to furnish professional services in the performance of medical, dental, or other health care by a health care provider," N.C. Gen. Stat. § 90-21.11(2)(a), where "furnishing or failure to furnish professional services" arises out of a "vocation, calling, occupation, or employment involving specialized knowledge, labor, or skill, and the labor or skill involved is predominantly mental or intellectual, rather than physical or manual." Lewis v. Setty, 130 N.C. App. 606, 608, 503 S.E.2d 673, 674 (1998) (internal quotations omitted).

In contrast to a medical malpractice action, plaintiffs may sue medical providers under ordinary negligence principles when a claim "arises out of policy, management or administrative decisions," Estate of Waters v. Jarman, 144 N.C. App. 98, 103, 547 S.E.2d 142, 145 (2001), or a "physical or manual activity," rather than "specialized knowledge or skill." Lewis, 130 N.C. App. at 608, 503 S.E.2d at 674. For example, North Carolina courts have held that a hospital can be held liable under a claim of ordinary negligence for its failure to promulgate adequate safety rules relating to the handling, storage, and administration of medications, see Habuda v. Trs. of Rex Hosp., Inc., 3 N.C. App. 11, 164 S.E.2d 17 (1968), for its failure to adequately investigate the credentials of a physician selected

- 59 -

to practice at the facility. Robinson v. Duszynski, 36 N.C. App. 103, 243 S.E.2d 148 (1978). North Carolina courts have found that improperly removing an individual from an examination table to a wheelchair involves a "physical or manual activity," rather than "specialized knowledge or skill," and thus "falls squarely within the parameters of ordinary negligence." Lewis, 130 N.C. App. at 608, 503 S.E.2d at 674. Moreover, the courts have found that "failing to supervise a patient recently treated with seizures until a responsible adult was able to care for him would also be a claim of ordinary negligence." Allen v. Cnty. of Granville, 203 N.C. App. 365, 367-68, 691 S.E.2d 124, 127 (2010).

This court finds that the duty of "continuity of care" alleged by Plaintiff sounds in ordinary negligence principles. Plaintiff describes Medical Defendants' duty to include "ensur[ing] that when detainees are transferred, health records and medicine are transferred too." (Pl.'s Resp. (Doc. 137 at 19.) Although North Carolina courts have not expressly recognized a common law duty for continuity of care as Plaintiff articulates, the duty Plaintiff articulates is similar to that in Allen v. County of Granville, in which the North Carolina Court of Appeals held that a medical center could be held liable in ordinary negligence principles where the plaintiff's mother

- 60 -

requested the medical center not release her disabled son until she was able to pick him up. 203 N.C. App. at 365-66, 691 S.E.2d at 125.

Moreover, this court finds that the transfer of medication and health records between jails clearly "arises out of policy, management or administrative decisions," see Jarman, 144 N.C. App. at 103, 547 S.E.2d at 145, rather than "specialized knowledge or skill," as is the case in medical malpractice actions. See Lewis, 130 N.C. App. at 608, 503 S.E.2d at 674. Accordingly, this court will not grant summary judgment for Medical Defendants on the grounds that Plaintiff's negligence claims are actually medical malpractice claims. (See Med. Defs.' Br. (Doc. 124) at 22.)

Having found that Plaintiff has articulated a common law duty of care, this court will consider whether the evidence presented creates a genuine dispute of material fact regarding the remaining elements of a negligence claim.

### ii. <u>Breach</u>

#### (a) <u>Plaintiff has not forecast evidence that Defendants Junkins, Hunt, Jackson, or SHP breached a duty to provide continuity of care</u>

This court does not find that Plaintiff has created a genuine issue for trial that Defendants Junkins, Hunt, Jackson, or SHP breached a duty to provide continuity of care. Aside from

- 61 -

asserting generally that Medical Defendants breached a common law duty owed to Plaintiff, Plaintiff does not indicate how these Defendants, in particular, breached that duty. (See Pl.'s Resp. (Doc. 137) at 19-20.) Where Plaintiff does cite evidence that Medical Defendants breached a duty to provide continuity of care, Plaintiff refers only to expert testimony regarding Defendant Maldonado's conduct, such as where Mr. Mooney opined that Defendant Maldonado failed to "make transferee facility aware of order for increased Coumadin," and "fail[ed] to ensure proper continuity of care in transfer." (Id. at 6.)

Because Plaintiff has not "come forward with specific facts showing that there is a genuine issue for trial," McLean, 332 F.3d at 719, this court will grant Medical Defendants' motion for summary judgment with regard to Plaintiff's negligence claims against Defendants Junkins, Hunt, Jackson, and SHP.

> **(b)  Medical Defendants have not met their burden with regard to showing Defendant Maldonado's conduct was not a breach of the duty of care**

This court will not, however, grant Medical Defendants' motion for summary judgment with regard to Plaintiff's negligence claim against Defendant Maldonado. As the moving party, Medical Defendants bear the initial burden of demonstrating "that there is an absence of evidence to support

- 62 -

the nonmoving party's case." Celotex Corp., 477 U.S. at 325.
Medical Defendants have not met this burden. In their opening
brief, Medical Defendants' only arguments regarding negligence
are that "Plaintiff's negligence claim is actually a claim for
medical malpractice," and thus, should be dismissed. (Med.
Defs.' Br. (Doc. 124) at 22.) In their reply brief, Medical
Defendants argue only that Defendants Jackson and Hunt were
unaware that Plaintiff would be or had been transferred, and
thus, it was "Plaintiff's failure to take any responsibility for
his health" which is "the cause of his failure to receive
Coumadin for the initial weekend at Stokes." (Med. Defs.' Reply
(Doc. 144) at 9-10.) Medical Defendants do not provide any
argument as to why Defendant Maldonado is not liable for the
alleged negligence during the transfer, (id.), and Plaintiff is
not required to present specific facts showing that there is a
genuine issue for trial, given that Medical Defendants did not
discharge their burden, see McLean, 332 F.3d at 718-19.
Nevertheless, Plaintiff does forecast evidence of Defendant
Maldonado's breach, citing Mr. Mooney's testimony where he
opined that Defendant Maldonado failed to ensure proper

continuity of care in the transfer.[12] (Pl.'s Resp. (Doc. 137) at 6.)

Because this court finds that Medical Defendants have not met their initial burden of demonstrating "that there is an absence of evidence to support [Plaintiff's] case," <u>Celotex Corp.</u>, 477 U.S. at 325, this court will deny Medical Defendants' motion for summary judgment with regards to Plaintiff's claim of negligence against Defendant Maldonado.[13]

_____

[12] Medical Defendants argue elsewhere in their brief that Defendant Maldonado should be dismissed because Plaintiff failed to comply with Rule 9(j) of the North Carolina Rules of Civil Procedure, which requires the certification of expert witnesses. (Med. Defs.' Br. (Doc. 124) at 21.) Where a plaintiff asserts a claim of ordinary negligence, rather than medical malpractice, a plaintiff is not required as a matter of law to comply with Rule 9(j). <u>See</u> <u>Allen</u>, 203 N.C. App. at 366, 691 S.E.2d at 126. Thus, because this court finds that this is a claim of ordinary negligence, this court will not consider Medical Defendants' argument when determining if Defendant Maldonado is liable for negligence.

[13] To the extent that Medical Defendants' statements that Plaintiff's failure to inform Stokes County Jail personnel that he had been receiving medication at Davie County Jail can be construed as an argument that Plaintiff was contributorily negligent, (see Med. Defs.' Reply (Doc. 144) at 9), this court finds that this is an issue for the jury to decide at trial, as Plaintiff's alleged negligence is not "so one-sided that one party must prevail as a matter of law." <u>Liberty Lobby, Inc.</u>, 477 U.S. at 252.

## c.  <u>Negligent Supervision Claim against</u> <u>Defendant SHP</u>

Medical Defendants move for summary judgment on Plaintiff's claim of negligent supervision against Defendant SHP. (<u>See</u> Second Am. Compl. (Doc. 57) ¶¶ 173-74.)

North Carolina recognizes a claim of negligent supervision against an employer where the plaintiff establishes: (1) "the specific negligent act on which the action is founded"; (2) "incompetency, by inherent unfitness or previous specific acts of negligence, from which incompetency may be inferred"; (3) "either actual notice to the master of such unfitness or bad habits, or constructive notice, by showing that the master could have known the facts had he used ordinary care in oversight and supervision"; and (4) "that the injury complained of resulted from the incompetency proved." <u>Medlin v. Bass</u>, 327 N.C. 587, 591, 398 S.E.2d 460, 462 (1990) (internal citations, quotations, and emphasis omitted).

Medical Defendants argue that this court should grant summary judgment in favor of Medical Defendants because Plaintiff has not established "incompetency or unfitness of the medical providers and no notice of such by SHP." (Med. Defs.' Br. (Doc. 124) at 23.) They also argue that Defendants Maldonado and Junkins are independent contractors whom Defendant SHP does

- 65 -

not supervise, and thus, this cause of action "fails as a matter of law." (Id.)

    Plaintiff argues in response that "[a] genuine dispute exists as to whether SHP was negligent in its supervision and enforcement of training on its policies, procedures and protocols." (Pl.'s Resp. (Doc. 137) at 20.) Plaintiff argues that "[s]pecific acts of negligence, including medical malpractice, ordinary negligence, and corporate negligence" as discussed in support of Plaintiff's other claims suffice as evidence for the first two elements of the negligent supervision claim. (Id.) Plaintiff argues that SHP delegated its duty to implement SHP policy and to ensure adherence with such policies to Defendant Junkins, and that Defendant Junkins "had constructive knowledge that lack of oversight would produce failures in policy adherence and supervision," which ultimately resulted in Plaintiff's injuries. (Id. at 21.) Similarly, Plaintiff argues that SHP delegated its responsibility to supervise medical staff at the jails to Defendant Maldonado, who had "either actual or constructive knowledge that nurses Jackson and Hunt failed to ensure that Plaintiff was being treated with the appropriate standard of care given his heart condition." (Id.) Plaintiff argues that "[i]t is immaterial whether Defendants Maldonado and . . . Junkins were independent

- 66 -

contractors" because "[p]roviding medical care to inmates is
. . . a non-delegable duty." (Id. (citing Medley v. N.C. Dep't
of Corr., 330 N.C. 837, 842, 412 S.E.2d 654, 657 (1992)).

This court finds that Plaintiff has not presented evidence
that creates a genuine issue of material fact regarding
negligent supervision of Defendants Hunt or Jackson.

First, this court has found as a matter of law that a
reasonable jury could not find, based on the evidence presented,
that Defendants Hunt or Jackson were negligent. (See discussion
supra III.B.1.b.) Thus, Plaintiff has not established a specific
negligent act on which this claim of negligent supervision could
be founded. Second, Plaintiff has not presented any evidence
that Defendants Hunt and Jackson were incompetent. Plaintiff
cites deposition testimony by Defendants Jackson and Hunt, as
well as Jennifer Hairsine, a leader at Southern Health Partners,
for the proposition that they were not adequately trained or
supervised, (Pl.'s Resp. (Doc. 137) at 20-21 (citing Doc. 137-1
at 6-7; Doc. 137-2 at 3; Doc. 137-3 at 4-6), but this court
finds that this testimony merely establishes that Defendants
Hunt and Jackson were aware of Defendant SHP's policies, (see
Doc. 137-2 at 3; Doc. 137-3 at 4-6). Third, Plaintiff has not
presented any evidence that Defendants Maldonado or Junkins had

- 67 -

constructive or actual notice that Defendants Hunt and Jackson were incompetent. (See Pl.'s Resp. (Doc. 137).)

Moreover, contrary to Plaintiff's assertions that Defendant SHP had a nondelegable duty to provide medical care to inmates and thus, is responsible for the conduct of independent contractors, this court finds as a matter of law that Defendant SHP cannot be held liable for the conduct of Defendants Maldonado and Junkins. Plaintiff does not contest that Defendants Maldonado and Junkins were independent contractors. (Pl.'s Resp. (Doc. 137) at 21.) Under North Carolina law, an employer is generally not liable for the negligent acts of an independent contractor. Gordon v. Garner, 127 N.C. App. 649, 658, 493 S.E.2d 58, 63 (1997). Although Plaintiff is correct that some duties may be nondelegable, including the duty to provide medical care to inmates, the case cited by Plaintiff, Medley v. North Carolina Dep't of Correction, expressly couches this duty in terms of a "state's nondelegable duty to provide medical care for inmates." 330 N.C. at 845, 412 S.E.2d at 659 (emphasis added). Similarly, the modern statute Plaintiff has previously cited as creating a duty to provide medical care to inmates, N.C. Gen. Stat. § 153A-225(a), creates a nondelegable duty on sheriffs operating county jails to provide medical services to jail inmates, not agents of the state, such as

- 68 -

Defendant SHP. See discussion supra Section III.B.1.a.(i). For these reasons, this court finds that Defendant SHP is not liable as a matter of law for the negligence of its independent contractors in providing medical care to inmates.

Accordingly, this court will grant Medical Defendants' motion for summary judgment with regards to Plaintiff's claims of negligent supervision.

### d. Plaintiff's False Imprisonment Claim

Medical Defendants move for summary judgment on Plaintiff's claim of False Imprisonment under North Carolina law. (Med. Defs.' Br. (Doc. 124) at 23.) In his response to Medical Defendants' motion, Plaintiff "concedes that this claim for false imprisonment against the Medical Defendants fails as a matter of law, with no effect on the claim as it stands against the other Defendants to this lawsuit." (Pl.'s Resp. (Doc. 137) at 22.) Accordingly, this court will grant Medical Defendants' motion with regard to Plaintiff's claim of False Imprisonment.

### e. Plaintiff's Torture and Intentional Infliction of Emotional Distress Claim

Medical Defendants move for summary judgment on Plaintiff's claim of Torture and Intentional Infliction of Emotional Distress under North Carolina law. (Med. Defs.' Br. (Doc. 124) at 23.) In his response to Medical Defendants' motion, Plaintiff "concedes that the claim for torture/intentional infliction of

emotional distress against the Medical Defendants fails as a matter of law, with no effect on the claim as it stands against the other Defendants to this lawsuit." (Pl.'s Resp. (Doc. 137) at 22.) Accordingly, this court will grant Medical Defendants' motion with regard to Plaintiff's claim of Torture and Intentional Infliction of Emotional Distress.

### 2. <u>Plaintiff's Claim under 42 U.S.C. § 1983</u>

Medical Defendants also move for summary judgment on Plaintiff's claim of a violation of 42 U.S.C. § 1983, (Med. Defs.' Br. (Doc. 124) at 20), in which Plaintiff alleges that Medical Defendants were deliberately indifferent to his medical needs. (<u>See</u> Second Am. Compl. (Doc. 57) ¶¶ 184-87). Medical Defendants argue that the evidence uncovered during discovery does not create a genuine dispute of material fact that Medical Defendants acted with the requisite intent for a § 1983 claim. (Med. Defs.' Br. (Doc. 124) at 20-21.) Plaintiff argues that Medical Defendants delayed providing Coumadin to Plaintiff, despite knowing that he had a mechanical heart valve, and that this evidence creates a genuine dispute of material fact that Medical Defendants acted with the requisite intent for a § 1983 claim. (Pl.'s Resp. (Doc. 137) at 16-18.)

In <u>Estelle v. Gamble</u>, the Supreme Court held that prison officials violate the Eighth Amendment's prohibition against

- 70 -

"cruel and unusual punishments" when they are deliberately indifferent to the serious medical needs of their prisoners. 429 U.S. 97, 104-05 (1976). "Pretrial detainees are entitled to at least the same protection under the Fourteenth Amendment as are convicted prisoners under the Eighth Amendment." Young v. City of Mount Ranier, 238 F.3d 567, 575 (4th Cir. 2001) (footnote omitted).

Pretrial detainees alleging they have been subjected to unconstitutional conditions of confinement must satisfy a two-pronged test: First, they must allege that the deprivation alleged was "objectively, sufficiently serious." Scinto v. Stansberry, 841 F.3d 219, 225 (4th Cir. 2016) (citing Farmer v. Brennan, 511 U.S. 825, 834 (1994)) (internal quotations omitted). "To be sufficiently serious, the deprivation must be extreme – meaning that it poses a serious or significant physical or emotional injury," id. (internal quotations omitted), and "is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Iko v. Shreve, 535 F.3d 225, 241 (4th Cir. 2008) (internal quotations omitted).

Second, pretrial detainees must show that prison officials acted with deliberate indifference, meaning that "the official knew of and disregarded an excessive risk to inmate health or

safety." Scinto, 841 F.3d at 225 (citing Farmer, 511 U.S. at 837) (internal quotations, and modifications omitted). "[A]n inadvertent failure to provide adequate medical care" does not satisfy the standard, and thus, mere negligence in diagnosis or treatment is insufficient. Estelle, 429 U.S. at 105-06; see also Farmer, 511 U.S. at 835 (holding that deliberate indifference requires a showing of "more than mere negligence [but] is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result"). Mere disagreement between an inmate and medical staff regarding the proper course of treatment is not a basis for relief. Russell v. Sheffer, 528 F.2d 318, 319 (4th Cir. 1975). Instead, "officials evince deliberate indifference by acting intentionally to delay or deny the prisoner access to adequate medical care or by ignoring an inmate's known serious medical needs." Sharpe v. S. Carolina Dept. of Corr., 621 F. App'x 732, 733 (4th Cir. 2015) (citing Estelle, 429 U.S. at 104-05); see also Smith v. Smith, 589 F.3d 736, 739 (4th Cir. 2009) (holding that a plaintiff had stated a claim for deliberate indifference where the complaint alleged that a nurse had destroyed the order which would have enabled a patient to receive necessary medical treatment).

This court finds that there is not a genuine dispute of material fact regarding whether Medical Defendants were deliberately indifferent to Plaintiff's medical needs. Plaintiff cites that the Fourth Circuit's opinion in Sosebee v. Murphy, 797 F.2d 179 (4th Cir. 1986) for the proposition that even a short delay in treating a life-threatening condition can rise to the level of deliberate indifference. (Pl.'s Resp. (Doc. 137) at 17.) In Sosebee, the Fourth Circuit held that the record was "replete with evidence from which a jury could rationally find that the guards on duty were aware of [the plaintiff]'s serious condition and intentionally abstained from seeking medical help." 797 F.2d at 182. This evidence included testimony that prison guards joked about the plaintiff's visibly poor physical state for several hours and threatened all prisoners with solitary confinement if they continued to request that the plaintiff receive medical assistance. Id.

The facts in Sosebee are distinguished from those in the matter presently before this court. Taken in the light most favorable to Plaintiff, the evidence presented is that Medical Defendants responded to Plaintiff's medical needs and provided treatment. Even taking the facts in the light most favorable to Plaintiff, the undisputed facts are that Defendant Jackson collected medical information from Plaintiff about his providers

- 73 -

and pharmacy when he was not released from Davie County Jail on November 7, 2012, (Pl.'s Resp. (Doc. 137) at 4); contacted Defendant Maldonado to establish a treatment plan, (id. at 4-5); worked within established protocols to obtain Plaintiff's medication from a pharmacy, (id.); and administered that medication to Plaintiff on a regular basis as directed by Defendant Maldonado (Id.) Defendant Maldonado ordered an INR test and changed Plaintiff's medication dosage when he learned that Plaintiff's INR levels were subtherapeutic. (Id. at 5.) Finally, Defendant Hunt immediately began providing medication to Plaintiff when she returned to work. (Id. at 6.)

There is no evidence on the record that Medical Defendants intended to prevent or delay Plaintiff from receiving medical treatment or that Medical Defendants ignored his medical needs. That Plaintiff disagrees with the treatment he received or that a different course of treatment might have led to a better medical outcome, (see id. at 17), is not evidence of any subjective intent by Medical Defendants to deprive Plaintiff of medical treatment. "Medical malpractice does not become a constitutional violation merely because the victim is a prisoner." Estelle, 429 U.S. at 106. Accordingly, this court finds that a reasonable jury could not find that Medical Defendants were deliberately indifferent to Plaintiff's

condition and will grant Medical Defendants' motion for summary judgment as to Plaintiff's § 1983 claims.

## IV.  CONCLUSION

For the reasons set forth above,

**IT IS THEREFORE ORDERED** that Medical Defendants' Motion to Strike, (Doc. 142), is **GRANTED.**

**IT IS FURTHER ORDERED** that Medical Defendants' Motion for Summary Judgment, (Doc. 123), is **GRANTED IN PART AND DENIED IN PART.** The Motion is **GRANTED** as to all claims against Defendants Southern Health Partners, Inc., Jason Junkins, Sandra Hunt, and Fran Jackson. The Motion is **GRANTED** as to the claims of medical malpractice, negligent supervision, violations of § 1983, false imprisonment, and intentional infliction of emotional distress against Defendant Manuel Maldonado. Finally, the Motion is **DENIED** as to the claim of negligence against Defendant Maldonado.

This the 23rd day of March, 2021.

William L. Osteen, Jr.
_____
United States District Judge

- 75 -