IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

DAVID RAY GUNTER,                )
                                 )
                Plaintiff,       )
                                 )
     v.                          )          1:16CV262
                                 )
SOUTHERN HEALTH PARTNERS, INC.,  )
et al.,                          )
                Defendants.      )


**<u>MEMORANDUM OPINION AND ORDER</u>**

**OSTEEN, JR., District Judge**

Plaintiff David Ray Gunter ("Plaintiff") has brought claims
arising out of injuries he sustained following his incarceration
at two North Carolina jails in November 2012. This court
previously issued a Memorandum Opinion and Order on March 23,
2021, (Doc. 178), granting in part and denying in part a Motion
for Summary Judgment, (Doc. 123), and granting a Motion to
Strike, (Doc. 142), filed by Defendants Southern Health
Partners, Inc., Jason Junkins, Sandra Hunt, Fran Jackson, and
Manuel Maldonado (collectively, the "Medical Defendants"). In
light of this court's Memorandum Opinion and Order on June 10,
2021, (Doc. 190), in which this court granted Medical
Defendants' motion for reconsideration, (Doc. 179), granted in
part and denied in part Plaintiff's motion for reconsideration,

(Doc. 181), and reopened summary judgment, this court will strike its March 23, 2021 Memorandum Opinion and Order, (Doc. 178). This court finds, for purposes of maintaining a relatively clear record, that one opinion and order addressing all summary judgment arguments and related issues is appropriate.

Accordingly, presently before this court are four motions. First, Medical Defendants have filed a Motion for Summary Judgment, (Doc. 123), to which Plaintiff has responded, (Doc. 137), and Medical Defendants have replied, (Doc. 144). Second, Medical Defendants have also filed a related Motion to Strike Affidavit of Michael Teal, (Doc. 142), from Plaintiff's Response to Medical Defendants' Motion for Summary Judgment. Plaintiff has responded, (Doc. 153), and Medical Defendants have replied, (Doc. 156). Third, Medical Defendants have filed a Motion for Summary Judgment on Reconsidered Issues, (Doc. 191), to which Plaintiff has responded, (Doc. 195), and Medical Defendants have replied, (Doc. 199). Fourth, Medical Defendants have filed a Motion to Strike the Affidavits of David Ray Gunter, Tammy J. Banas and Francis M. Hinson, IV, and the Declaration of Damian Laber, (Doc. 197), to which Plaintiff has responded, (Doc. 201), and Medical Defendants have replied, (Doc. 202).

These motions are ripe for adjudication. For the reasons stated herein, this court will grant Medical Defendants' Motion

- 2 -

for Summary Judgment, (Doc. 123), and Medical Defendants' Motion for Summary Judgment on Reconsidered Issues, (Doc. 191). This court will further grant Medical Defendants' Motion to Strike the Affidavit of Michael Teal, (Doc. 142), and grant in part and deny in part Medical Defendants' Motion to Strike the Affidavits of David Ray Gunter, Tammy J. Banas, and Francis M. Hinson, IV, and the Declaration of Damian Laber, (Doc. 197).

## I.   **FACTUAL AND PROCEDURAL BACKGROUND**

### A.   **Parties**

Plaintiff was incarcerated at the Davie County and Stokes County jails over fourteen consecutive days in November 2012. (Medical Defs.' Mem. in Supp. of Mot. for Summ. J. ("Med. Defs.' First Br.") (Doc. 124) at 2.) Defendant Southern Health Partners, Inc. ("SHP") is a corporation that contracts with county jails to provide medical services, including at Davie County and Stokes County jails. (Id.) Defendant Jackson ("Jackson") is a nurse employed by SHP who worked at Davie County jail. (Id. at 2-3.) Defendant Hunt ("Hunt") is a nurse employed by SHP who worked at Stokes County jail. (Id. at 3.) Defendant Maldonado ("Maldonado") is an independent contractor with SHP and a Physician's Assistant who served as Medical Director at both Davie and Stokes County jails. (Id.) Defendant Junkins ("Junkins") is an independent contractor with SHP who

- 3 -

served as the company's corporate medical Director during the applicable time period. (Id.) Defendant Junkins resides in Alabama and neither treated Plaintiff nor supervised the providers who did treat Plaintiff. (Id.)

B.   **Procedural History**

Plaintiff commenced the present action in the Randolph County Superior Court Division of the State of North Carolina on November 6, 2015, by filing an Application Extending Time to File Complaint (Petition for Removal, Ex. B (Doc. 1-2)), and a Motion Extending Statute of Limitations in Medical Malpractice Action. (Id., Ex. C (Doc. 1-3).) Plaintiff was granted permission to file a complaint up to and including November 26, 2015, by order of the Assistant Clerk of Superior Court. (Doc. 1-2.) By order of the Superior Court Judge, the statute of limitations for Plaintiff's medical malpractice action was extended to and including March 4, 2016. (Doc. 1-3.)

Plaintiff filed his Complaint on November 25, 2015, against Southern Health Partners, Inc., Jason Junkins, Sandra Hunt, Fran Jackson, and others. (Complaint ("Compl.") (Doc. 23).) On March 3, 2016, Plaintiff filed his Amended Complaint, adding Defendant Manuel Maldonado and adding a medical malpractice claim. (Doc. 26.) The Amended Complaint contained a "9(j) Medical Malpractice Certification." (Id. at 87.)

- 4 -

A Petition for Removal to this court was filed on April 1, 2016. (Doc. 1.) On December 27, 2016, with leave of court, (Doc. 56), Plaintiff filed a Second Amended Complaint to substitute a defendant. (Second Amended Complaint ("Second Am. Compl.") (Doc. 57).) In the Second Amended Complaint, Plaintiff brings claims against Medical Defendants for medical malpractice, violations of 42 U.S.C. § 1983, negligence, negligent supervision, false imprisonment, and torture and intentional infliction of emotional distress. (Id.) On January 9, 2017, Medical Defendants answered Plaintiff's Second Amended Complaint. (Doc. 61.) On February 22, 2017, Medical Defendants filed a Motion for Partial Judgment on the Pleadings, seeking dismissal of Plaintiff's medical malpractice claim for failure to comply with Rule 9(j) of the North Carolina Rules of Civil Procedure and failure to allege certain claims against certain defendants. (Doc. 63.) This court denied that motion on September 20, 2017. (Doc. 87.)

On December 14, 2018, this court approved the Amended Joint Rule 26(f) Report, (Doc. 99), prepared by the parties, (Doc. 101). Discovery was scheduled to close on July 10, 2019. (Id.) On December 3, 2019, the parties filed a Joint Motion for Extension of Time to Complete Discovery, (Doc. 107), which this court granted in part, extending discovery until March 16, 2020. (Text Order 02/25/2020.) Plaintiff filed a Consent Motion for

- 5 -

Extension of Time to Complete Discovery on March 13, 2020, (Doc. 111), which this court granted, (Text Order 03/23/2020.) Discovery closed on June 15, 2020. (Id.)

Following the close of discovery, Medical Defendants filed the instant Motion and Memorandum for Summary Judgment, (Docs. 123, 124), on July 6, 2020. Plaintiff filed a response on July 30, 2020, (Pl.'s Resp. to Med. Defs.' Mot. for Summ. J. ("Pl.'s First Resp.") (Doc. 137)), and Medical Defendants filed a reply on August 10, 2020, (Med. Defs.' Reply in Supp. of Mot. for Summ. J. ("Med. Defs.' First Reply") (Doc. 144)).

On August 10, 2020, Medical Defendants filed a related Motion to Strike, (Doc. 142), and Memorandum, (Med. Defs.' Mem. in Supp. of Mot. to Strike Aff. of Michael Teal ("Med. Defs.' Mot. to Strike Br.") (Doc. 143)). Plaintiff responded on August 31, 2020, (Pl.'s Opp'n to Med. Defs.' Mot. to Strike ("Pl.'s Resp. to Mot. to Strike") (Doc. 153)), and Medical Defendants replied on September 2, 2020, (Reply in Supp. of Med. Defs.' Mot. to Strike ("Med. Defs.' Reply in Supp. of Mot. to Strike") (Doc. 156)).

On March 2, 2021, Medical Defendants filed a Motion for Relief from Local Rule 83.1(d)(2), (Doc. 169), which the court denied on March 3, 2021. (Doc. 170 at 2.) This court also ordered the parties to "stand down from the presently scheduled

- 6 -

trial preparation deadlines," and ordered the Clerk to set a
scheduling and status conference in this matter after April 1,
2021. (Id. at 1.) This court ordered that the trial not commence
on April 5, 2021, as scheduled, but instead, for a date at least
30 days thereafter. (Id.)

On March 23, 2021, this court issued a Memorandum Opinion
and Order ("March Order"), (Doc. 178), in which it granted
Medical Defendants' Motion to Strike, (Doc. 142), and granted
Medical Defendants' Motion for Summary Judgment, (Doc. 123), as
to all claims against Defendants SHP, Junkins, Hunt, and
Jackson, (March Order (Doc. 178) at 75). The March Order also
granted Medical Defendants' Motion for Summary Judgment as to
the claims of medical malpractice, negligent supervision,
violations of § 1983, false imprisonment, and intentional
infliction of emotional distress against Defendant Maldonado,
but denied the motion as to the claim of negligence against
Defendant Maldonado. (Id.)

Following this court's March Order, Defendant Maldonado
filed a Motion to Reconsider, (Doc. 179), to which Plaintiff
responded, (Doc. 184), and Defendant Maldonado replied, (Doc.
185). Plaintiff also filed a Motion for Reconsideration, (Doc.
181), to which Medical Defendants responded, (Doc. 183), and
Plaintiff replied, (Doc. 186). On June 10, 2021, this court

- 7 -

issued a Memorandum Opinion and Order ("June Order") granting Defendant Maldonado's Motion to Reconsider. (Doc. 190.) In the June Order, this court also granted in part and denied in part Plaintiff's motion. (Id.) This court reopened summary judgment to address three issues: (1) with regard to Plaintiff's medical malpractice claim, this court reopened summary judgment to consider whether there is a genuine dispute of material fact that Defendant Jackson breached the standard of care; (2) with regard to Plaintiff's medical malpractice claim, this court reopened summary judgment to consider whether there is a genuine dispute of material fact that missed medication at the Stokes and Davie County jails was the proximate cause of Plaintiff's injuries; and (3) with regard to Plaintiff's ordinary negligent claim, this court reopened summary judgment to consider whether the intra-system of transfer of Plaintiff from the Davie County Detention Center to the Stokes County Detention Center proximately caused Plaintiff's injuries. (Doc. 190 at 32-33.)

Pursuant to the June Order, on June 18, 2021, Medical Defendants filed a Motion for Summary Judgment on Reconsidered Issues. (Med. Defs.' Mem. in Supp. of Summ. J. on Reconsidered Issues ("Med. Defs.' Second Br.") (Doc. 191).) Plaintiff responded on June 28, 2021, (Pl.'s Resp. to the Court's June 10, 2021 Mem. Op. and Order ("Pl.'s Second Resp.") (Doc. 195)), and

Medical Defendants replied on July 5, 2021. (Med Defs.' Reply in Supp. of Summ. J. on Reconsidered Issues ("Med. Defs.' Second Reply") (Doc. 199),)

On July 5, 2021, Medical Defendants filed a Motion to Strike the Affidavits of David Ray Gunter, Tammy J. Banas and Francis M. Hinson, IV, and the Declaration of Damian Laber. (Doc. 197.) Plaintiff responded on July 19, 2021, (Doc. 201), and Medical Defendants replied on July 23, 2021, (Doc. 202).

C.   **Factual Background**

A majority of the facts are described here, but additional relevant facts will be addressed as necessary throughout the opinion. The majority of facts are not disputed, and any material factual disputes will be specifically addressed in the relevant analysis. The facts described in this summary are taken in a light most favorable to Plaintiff. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

Plaintiff was diagnosed with aortic stenosis, a heart condition, at birth. (Ex. 8, Excerpts from the Dep. of David Ray Gunter ("Gunter Dep.") (Doc. 124-8) at 6.)[1] To address the condition, Plaintiff's aortic valve was replaced with a

_____

[1] All citations in this Memorandum Opinion and Order to documents filed with the court refer to the page numbers located at the bottom right-hand corner of the documents as they appear on CM/ECF.

- 9 -

mechanical heart valve ("MHV") when he was fifteen years old. (Id. at 7.) Because patients with an MHV have a higher risk for a blood clot compared to a person without an MHV, (Dep. of Virginia Glover Yoder ("Yoder Dep. Part II") (Doc. 172-1) at 56), individuals with an MHV are treated with Coumadin,[2] which thins their blood and reduces the risk of clotting, (Dep. of Virginia Glover Yoder ("Yoder Dep. Part I") (Doc. 172) at 78). Too much Coumadin can create a risk of bleeding, as thin blood lacks clotting factors. (Id.) Providers monitor a patient's "INR" level, which indicates the blood's bleeding time, thickness, and clotting factors. (See id. at 82.) A patient's INR can vary, and medical providers must monitor a patient's INR regularly and adjust their medication, as needed. (See id. at 77-78.) Through medication and monitoring, the goal of Coumadin therapy is to maintain a therapeutic INR level, which is defined as being between 2.5 and 3.5. (Ex. 6, Excerpts from the Dep. of Manuel Maldonado ("Maldonado Dep.") (Doc. 124-6) at 3.) A patient's diet, alcohol use, and smoking habits can affect a patient's INR level. (Yoder Dep. Part I (Doc. 172) at 117.)

_____

[2] Coumadin is the brand name and Warfarin is the generic name for the same medication, and the names are used interchangeably in this opinion. (See Med. Defs.' First Br. (Doc. 124) at 4 n.1.)

Plaintiff has been taking Coumadin since he was 15 years old. (Gunter Dep. (Doc. 124-8) at 7.) At the time he was incarcerated at the Davie and Stokes County jails, Plaintiff was thirty-seven years old. (See id. at 5.) Plaintiff typically took Coumadin once per day in the evening. (See id. at 11.) In 2012, Plaintiff was being treated by Virginia Yoder, PharmD at the Coumadin Clinic in Forsyth County, but on May 29, 2012, Dr. Yoder discharged Plaintiff from the clinic for failing to show up for his appointments. (Doc. 124-11 at 2; see also Yoder Dep. Part II (Doc. 172-1) at 55-56.)

As will be discussed further hereinafter, Plaintiff presents no admissible evidence to suggest that his INR levels were monitored by a physician or that his INR levels were in any way monitored or measured from his last appointment with Dr. Yoder prior to May 29, 2012, until after his arrest on November 6, 2012 – a period of almost 180 days. Plaintiff presents no evidence that his INR levels were therapeutic when he was arrested.

Plaintiff was arrested on November 6, 2012, in Forsyth County on a bench warrant, and after one night at the Forsyth County jail, Plaintiff was transferred to the Davie County jail

- 11 -

on November 7, 2012.[3] At 8:00 a.m. on November 7, 2012, upon his arrival at Davie County jail, Plaintiff was screened by Defendant Jackson. (Doc. 124-1 at 6.) Plaintiff told Defendant Jackson that he had heart problems and took Coumadin, which she noted in his medical record. (Id. at 6-7.) Plaintiff's medical records indicate that he told Defendant Jackson that he would have his medications brought to the jail if he was not released. (Id. at 7.)

Plaintiff was not released on November 7, 2012, and on November 8 at 9:40 a.m., Defendant Jackson noted in the medical records that she contacted his primary care physician and pharmacy to verify the information Plaintiff had provided about his medication and conditions. (Id.) Defendant Jackson's notes in the medical records indicate that Plaintiff last filled his prescription for 1 mg of Coumadin on October 19, 2012, and that he did not have any refills remaining. (Id.) Defendant Jackson contacted Maplewood Family Practice, which Plaintiff had indicated was where his primary care physician worked. (Id.)

---

[3] Both parties address this fact as though it is not disputed, (see Med. Defs.' First Br. (Doc. 124) at 6-7; Pl.'s First Resp. (Doc. 137) at 4), although there is no citation to an affidavit, deposition, or other necessary evidentiary foundation as required by Rule 56. Nevertheless, in the absence of any dispute or objection, the court will treat the fact as undisputed.

- 12 -

Maplewood Family Practice indicated that they had last seen Plaintiff in June 2012 for a sick visit, but they had last managed Plaintiff's INR levels in 2010. (Id.) Defendant Jackson's notes do not indicate that she was aware of any medical practitioner who had been managing Plaintiff's Coumadin medication between 2010 and 2012. (Id.)

On November 8, 2012, following her conversation with Plaintiff, Defendant Jackson consulted with Defendant Maldonado, who ordered a prescription for 5 mg of Coumadin and for Plaintiff to have an INR check on November 13, 2012. (Id. at 2, 7.) Plaintiff received 5 mg of Coumadin each day on November 9 through November 14, 2012. (Id. at 11.) Plaintiff did not receive any Coumadin on November 7 or 8. (Id.)

Later in the day on November 8, 2012, Plaintiff's family delivered two 5 mg pills and four 1 mg pills in bottles labeled as Coumadin to the Davie County jail. (Id. at 14.) The pills arrived after Defendant Jackson had left, and Plaintiff was not dispensed this medication while at the Davie County jail.[4]

---

[4] Medical Defendants assert this in their brief, but there is no accurate citation to an affidavit, deposition, or other necessary evidentiary foundation as required by Rule 56. (Med. Defs.' First Br. (Doc. 124) at 8). Plaintiff does not contest this fact. (See Pl.'s First Resp. (Doc. 137) at 5.) In the absence of any dispute or objection, the court will treat the fact as undisputed.

Case 1:16-cv-00262-WO-JLW   Document 204   Filed 09/17/21   Page 13 of 95

On Tuesday, November 13, 2012, Plaintiff was transported to the hospital for an INR test, which showed that his INR levels were 1.07. (Id. at 12.) Defendant Jackson notified Defendant Maldonado of the INR test result, and Defendant Maldonado ordered Plaintiff's dosage be increased to 7.5 mg for Thursday, November 15; Saturday, November 17; and Monday, November 19, and remain at 5 mg on Tuesday, November 13; Wednesday, November 14; Friday, November 16; and Sunday, November 18. (Id. at 2.) Defendant Jackson gave Plaintiff medication according to this schedule on November 13-15. (Id. at 11.)

On November 15, 2012, Defendant Jackson completed a "Medical Information Transfer Form" summarizing Plaintiff's medical condition and indicating the medication plan. (Id. at 13.) On Friday, November 16, 2012, Plaintiff was transferred to the Stokes County jail. (Doc. 124-5 at 11.) Plaintiff arrived at the jail in the afternoon after Defendant Hunt, the nurse, had left for the day. (Id. at 9-10.) Defendant Hunt was not scheduled to return until Monday, November 19, 2012. (Id. at 15-16.) Plaintiff did not receive any Coumadin until November 19, 2012, when Defendant Hunt returned. (Id.; Doc. 137-11 at 4.) Officers at the jail called Defendant Hunt about the pills Plaintiff's family had previously brought to the Davie County jail, but Plaintiff was not permitted to take the medication

- 14 -

because the pills were expired. (Doc. 124-5 at 14.) When
Defendant Hunt returned to work on Monday, she learned about
Defendant Maldonado's order for Coumadin, and arranged for
Plaintiff to receive his Coumadin doses on Monday, November 19,
and Tuesday, November 20. (Id. at 15-16; Doc. 137-11 at 4.)

Plaintiff was released from Stokes County jail on
Wednesday, November 21, 2012.[5] Upon release, Plaintiff possessed
only the six Coumadin pills his family had brought to the jail.[6]

On November 29, 2012, Plaintiff was admitted to Wake Forest
Baptist Medical Center for a blood clot. (Doc. 124-17 at 2.)
Plaintiff's medical record from his admission states that he
began experiencing abdominal pain two days before seeking
admission. (Id. at 2-3.) At the time of admission, his INR level
was 1.7, and his medical record indicates that he had been "off
of his Coumadin since earlier [in the] week." (Id. at 5.)

---

[5] Both parties address this fact as though it is not
disputed, (see Med. Defs.' First Br. (Doc. 124) at 9; Pl.'s
First Resp. (Doc. 137) at 6), but there is no citation to an
affidavit, deposition, or other necessary evidentiary foundation
as required by Rule 56. Nevertheless, in the absence of any
dispute or objection, this court will treat this as undisputed.

[6] Medical Defendants assert this in their brief, but there
is no accurate citation to an affidavit, deposition, or other
necessary evidentiary foundation as required by Rule 56. (Med.
Defs.' First Br. (Doc. 124) at 10). Plaintiff does not contest
this fact. (See Pl.'s First Resp. (Doc. 137) at 6-7.) In the
absence of any dispute or objection, the court will treat the
fact as undisputed.

Plaintiff was discharged from the hospital on December 11, 2012, with a therapeutic INR of 3.16. (Id. at 4.) At that time, the clot had been surgically removed, his organs were viable, and there was no medical need for a bowel resection. (Id. at 3-4.)

Plaintiff's INR was tested five times between December 14, 2012, and January 2, 2013, and his INR levels were sub-therapeutic on four of the five tests, including on December 14, 2012, three days after his release from the hospital. (See Doc. 124-18 at 2.) On January 18, 2013, Plaintiff was diagnosed with a second clot, requiring surgeons to resect part of Plaintiff's bowel. (Dep. of Damian A. Laber, M.D. ("Laber Dep.") (Doc. 174) at 121.)[7]

## II. STANDARD OF REVIEW

Courts "apply state substantive law and federal procedural law when reviewing state-law claims." Kerr v. Marshall Univ. Bd. of Governors, 824 F.3d 62, 74 (4th Cir. 2016). "[W]hether there is sufficient evidence to create a jury issue of those essential substantive elements of the action, as defined by state law, is

_____

[7] Medical Defendants assert this in their brief, but there is no accurate citation to an affidavit, deposition, or other necessary evidentiary foundation as required by Rule 56. (Med. Defs.' First Br. (Doc. 124) at 10). Plaintiff does not contest this. (See Pl.'s First Resp. (Doc. 137).) In the absence of any dispute or objection, this court will treat this as undisputed.

controlled by federal rules." Fitzgerald v. Manning, 679 F.2d 341, 346 (4th Cir. 1982).

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). Courts consider whether the evidence "is so one-sided that one party must prevail as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986). The moving party bears the burden of demonstrating "that there is an absence of evidence to support the nonmoving party's case." Celotex Corp., 477 U.S. at 325. If the "moving party discharges its burden . . ., the nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." McLean v. Patten Cmtys., Inc., 332 F.3d 714, 718-19 (4th Cir. 2003) (citing Matsushita Elec. Indus. Co., 475 U.S. at 586-87). Summary judgment should be granted "unless a reasonable jury could return a verdict in favor of the nonmoving party on the evidence presented." Id. at 719 (citing Liberty Lobby, 477 U.S. at 247-48).

When considering a summary judgment motion, courts "construe the evidence in the light most favorable to . . . the non-moving party. [Courts] do not weigh the evidence or make credibility determinations." Wilson v. Prince George's Cnty.,

- 17 -

893 F.3d 213, 218-19 (4th Cir. 2018) (internal citations omitted).

## III. **ANALYSIS**

### A.   **Medical Defendants' Motions to Strike**

Because "[a] party asserting that a fact cannot be or is genuinely disputed must support the assertion by: . . . citing to particular parts of materials in the record, including . . . affidavits," Fed. R. Civ. P. 56(c)(1)(A), this court considers Medical Defendants' motions to strike as an initial matter.

#### 1.   **Motion to Strike the Teal Affidavit**

Plaintiff attached the Affidavit of Michael Teal in support of Plaintiff's first response to Medical Defendants' motion for summary judgment. (Pl.'s First Resp., Ex. 15, Affidavit of Michael Ryan Teal ("Teal Aff.") (Doc. 137-15).) Plaintiff argues that Dr. Teal's testimony rebuts Medical Defendants' affirmative defenses "by explaining the proper interpretation of Plaintiff's pharmacy records." (Pl.'s Resp. to Mot. to Strike (Doc. 153) at 1.)

Medical Defendants argue the Teal Affidavit should be struck for several reasons.

First, Medical Defendants argue that Dr. Teal "is not an expert witness," and "has no personal knowledge of Plaintiff," and that his testimony "includes inadmissible hearsay as Mr.

- 18 -

Teal admits he consulted with unnamed colleagues." (Med. Defs.'
Mot. to Strike Br. (Doc. 143) at 2.) Medical Defendants argue
that to include his affidavit would violate Federal Rules of
Evidence 801, 802, and 803. (Id.)

Second, Medical Defendants argue that inclusion of the
affidavit violates Federal Rule of Civil Procedure 37(c), (id.),
which states that "[i]f a party fails to . . . identify a
witness as required by Rule 26(a) or (e), the party is not
allowed to use that . . . witness to supply evidence on a motion
. . . unless the failure was substantially justified or is
harmless." Fed. R. Civ. P. 37(c)(1). Medical Defendants argue,
and Plaintiff does not contest, that Dr. Teal was not identified
as a witness during discovery, in violation of Federal Rule of
Civil Procedure 26(a). (Med. Defs.' Mot. to Strike Br. (Doc.
143) at 2; see Pl.'s Resp. to Mot. to Strike (Doc. 153).)
Medical Defendants argue that the affidavit is prejudicial
because they did not have an opportunity to depose or challenge
Dr. Teal's testimony and that Plaintiff has not offered a
justification or sought court approval to include the affidavit
after failing to identify Dr. Teal as a witness during
discovery. (Med. Defs.' Mot. to Strike Br. (Doc. 143) at 2-3.)

Plaintiff argues that a district court's decision in
Syngenta Crop Protection, LLC v. Willowood, LLC, No. 1:15-CV-

- 19 -

274, 2017 WL 3309699 (M.D.N.C. Aug. 2, 2017), counsels denying Medical Defendants' motion. (Pl.'s Resp. to Mot. to Strike (Doc. 153) at 1-2.) Applying the factors used in Syngenta, Plaintiff argues that the Teal Affidavit does not present any previously undisclosed evidence. (Id. at 2.) Plaintiff argues that Medical Defendants "had the ability and opportunity through counter affidavits to take issue with Dr. Teal's conclusions or citations to entries in the pharmacy records," but instead, chose to file the instant motion. (Id.)

Moreover, Plaintiff argues that Medical Defendants' actions necessitated the inclusion of the Teal Affidavit, asserting that Medical Defendants provided witnesses with an "unauthenticated (and incorrect) summary" of the pharmacy records and questioned several witnesses about this summary during depositions. (Id. at 3.) Plaintiff argues that the Teal Affidavit is submitted "solely" to rebut Medical Defendants' affirmative defense that Plaintiff was contributorily negligent in failing to take his medication regularly, (id. at 5), as Plaintiff argues that the Teal Affidavit "demonstrate[s] that Plaintiff continued to have a sufficient and timely supply of warfarin in the weeks and months prior to his arrest . . . ." (Id.) Because it is used solely for this purpose, "Plaintiff has not violated any Rule or Order relating to the disclosure of witnesses." (Id.)

- 20 -

This court disagrees. In <u>Southern States Rack and Fixture,</u> <u>Inc. v. Sherwin-Williams Co.</u>, the Fourth Circuit held that, when determining whether information or witnesses should be excluded under Rule 37(c), courts must consider:

> (1) the surprise to the party against whom the evidence would be offered; (2) the ability of that party to cure the surprise; (3) the extent to which allowing the testimony would disrupt the trial; (4) the importance of the evidence; and (5) the nondisclosing party's explanation for its failure to disclose the evidence.

318 F.3d 592, 597 (4th Cir. 2003) (internal quotations omitted). The first four factors of this test "relate primarily to the harmlessness exception, while the last factor, addressing the party's explanation for its nondisclosure, relates mainly to the substantial justification exception." <u>Bresler v. Wilmington Tr.</u> <u>Co.</u>, 855 F.3d 178, 190 (4th Cir. 2017). Applying these factors, this court finds that Plaintiff's failure to disclose Dr. Teal as a witness is neither substantially justified nor harmless.

### a.   <u>Plaintiff's failure to disclose is not</u> <u>substantially justified</u>

Plaintiff argues that the Teal Affidavit rebuts Medical Defendants' arguments that Plaintiff was contributorily negligent in failing to take his medication regularly. (Pl.'s Resp. to Mot. to Strike (Doc. 153) at 4.) Yet, Plaintiff had notice long before the close of discovery on June 15, 2020, that Medical Defendants intended to raise this argument.

- 21 -

For example, Plaintiff's counsel received the pharmacy records at issue by correspondence on September 20, 2017. (Doc. 156-1 at 1-2.) Moreover, Medical Defendants served their expert report of Dr. Julie M. Sease on October 18, 2019, in which Dr. Sease opined that, based on the prescription records she had reviewed, Plaintiff "most likely ran out of his Warfarin 5 mg tablets around the end of September 2012 or at least by mid-October when he called requesting a refill of those tablets," and as a result, "it is most likely that Mr. Gunter's INR value was subtherapeutic for a number of weeks before he was ever under the care of Southern Health Partners." (Doc. 156-2 at 3.) Despite Plaintiff's awareness of Medical Defendants' use of the testimony and pharmacy records, Plaintiff did not supplement his disclosures or discovery to include Dr. Teal as a witness. (Med. Defs.' Reply in Supp. of Mot. to Strike (Doc. 156) at 3.)

As the court found in Syngenta, Medical Defendants were "entitled to rely on [the plaintiff]'s disclosures as to who its witnesses were likely to be." 2017 WL 3309699, at *4. Indeed, in Hoyle v. Freightliner, LLC, the Fourth Circuit upheld a district court's decision to exclude a newly disclosed witness even where there were references to the witness in deposition testimony and discovery responses, because the new witness had not been identified in response to discovery requests that expressly

sought identification of potential witnesses. 650 F.3d 321, 329-30 (4th Cir. 2011). Here, as in Hoyle, Plaintiff failed to identify Dr. Teal as a potential witness, despite Plaintiff's awareness far before the close of discovery that Plaintiff might find it necessary to rebut Medical Defendants' expert who testified that Plaintiff was subtherapeutic based on the pharmacy records. For these reasons, Plaintiff's explanation for why he failed to disclose Dr. Teal's testimony is unpersuasive, and this court finds that Plaintiff's failure is not substantially justified under Rule 37(c)(1).

### b. Plaintiff's failure to disclose is not harmless

This court further finds that Plaintiff's failure to disclose is not harmless. Under the first factor identified in Southern States, 318 F.3d at 597, Dr. Teal's affidavit is a surprise to Medical Defendants, as Plaintiff did not identify Dr. Teal in his Rule 26 disclosures or in response to Medical Defendants' interrogatory in which they requested Plaintiff identify his witnesses. (Med. Defs.' Reply in Supp. of Mot. to Strike (Doc. 156) at 2.)

Courts have discretion under Rule 37(c) to determine appropriate sanctions, including excluding the evidence, "payment of the reasonable expenses . . . caused by the failure," "inform[ing] the jury of the party's failure," or

- 23 -

"impos[ing] other appropriate sanctions . . . ." Fed. R. Civ. P.
37(c)(1)(A)-(C). Here, to cure the surprise to Medical
Defendants, this court considered requiring Plaintiff to produce
Dr. Teal for deposition at a place selected by Medical
Defendants and at Plaintiff's expense, reopening discovery,
informing the jury at any trial of Plaintiff's failure to timely
disclose Dr. Teal as a witness, or a combination of these
sanctions. Yet, each of these alternative sanctions would have
serious negative consequences.

First, as the court found in Syngenta, 2017 WL 3309699, at
*5, and as Medical Defendants argue, (Med. Defs.' Reply in Supp.
of Mot.to Strike (Doc. 156) at 2), affidavits are of limited
value and do not allow the parties to evaluate a witness's
demeanor, which is an important aspect of credibility, or to
identify weaknesses or gaps in the affidavit. Second, this
matter has already been delayed several times due to extensions
requested by the parties. Reopening discovery would further
delay resolution of this matter. Third, notwithstanding this
court's decision to grant Medical Defendants' motion for summary
judgment, see discussion infra Part III.B, if this matter were
to go to trial, "an instruction to the jury is likely to
interject additional confusing issues related to discovery into
the trial." Syngenta Crop Protection, 2017 WL 3309699 at *5.

- 24 -

None of these alternatives would address the harm to Medical Defendants arising from its reliance on Plaintiff's pretrial disclosures in formulating its trial and discovery strategy.

For the reasons stated therein, this court finds that Dr. Teal's affidavit is neither harmless nor substantially justified under Rule 37(c) or the factors indicated by the Fourth Circuit in <u>Southern States</u>. Accordingly, this court will grant Medical Defendants' motion to strike.

### 2. <u>Motion to Strike the Affidavits of David Ray Gunter, Tammy J. Banas, Francis M. Hinson, IV, and the Declaration of Damian Laber</u>

Medical Defendants move to strike, (Doc. 197), the affidavits of David Ray Gunter, (Aff. of David Ray Gunter ("Gunter Aff.") (Doc. 195-6)), Tammy J. Banas, (Aff. of Tammy J. Banas ("Banas Aff.") (Doc. 195-3)), and Francis M. Hinson, IV, (Aff. of Francis M. Hinson, IV ("Hinson Aff.") (Doc. 195-2)), as well as the Declaration of Damian Laber, (Decl. of Damian Laber ("Laber Decl.") (Doc. 195-5)). Following this court's June Order, Plaintiff filed these documents in his response to Medical Defendants' renewed motion for summary judgment, (Pl.'s Second Resp. (Doc. 195)). This court considers each of these documents, in turn.

### a. <u>Affidavit of David Ray Gunter</u>

Medical Defendants argue the Gunter Affidavit should be struck for several reasons. First, Medical Defendants argue the Gunter Affidavit "is nothing short of an attempt to circumvent" this court's previous exclusion of the Teal Affidavit, and that because the Teal Affidavit was excluded under a <u>Southern States</u> analysis, the Gunter Affidavit should also be excluded. (Med. Defs.' Mem. in Supp. of Mot. to Strike the Affs. of David Ray Gunter, Tammy J. Banas & Francis M. Hinson IV & the Decl. of Damian Laber ("Med. Defs.' Second Mot. to Strike Br.") (Doc. 198) at 12.)

Plaintiff responds that the exclusion of the Teal Affidavit did not create a finding of fact that Plaintiff was without Coumadin for weeks prior to his incarceration, nor did this court address the admissibility of the pharmacy records. (Pl.'s Resp. to Med. Defs.' Mot. to Strike ("Pl.'s Resp. to Second Mot. to Strike") (Doc. 201) at 10.) This court agrees with Plaintiff. This court excluded the Teal Affidavit because of Plaintiff's failure to timely disclose Dr. Teal and did not address whether the exclusion of the Teal Affidavit created a finding of fact that Plaintiff was without Coumadin leading up to his incarceration. <u>See supra</u> Part III.A.1.

Second, Medical Defendants argue the Gunter Affidavit is unreliable, and Defendants have not had the opportunity to establish that unreliability through deposition. (Med. Defs.' Second Mot. to Strike Br. (Doc. 198) at 13.) Medical Defendants point to Plaintiff's deposition testimony where Plaintiff stated he took 5 mg of Warfarin "pretty much the whole time," but Plaintiff's expert now contends Plaintiff was underdosed by being provided 5 mg while incarcerated. (Compare Gunter Dep. (Doc. 124-8) at 10 with Laber Decl. (Doc. 195-5) ¶ 5.) Medical Defendants also point to Plaintiff's education as further evidence of the unreliability of the Gunter Affidavit,[8] implying that someone without a high school education cannot accurately interpret "a complicated Walgreens record which is otherwise unclear to even lawyers." (Med. Defs.' Second Mot. to Strike Br. (Doc. 198) at 13.) (Id.)

Medical Defendants further argue the Gunter Affidavit is not based on personal knowledge but rather on Plaintiff's review of the Walgreens records. (Med. Defs.' Second Mot. to Strike Br. (Doc. 198) at 13; Gunter Aff. (Doc. 195-6) ¶ 6.) Contrary to

_____

[8] Medical Defendants cite Plaintiff's deposition for this proposition, but the cited portion of Plaintiff's deposition has not been placed on the record. Nevertheless, Plaintiff does not contest Medical Defendants' assertion that Plaintiff does not have a high school diploma or a GED. (See Pl.'s Resp. to Second Mot. to Strike (Doc. 201) at 9-12.)

- 27 -

Medical Defendants' assertion, this court finds Plaintiff can use the Walgreens records to refresh his recollection as to what medicine he was taking. See Fed. R. Evid. 612; United States v. Morlang, 531 F.2d 183, 190-91 (4th Cir. 1975) (noting that use of written document to refresh a witness's recollection is proper).

In addition to arguing the Gunter Affidavit is not based on personal knowledge, Medical Defendants argue the Gunter Affidavit contains impermissible hearsay because Plaintiff is using the Walgreens records (an out-of-court statement) for its truth. (Med. Defs.' Second Mot. to Strike Br. (Doc. 198) at 13-14.) Under Fed. R. Evid. 803(6)(D), business records are admissible as an exception to the rule against hearsay. Medical Defendants do not appear to contest that these are the actual Walgreens records, but rather they argue Plaintiff has not authenticated the Walgreens records through a witness. (Id. at 14.) This court finds that Plaintiff would be able to authenticate the Walgreens records, and therefore the Walgreens records would "be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). Thus, the Gunter Affidavit does not contain impermissible hearsay.

Finally, Medical Defendants argue the Gunter Affidavit contains impermissible opinion testimony. (Med. Defs.' Second

Mot. to Strike Br. (Doc. 198) at 14 (citing Fed. R. Evid. 701).)
Plaintiff responds that this court can ignore Plaintiff's
opinion "yet still believe Mr. Gunter's testimony that he
obtained the supplies of coumadin detailed in his affidavit, as
corroborated by the pharmacy records." (Pl.'s Resp. to Second
Mot. to Strike (Doc. 201) at 11.)

If this court disregards the reason Plaintiff received the
emergency supply of Coumadin from Walgreens, the Gunter
Affidavit appears to create a genuine issue of fact: whether
Plaintiff had a prescription for Coumadin prior to his
incarceration. The Gunter Affidavit appears to attempt to
establish that Plaintiff had a Coumadin prescription leading up
to his incarceration through this "emergency supply"; however,
Plaintiff cannot use the Gunter Affidavit to "avoid summary
judgment by submitting contradictory evidence." Williams v.
Genex Servs., LLC, 809 F.3d 103, 110 (4th Cir. 2015). The Gunter
Affidavit contradicts Plaintiff's other evidence, which shows he
did not have a valid Coumadin prescription prior to his
incarceration, see discussion infra Part III.B.1.c.iii, which is
impermissible under Williams. Therefore, the Gunter Affidavit is
not admissible to prove whether there was a current prescription
or to offer an opinion as to the basis for the Walgreens
provision of the medications, whether prescription or otherwise.

Even if this court does not strike the Gunter Affidavit,
the inclusion of the Gunter Affidavit would not change this
court's analysis of the merits of Medical Defendants' summary
judgment arguments. The Gunter Affidavit essentially restates
the substance of the Walgreens records based on Plaintiff's
refreshed recollection. The Walgreens records are not new; they
were already in the record and considered by this court during
the first Motion for Summary Judgment. (March Order (Doc. 178)
at 48 (citing Doc. 124-12).) Additionally, the Gunter Affidavit
does not establish Plaintiff had an actual prescription to
maintain his therapeutic INR besides the prescription Dr. Yoder
prescribed, which was expired. (See Doc. 124-12 at 2-3; see also
Yoder Dep. Part I (Doc. 172) at 144; Doc. 124-3 at 4.)

In sum, this court finds the Gunter Affidavit, in light of
Plaintiff's refreshed recollection from the Walgreens records,
may be considered to show what medicine Plaintiff was taking,
how often, and what dosage. However, the Gunter Affidavit is
inadmissible to prove whether there was a current prescription
or to offer an opinion as to the basis for the Walgreens
provision of the medicines. This court thus finds that the
Gunter Affidavit will be considered in part. Accordingly, this
court will grant in part and deny in part Medical Defendants'
Motion to Strike the Gunter Affidavit.

- 30 -

### b.  **Affidavit of Tammy J. Banas**

Medical Defendants argue the Banas Affidavit should be struck because it is a sham affidavit. (Med. Defs.' Second Mot. to Strike Br. (Doc. 198) at 8-9.) Plaintiff argues that the Banas Affidavit should be allowed because Nurse Banas is explaining her deposition testimony, not adding new testimony. (Pl.'s Resp. to Second Mot. to Strike (Doc. 201) at 5-6.)

To strike an affidavit as a sham affidavit, "there must be a bona fide inconsistency" between the prior deposition testimony and the affidavit. Spriggs v. Diamond Auto Glass, 242 F.3d 179, 185 n.7 (4th Cir. 2001). "No such inconsistency exists when the affidavit 'merely detail[s] and lend[s] context' to the prior testimony." Riggins v. SSC Yanceyville Operating Co., 800 F. App'x 151, 160 (4th Cir. 2020) (quoting Libertarian Party of Va. v. Judd, 718 F.3d 308, 314 n.6 (4th Cir. 2013)).

Here, the Banas Affidavit explains why Nurse Banas testified at her deposition that she had not reviewed any standards of care for correctional nursing. (Banas Aff. (Doc. 195-3) ¶ 5.) Nurse Banas asserts the reason she was unaware of the standard of care for correctional nursing is because "there are no such standards that are specific to jails in North Carolina." (Id.) Similarly, the Banas Affidavit provides context for why Nurse Banas testified at her deposition that Plaintiff

- 31 -

did not have a Coumadin prescription, but now her affidavit states that Plaintiff did have a prescription of coumadin. (Id. ¶ 7 ("Since the time of my deposition, I have received and reviewed one additional page that . . . was not part of what the Defense initially produced.").) The Banas Affidavit thus "lend[s] context" to Banas' deposition testimony. Riggins, 800 F. App'x at 160 (internal quotation omitted).

Medical Defendants also argue the Banas Affidavit should be struck under Southern States. (Med. Defs.' Second Mot. to Strike Br. (Doc. 198) at 11.) However, under Southern States, the Banas Affidavit is both harmless and substantially justified. Southern States, 318 F.3d at 597. The Banas Affidavit should not be a surprise to Medical Defendants because this court invited "the parties to address the issue of whether Ms. Banas was qualified to testify regarding Defendant Jackson's possible breach of the standard of care." (Doc. 190 at 21.) Additionally, the Banas Affidavit is important because it provides context and further explanation for one of Plaintiff's expert witnesses. Plaintiff has also offered a sufficient explanation for the Banas Affidavit, which is that the affidavit explains why Nurse Banas testified at her deposition she had not reviewed any standards of care for correctional nursing and that Plaintiff did not have

a valid Coumadin prescription. (See Pl.'s Resp. to Second Mot. to Strike (Doc. 201) at 5.)

For the reasons stated therein, this court finds that the Banas Affidavit is not a sham affidavit, and it is harmless and substantially justified under Rule 37(c) and the factors indicated by the Fourth Circuit in Southern States. Accordingly, this court will deny Medical Defendants' Motion to Strike the Banas Affidavit.

### c. Affidavit of Francis M. Hinson, IV

Medical Defendants argue the Hinson Affidavit should be struck because the affidavit reflects improper opinion testimony in violation of Fed. R. Evid. 701. (Med. Defs.' Second Mot. to Strike Br. (Doc. 198) at 11-12.) Plaintiff responds that the Hinson Affidavit was presented to this court to explain how the third page of the facsimile from the Maplewood Clinic to the Medical Defendants was only recently discovered and why it was not included as an exhibit in Plaintiff's response brief to the first Motion for Summary Judgment. (Pl.'s Resp. to Second Mot. to Strike (Doc. 201) at 7.)

This court, in its order reopening summary judgment, invited the parties to explain the source of the document at issue. (Doc. 190 at 32-33.) Paragraph six of the Hinson

Affidavit does just that. (See Hinson Affidavit (Doc. 195-2) ¶ 6.)

However, paragraph seven of the Hinson Affidavit contains impermissible opinion testimony. Under Fed. R. Civ. P. 56(c)(4), an affidavit must be based on personal knowledge and set out facts that would be admissible in evidence. Fed. R. Civ. P. 56(c)(4). Lay witnesses are not allowed to give testimony that is not based on the witness's own perception or testimony that is "based on scientific, technical, or other specialized knowledge." Fed. R. Evid. 701.

Here, in paragraph seven of the Hinson affidavit, Hinson offers an opinion as to what the medical record means. (See Hinson Aff. (Doc. 195-2) ¶ 7 ("[T]his new page demonstrates that SHP's healthcare providers were informed that Mr. Gunter had a prescription for 7mg of warfarin . . . to be taken daily.").) This is impermissible because Hinson is not a medical expert and does not have personal knowledge about the document at issue.

Thus, this court will grant Medical Defendants' Motion to Strike the Hinson Affidavit as to paragraph seven and will deny the Motion as to paragraphs one through six.

### d.  Declaration of Damian Laber

Medical Defendants argue the Laber Declaration should be struck because the declaration contradicts Dr. Laber's

- 34 -

deposition testimony. (Med. Defs.' Second Mot. to Strike Br. (Doc. 198) at 7.) Plaintiff disagrees and argues the Laber Declaration supplements prior testimony. (Pl.'s Resp. to Second Mot. to Strike (Doc. 201) at 3.)

This court agrees with Medical Defendants. Dr. Laber's commentary about there being an underdosing of medication is new testimony that expressly contradicts his findings in his deposition about proximate cause being a lack of anticoagulation generally. (Compare Laber Decl. (Doc. 195-5) ¶ 5 with Laber Dep. (Doc. 174) at 56, 121.) Dr. Laber is not explaining how lack of anticoagulation generally caused Plaintiff's injuries. He is proposing a new proximate cause: underdosing of medication. (Laber Decl. (Doc. 195-5) ¶ 5.) Plaintiff cannot create a dispute of material fact through this contradictory evidence. See Luke v. Family Care & Urgent Med. Clinics, 323 F. App'x 496, 500 (4th Cir. 2009) ("This new theory [of causation] did not correct an inaccuracy . . . nor did it fill in a gap based on information previously unavailable . . . . [T]he untimely declarations instead impermissibly attempted to fix the weaknesses, identified by the [defendants] in their summary judgment motion, in [the plaintiff's] ability to establish causation.").

- 35 -

Medical Defendants also argue Dr. Laber has contradicted himself by asserting in his declaration that INR testing prior to Plaintiff's incarceration was not necessary to determine proximate cause. (Med. Defs.' Second Mot. to Strike Br. (Doc. 198) at 7.) Plaintiff argues the declaration is not contradictory but offers explanation about Dr. Laber's opinion on proximate cause. (Pl.'s Resp. to Second Mot. to Strike (Doc. 201) at 3.)

This court need not decide whether this portion of the Laber Affidavit is explanatory or contradictory testimony because this court finds that Plaintiff is attempting to put forth a new theory of proximate cause, which is disallowed under the Fourth Circuit's sham affidavits line of cases. See, e.g., Rohrbough v. Wyeth Lab'ys, Inc., 916 F.2d 970, 976 (4th Cir. 1990) (holding that conflicting versions of a medical expert's testimony warrant caution because they "may not represent the considered opinion of the doctor himself, but rather an effort on the part of the plaintiffs to create an issue of fact").

Moreover, Plaintiff has offered no explanation for why this testimony was not offered previously, either in Dr. Laber's report or during his deposition. (Pl.'s Resp. to Second Mot. to Strike (Doc. 201) at 3.) Dr. Laber was asked about the significance of INR testing during his deposition. (Laber Dep.

- 36 -

(Doc. 174) at 34-37.) Despite being asked several questions about INR testing, Dr. Laber never mentioned that INR levels are not necessary to evaluate proximate cause as he mentioned in his affidavit. (See Laber Decl. (Doc. 195-5) ¶ 8.) This court finds Plaintiff is engaging in an impermissible effort to expand an expert's testimony to provide alternative proximate cause theories after expert disclosures and the completion of discovery. See Southern States, 318 F.3d at 598 (disallowing previously nondisclosed evidence where the nondisclosing party's explanation for its failure to disclose was insufficient). Dr. Laber's opinion, as set forth in his most recent affidavit, that INR levels are not necessary for a patient who has achieved a stable anticoagulant therapy regimen, (Laber Decl. (Doc. 195-5) ¶ 8), is directly contradicted by Plaintiff's other evidence. For example, Dr. Yoder's letter, one of Plaintiff's exhibits, states: "I have learned that Mr. Gunter is extremely sensitive to warfarin dose changes and needs very close follow-up to ensure his INR remains in the therapeutic range (2.5 – 3.5)." (Doc. 75-2.)

Even if this court did not strike the Laber Declaration, the inclusion of the Laber Declaration would not change this court's analysis of the merits of Medical Defendants' summary judgment arguments. The Laber Declaration does not cure the

- 37 -

speculation and conjecture that makes Dr. Laber's expert opinion and deposition testimony insufficient to create a genuine dispute of material fact for proximate cause. See infra Part III.B.1.c.v. The Laber Declaration states, "[i]t is my opinion to a reasonable degree of medical certainty, more likely than not[,] that Plaintiff's INR was likely subtherapeutic from at least November 13, 2012 (INR 1.07) through November 29, 2012 (INR 1.7)." (Laber Decl. (Doc. 195-5) ¶ 6.) But this testimony does not establish that Plaintiff was therapeutic before incarceration, thus making Dr. Maldonado's conduct the cause of Plaintiff's injuries. Because Plaintiff has not shown he was therapeutic before being incarcerated, see discussion infra Part III.B.1.c.iii, Plaintiff could have come to the jail subtherapeutic, so the fact Plaintiff was subtherapeutic after leaving the jail does not establish Dr. Maldonado proximately caused Plaintiff's injuries.

Moreover, there are several other deficiencies with Dr. Laber's opinion. Dr. Laber acknowledged throughout his opinion testimony that there was speculation as to when Plaintiff's blood clot formed, (see Laber Dep. (Doc. 174) at 54), that the source of the clotting was the lack of anticoagulation for the heart valve, (id. at 56), and the longer a patient is subtherapeutic, the greater the risk of a clot,

(id. at 67), all of which illustrates the necessity of the accuracy of the underlying facts to support Dr. Laber's opinion that it was the lack of medical care in the jails that caused Plaintiff's subsequent medical conditions.

Dr. Laber, even in his most recent affidavit, relies upon the fact that Plaintiff was "fully anticoagulated when he was arrested." (Id. at 86.) Dr. Laber also testified that "per the records obtained by the Davie County Jail from Maplewood Clinic, he was prescribed warfarin at 7 mg daily. During his incarceration, the jail medication administration records demonstrate that Mr. Gunter was not provided his daily warfarin medication at his recommended dose and schedule." (Laber Decl. (Doc. 195-5) ¶ 5.) As will be explained more fully hereinafter, there is no evidence that the Maplewood Clinic examined Plaintiff as to his therapeutic levels of anticoagulation nor did the Maplewood Clinic issue a prescription which might have provided a "recommended dose and schedule" as relied upon by Dr. Laber. The pharmaceutical records do not reflect that Plaintiff has a current prescription from any medical provider. The last admissible evidence of an examination of Plaintiff and his anticoagulation by a medical provider was Dr. Yoder at Wake Forest; no evidence of a "current" recommended dose and schedule of medication has been presented. Assuming a therapeutic dose is

7 mg daily, the pharmaceutical records do not support a finding that Plaintiff has access to that dosage of Warfarin daily. In the absence of a prescription, examination, or some evidence to support Plaintiff's medical opinion that he was fully anticoagulated on November 6, 2012, there is no admissible evidence to support that statement.

In sum, Plaintiff attempts to offer a new theory of proximate cause, and Dr. Laber's opinion relies on speculation. Accordingly, this court will grant Medical Defendants' Motion to Strike the Laber Declaration.

## B. <u>Medical Defendants' Motions for Summary Judgment</u>

### 1. <u>Medical Malpractice</u>

Medical Defendants first move for summary judgment as to Plaintiff's Medical Malpractice claim. (Med. Defs.' First Br. (Doc. 124) at 12-19; <u>see also</u> Pl.'s Second Am. Compl. (Doc. 57) ¶¶ 213-20.)

Under North Carolina law, a plaintiff must show: "(1) the applicable standard of care; (2) a breach of such standard of care by the defendant; (3) the injuries suffered by the plaintiff were proximately caused by such breach; and (4) the damages resulting to the plaintiff." <u>Weatherford v. Glassman</u>, 129 N.C. App. 618, 621, 500 S.E.2d 466, 468 (1998). Medical Defendants argue that Plaintiff has failed to establish the

necessary elements for medical malpractice against any of the
Medical Defendants. (Med. Defs.' First Br. (Doc. 124) at 12.)

### a.  Duty of Care Owed to Plaintiff

Plaintiff argues that Medical Defendants owed two duties of
care to Plaintiff: (1) a duty to "act in accordance with the
customary practice of other similarly situated health care
professionals," under N.C. Gen. Stat. § 90-21.12(a); and (2) the
"standard of care specific to medical care for inmates," under
N.C. Gen. Stat. § 153A-225(a). (Pl.'s First Resp. (Doc. 137) at
11.) Plaintiff argues that medical experts opined that Medical
Defendants breached both duties. (Id. at 11-12).

This court finds that, contrary to Plaintiff's assertions,
Medical Defendants did not owe a statutory duty to Plaintiff
pursuant to N.C. Gen. Stat. § 153A-225(a). Under the statute,
"[e]ach unit that operates a local confinement facility shall
develop a plan for providing medical care for prisoners in the
facility." N.C. Gen. Stat. § 153A-225(a) (emphasis added). North
Carolina courts have found that the statute creates a
nondelegable duty on sheriffs operating county jails to develop
a plan and provide medical services to jail inmates. See, e.g.,
State v. Wilson, 183 N.C. App. 100, 104, 643 S.E.2d 620, 623
(2007) (emphasis added). This court does not find precedent in
North Carolina law, nor does Plaintiff identify such precedent,

- 41 -

for the proposition either N.C. Gen. Stat. § 153A-221 or § 153A-225 applies to the respect to the standard of care specific to medical treatment, the duty of a medical care provider to a jail inmate. Instead, these two statutes impose a duty on the governmental unit operating a jail to develop a "plan for providing medical care to prisoners." See Simmons v. Corizon Health, Inc., 122 F. Supp. 3d 255, 262-63 (M.D.N.C. 2015). That duty is separate from the responsibility to deliver individual medical care in keeping with the standard of care and is not delegable to Medical Defendants.

Accordingly, this court will consider only whether the evidence presented creates a genuine dispute of material fact that Medical Defendants violated their statutory duty under N.C. Gen. Stat. § 90-21.12(a).

## b. **Breach of the Standard of Care**

Medical Defendants argue the expert testimony does not establish that Medical Defendants breached the accepted standard of medical care. (Med. Defs.' First Br. (Doc. 124) at 12-15.)

Under N.C. Gen. Stat. § 90-21.12(a), a defendant health care provider shall not be found to have breached the standard of care unless "the action or inaction of such health care provider was not in accordance with the standards of practice among similar health care providers situated in the same or

similar communities under the same or similar circumstances
. . . ." N.C. Gen. Stat. § 90-21.12(a). Under North Carolina
law, "[p]laintiffs must establish the relevant standard of care
through expert testimony." Hawkins v. SSC Hendersonville
Operating Co., 202 N.C. App. 707, 710, 690 S.E.2d 35, 38 (2010),
writ denied, review denied, 365 N.C. 87, 706 S.E.2d 248 (2011)
(internal quotations omitted).

Ordinarily, an expert who testifies as to the applicable
standard of care under N.C. Gen. Stat. § 90-21.12 must qualify
as an expert under North Carolina Rule of Evidence 702. See Wood
v. United States, 209 F. Supp. 3d 835, 842 (M.D.N.C. 2016)
(holding claims raising a North Carolina medical malpractice
claim must comply with North Carolina Rule of Civil Procedure
9(j), which in turn requires an expert to qualify under Rule
702). Compliance with the expert witness requirement "is a
substantive element of a medical malpractice claim" under North
Carolina law. Lauer v. United States, Civil No. 1:12cv41, 2013
WL 566124, at *3 (W.D.N.C. Feb. 13, 2013) (citing Camalier v.
Jeffries, 340 N.C. 699, 460 S.E.2d 133 (1995)). Because this
court must consider state substantive law when considering state
law claims, Kerr, 824 F.3d at 74, this court must determine
whether witness testimony complies with North Carolina Rule of
Evidence 702. See, e.g., Huntley v. Crisco, No. 1:18-CV-744,

- 43 -

2020 WL 4926636, at *3-4 (M.D.N.C. Aug. 21, 2020) (analyzing whether an expert's testimony was compliant with North Carolina Rule of Evidence 702); <u>Wood</u>, 209 F. Supp. 3d at 842 (same).

Rule 702(d) states that a physician "who by reason of active clinical practice . . . has knowledge of the applicable standard of care for nurses . . . or other medical support staff may give expert testimony in a medical malpractice action with respect to the standard of care of which he is knowledgeable." N.C. Gen. Stat. § 8C-1, Rule 702(d). "Although it is not necessary for the witness . . . to have actually practiced in the same community as the defendant, the witness must demonstrate that he is familiar with the standard of care in the community where the injury occurred, or the standard of care in similar communities." <u>Billings v. Rosenstein</u>, 174 N.C. App. 191, 194, 619 S.E.2d 922, 924 (2005) (internal citations omitted).

The North Carolina Court of Appeals[9] has clarified that "similar community" standard under N.C. Gen. Stat. § 90-21.12 is

---

[9] This court must apply the jurisprudence of North Carolina's highest court. <u>See</u> <u>Private Mortg. Inv. Servs., Inc. v. Hotel & Club Assocs., Inc.</u>, 296 F.3d 308, 312 (4th Cir. 2002). Although courts "defer to a decision of the state's intermediate appellate court to a lesser degree than [they] do to a decision of the state's highest court," courts still "do defer" and "a federal court must present persuasive data when it chooses to ignore a decision of a state intermediate appellate court that is directly on point." <u>Assicurazioni Generali, S.p.A. v. Neil</u>, 160 F.3d 997, 1002 (4th Cir. 1998) (internal citations and quotations omitted).

not a statewide standard, Henry v. Se. OB-GYN Assocs., P.A., 145
N.C. App. 208, 212, 550 S.E.2d 245, 248 (2001), and "the concept
of an applicable standard of care encompasses more than mere
physician skill and training; rather, it also involves the
physical and financial environment of a particular medical
community," id. at 211, 550 S.E.2d at 247.

For example, in Henry, the court found that the expert's
testimony did not establish breach of the standard of care
because "the record indicate[d] [the medical expert] failed to
testify in any instance that he was familiar with the standard
of care in Wilmington or similar communities," and that "there
[was] no evidence in the record that the standard of care
practiced in Wilmington is the same standard that prevails in
Durham or Chapel Hill, or that these communities are the 'same
or similar.'" Id. at 210, 550 S.E.2d at 246-47. Similarly, in
Smith v. Whitmer, the court held that an expert did not testify
as to a breach because although the doctor "stated that he was
familiar with a uniform or national standard of care, there was
no evidence that a national standard of care is the same
standard of care practiced in defendants' community." 159 N.C.
App. 192, 197, 582 S.E.2d 669, 673 (2003).

There is no particular method by which a medical expert
must become familiar with a given community. Grantham ex rel.

- 45 -

Tr. Co. of Sterne, Agee & Leach, Inc. v. Crawford, 204 N.C. App. 115, 119, 693 S.E.2d 245, 248 (2010). Book and internet research "may be [] perfectly acceptable," id., 693 S.E.2d at 249, so long as the expert "demonstrate[s] specific familiarity with and expresse[s] unequivocal opinions regarding the standard of care," Crocker v. Roethling, 363 N.C. 140, 146, 675 S.E.2d 625, 630 (2009). An expert is not required "to have actually practiced in the community in which the alleged malpractice occurred, or even to have practiced in a similar community." Id. at 151, 675 S.E.2d at 633; see also Huntley, 2020 WL 4926636, at *4 (finding that the expert witness had "extensive experience working in correctional medicine," and that "[w]hile his experience has principally been in larger correctional facilities, it is in the same field of correctional medicine as is at issue here").

During discovery, Plaintiff presented four experts: Tammy Banas, Virginia Yoder, Raymond Mooney, and Damian Laber. Tammy Jo Banas is a Registered Nurse in North Carolina who holds a Bachelor of Science in Nursing. (Dep. of Tammy Jo Banas ("Banas Dep.") (Doc. 171) at 32, 46-48.) Virginia Glover Yoder is a Doctor of Pharmacy who works in a Pharmacy Care Clinic in North Carolina where she manages patients' Coumadin treatment. (Yoder Dep. Part I (Doc. 172) at 5, 53.) Raymond P. Mooney is a

- 46 -

Physician's Assistant. (Dep. of Raymond P. Mooney ("Mooney Dep. Part I") (Doc. 173) at 8.) Damian Laber is a Medical Doctor at the Moffitt Cancer Center in Tampa, Florida, who specializes in hematology and oncology. (Laber Dep. (Doc. 174) at 22, 24-25.)

Plaintiff argues these experts "opined as to multiple breaches of the standard of care by the Medical Defendants," including "failure to timely administer anticoagulant testing and medication, failure to communicate Plaintiff's medical needs to a physician/physician assistant, mis-documenting of INR testing levels, the failure to order/administer anticoagulant bridge therapy, failure to ensure continuity of care for the chronic condition, and the failure to conduct proper discharge planning." (Pl.'s First Resp. (Doc. 137) at 11-12.) Medical Defendants argue that the experts' testimony does not create a genuine issue of material fact as to whether Medical Defendants' conduct breached the standard of care. (Med. Defs.' First Br. (Doc. 124) at 12-15.) This court addresses the expert testimony regarding each of the Medical Defendant's conduct, in turn.

### i. **Defendant Hunt**

This court finds that Plaintiff has not presented evidence through expert testimony that Defendant Hunt breached the standard of care. Ms. Banas, when asked as to whether she had an opinion as to whether Defendant Hunt breached the standard of

- 47 -

care, answered, "No." (Banas Dep. (Doc. 171) at 110.) Although Ms. Banas expressed, referring to Defendant Hunt's conduct, that "it's unfortunate for the patient" that someone could be "in a jail on a Friday and not have a nurse available until a Monday," Ms. Banas ultimately agreed with counsel that Defendant Hunt "handled that the way it should be handled." (Id.)

Dr. Yoder and Dr. Laber declined to provide an opinion as to whether Defendant Hunt breached the standard of care for nurses. (Yoder Dep. Part II (Doc. 172-1) at 94; Laber Dep. (Doc. 174) at 108.) Similarly, Mr. Mooney stated that he would opine only as to whether Defendant Maldonado breached the standard of care. (Mooney Dep. Part II (Doc. 173-1) at 50.)

Because "[o]ne of the essential elements of a claim for medical negligence is that the defendant breached the applicable standard of medical care owed to the plaintiff," Hawkins, 202 N.C. App. at 710, 690 S.E.2d at 38 (internal citation omitted), and none of the experts opined that Defendant Hunt breached the standard of care, a reasonable jury could not return a verdict in favor of Plaintiff on the evidence presented. See McLean, 332 F.3d at 719. Accordingly, this court will grant Medical Defendants' motion for summary judgment regarding Plaintiff's medical malpractice claim against Defendant Hunt.

### ii.  **Defendant Junkins**

This court finds that Plaintiff has not presented evidence through expert testimony that Defendant Junkins breached the standard of care owed to Plaintiff. Dr. Laber did not offer an opinion as to whether Defendant Junkins breached the standard of care, stating, "I don't know his role." (Laber Dep. (Doc. 174) at 108.) Similarly, when asked whether Defendant Junkins breached the standard of care, Mr. Mooney stated, "I don't even know who he is." (Mooney Dep. Part II (Doc. 173-1) at 51.) Neither Ms. Banas nor Dr. Yoder were asked directly about whether they had an opinion about Defendant Junkins' conduct. (See Banas Dep. (Doc. 171); Yoder Dep. Part I (Doc. 172); Yoder Dep. Part II (Doc. 172-1).)

Accordingly, this court finds that a reasonable jury could not return a verdict in favor of Plaintiff on the evidence presented, see McLean, 332 F.3d at 719, and will grant Medical Defendants' motion for summary judgment with regard to Plaintiff's medical malpractice claim against Defendant Junkins.

### iii. **Defendant SHP**

This court also finds that Plaintiff has not presented evidence through expert testimony that Defendant SHP violated a standard of care owed to Plaintiff. Ms. Banas indicated in her deposition that her "complaints" were only against Defendants

- 49 -

Jackson and Hunt, and not against SHP. (Banas Dep. (Doc. 171) at 142.) When asked whether she was qualified or intended to give an opinion as to whether the SHP protocols used at the Davie and Stokes County jails met the standard of care, Dr. Yoder declined to state an opinion. (Yoder Dep. Part II (Doc. 172-1) at 96.) Similarly, Dr. Laber declined opine whether Stokes and Davie County procedures were adequate to obtain and dispense medications to inmates. (Laber Dep. (Doc. 174) at 114-15.) Finally, Mr. Mooney stated that he would offer an opinion only as to whether Defendant Maldonado breached the standard of care. (Mooney Dep. Part II (Doc. 173-1) at 51.)

Accordingly, this court finds that a reasonable jury could not return a verdict in favor of Plaintiff on the evidence presented, see McLean, 332 F.3d at 719, and will grant Medical Defendants' motion for summary judgment with regard to Plaintiff's medical malpractice claim against Defendant SHP.

### iv. **Defendant Jackson**

This court further finds that Plaintiff presented expert testimony that Defendant Jackson violated the standard of care.

Neither Mr. Mooney, (Mooney Dep. Part II (Doc. 173-1) at 51), Dr. Laber, (Laber Dep. (Doc. 174) at 108), nor Dr. Yoder, (Yoder Dep. Part II (Doc. 172-1) at 96), offered an opinion about Defendant Jackson's conduct.

- 50 -

Only Ms. Banas opined whether Defendant Jackson breached the standard of care owed to Plaintiff, stating in her deposition that,

> the standard of care would be to be able to communicate and give [Plaintiff] the proper care based on the medications and the needs that he had as a patient. Because of his heart valve, he needed certain medications and labs done that were not done. And that's just the standard of care for his diagnosis. Those are basic things that needed to be done.
>
> . . . .
>
> They didn't do it. They didn't do what was the basic standard of care for him. They knew that he had a mechanical valve, and the basic things that they should have done, they did not.

(Banas Dep. (Doc. 171) at 61.) Ms. Banas opined specifically that, based on her review of the medical records, Defendant Jackson was aware when Plaintiff arrived that Plaintiff had an MHV, that it is a "known fact" that individuals with an MHV must maintain a therapeutic INR level and that "there was no urgency" to obtain the medications necessary to maintain a therapeutic INR level. (Id. at 82-83.) When asked to "identify . . . every way in which Nurse Jackson acted or failed to act that breached the standard of care," (id. at 104), Ms. Banas replied that, first, "[Defendant Jackson] did not start the medication on the evening of [November] 8th, and she had plenty of time to do that," (id.), and second, Defendant Jackson documented Plaintiff's INR levels as 1.7, when they were 1.07. (Id.)

- 51 -

Ms. Banas stated that "whatever their agency is, however they get their medications, I feel like they did not communicate the needs to the doctor efficiently . . . ." (Id. at 83.)

In an affidavit submitted in response to Medical Defendants' renewed motion for summary judgment, Ms. Banas further stated that she identified several errors in the care Plaintiff received while he was incarcerated, and that those "errors relate to medication administration, anticoagulant therapy, and nursing documentation." (Banas Aff. (Doc. 195-3 ¶ 3.)

In their original motion for summary judgment, Medical Defendants characterize Ms. Banas' testimony as "criticism" that does not rise to the level of a breach of the standard of care. (Med. Defs.' First Br. (Doc. 124) at 13.) They argue that Defendant Jackson "follows orders received from the physician assistant" because, as a nurse, she "does not have authority to diagnose patients or prescribe medication." (Id.) Rather than acting inefficiently or slowly, Medical Defendants argue that, when Defendant Jackson learned Plaintiff had not been released from the jail, "she sought [Plaintiff] out," and "had him sign the release form," "then contacted the providers, contacted PA Maldonado, received an order, called the order into the pharmacy, obtained Coumadin the next day and had it dispensed to

- 52 -

the Plaintiff the day it arrived." (Id. at 14.) Medical
Defendants argue that this conduct is "sufficient and is
certainly not a breach of the standard of care." (Id.)

In response to Medical Defendants' original motion,
Plaintiff argues that Ms. Banas' testimony establishes that
Defendant Jackson breached the standard of care by failing to
identify and communicate Plaintiff's medical needs to a
physician in a timely manner and by mis-documenting Plaintiff's
INR testing levels. (See Pl.'s First Resp. (Doc. 137) at 11-12.)

In its original motion granting partial summary judgment,
(March Order (Doc. 178)), this court found that Plaintiff had
not presented expert testimony from which a reasonable jury
could conclude that Defendant Jackson breached a standard of
care because Ms. Banas' opinion did not demonstrate familiarity
with and express unequivocal opinions regarding the standard of
care. (Id. at 36-39.) In particular, this court found that
Ms. Banas' personal experience could not form the basis of her
expertise, (id. at 36-37), as Ms. Banas testified in her
deposition that she has never worked in a jail, (Banas Dep.
(Doc. 171) at 62), had education or experience with correctional
nursing, (id.), or even been inside a jail, (id. at 70).
Moreover, this court found that Ms. Banas did not indicate in
her deposition testimony how she became familiar with the

- 53 -

standard of care for correctional nursing, (March Order (Doc.
178) at 37), because she stated in her deposition that she had
not reviewed or was aware of "any standards, either by the state
or national organizations, regarding correctional nursing,"
(Banas Dep. (Doc. 171) at 80). Finally, this court found that
Ms. Banas was unfamiliar with basic aspects of jail operations.
(March Order (Doc. 178) at 37-38.)

Upon consideration of Ms. Banas' affidavit, this court
finds that Ms. Banas is qualified to testify as to whether
Defendant Jackson has breached the standard of care. In her
affidavit, Ms. Banas clarified her deposition testimony, stating
that "the standard of care would be the same for nurses
throughout central North Carolina, whether they were working in
a hospital, a nursing home, or a jail," and that "there are no
particular financial or other resource issues that relate to the
acquisition or administration of [warfarin] – it is easy to
acquire, inexpensive to purchase, and easy to dispense." (Banas
Aff. (Doc. 195-3) ¶ 3.) She further stated that "[w]hile some
fields of nursing (labor and delivery, for example) do require
specialized training, there is no specialized training required
to work in correctional nursing," (id. ¶ 4), and that she had
previously opined that she had "not reviewed any standards,
either by the state or national organizations, regarding

- 54 -

correctional nursing" because "there are no such standards that are specific to jails in North Carolina," (id. ¶ 5). Accordingly, this court finds that Ms. Banas has "demonstrated specific familiarity with and expressed unequivocal opinions regarding the standard of care" at Davie County jail. Crocker, 363 N.C. at 146, 675 S.E.2d at 630.

In light of Ms. Banas' testimony that Defendant Jackson breached the standard of care, and Ms. Banas' qualifications to render such an opinion, this court finds that Plaintiff has created a genuine dispute of material fact that Defendant Jackson breached the standard of care.[10]

### v.    Defendant Maldonado

Plaintiff alleges that Defendant Maldonado breached the standard of care by failing to order anticoagulant bridge therapy, failing to ensure continuity of care, and failing to conduct proper discharge planning. (Pl.'s First Resp. (Doc. 137) at 12.) Medical Defendants argue "the decision whether to bridge Plaintiff was a judgment call with providers having different

---

[10] Because Defendant Banas has demonstrated "specific familiarity with and express[ed] unequivocal opinions regarding the standard of care" at Davie County jail, Crocker, 363 N.C. at 146, 675 S.E.2d at 630, this court need not consider whether, as a matter of North Carolina law, there is a different standard of care in jails as compared to other medical settings, including prisons, (Pl.'s Second Resp. (Doc. 195) at 5-6; Med. Defs'. Second Reply (Doc. 199) at 4-5).

- 55 -

opinions," and Defendant Maldonado's decision was an exercise of professional judgment that did not breach the standard of care. (Med. Defs.' First Br. (Doc. 124) at 15.) Defendants argue that "[c]ourts are required only to make certain that professional judgment was in fact exercised," and "[i]t is not appropriate for the courts to specify which of several professionally acceptable choices should have been made." (Id. (quoting Boryla-Lett v. Psychiatric Sols. of N. Carolina, Inc., 200 N.C. App. 529, 536, 685 S.E.2d 14, 20 (2009)).)

During discovery, Ms. Banas and Dr. Laber did not express an opinion as to whether Defendant Maldonado breached the applicable standard of care. (Banas Dep. (Doc. 171) at 75; Laber Dep. (Doc. 174) at 111.) Dr. Yoder testified that it was not a breach of the standard of care for a physician not to provide Plaintiff with anticoagulant bridge therapy, as he was a "medium-risk patient" in a "gray area." (Yoder Dep. Part II (Doc. 172-1) at 29.) Mr. Mooney testified that he believed that there was a breach of the standard of care because Plaintiff did not receive anticoagulant bridge therapy. (See Mooney Dep. Part I (Doc. 173) at 88; Mooney Dep. Part II (Doc. 173-1) at 23.)

This court finds Medical Defendants' citation of Boryla-Lett to be inapposite, as that case concerned professional judgment within the context of liability from immunity under

- 56 -

N.C. Gen. Stat. § 122C-210.1, see Boryla-Lett, 200 N.C. App. at 451, 685 S.E.2d at 23, a statute which expressly applies to the provision of healthcare for individuals who are mentally ill, a substance abuser, or who are dangerous to themselves or others, see N.C. Gen. Stat. § 122C-210.1 et seq.

Instead, this court finds that the competing testimony of Dr. Yoder and Mr. Mooney creates a genuine issue of material fact from which a reasonable jury could find that Defendant Maldonado breached the standard of care.[11] See McLean, 332 F.3d at 718-19. Accordingly, Plaintiff has carried his burden with regard to the element of breach of the standard of care.

### c. Proximate Cause

Having found that Plaintiff created a genuine dispute of material fact as to whether Defendant Maldonado and Defendant Jackson breached the standard of care, this court will consider Medical Defendants' arguments regarding proximate causation.

---

[11] Medical Defendants do not argue that, with regard to Defendant Maldonado, the treatment required to meet the standard of care for a patient in the jail differed from that due to a patient in a different community or setting. (See Med. Defs.' First Br. (Doc. 124) at 12-15.) Accordingly, this court need not find that Defendant Maldonado breached a specialized standard of care specific to pre-trial detainees. See Kovari v. Brevard Extraditions, LLC, 461 F. Supp. 3d 353, 374-75 (W.D. Va. 2020) (finding that the expert witness's testimony on standards of care in prison-transport industry was relevant to help jury understand a specialized industry).

- 57 -

## i.   **North Carolina Law**

North Carolina courts define proximate cause as (1) "a cause which in natural and continuous sequence, unbroken by any new and independent cause, produced the plaintiff's injuries," and (2) "one from which a person of ordinary prudence could have reasonably foreseen that such a result, or consequences of a generally injurious nature, was probable under all the facts as they existed." Hawkins, 240 N.C. App. at 341-42, 770 S.E.2d at 162-63. "Only when the facts are all admitted and only one inference may be drawn from them will the court declare whether an act was the proximate cause of an injury or not." Adams v. Mills, 312 N.C. 181, 193, 322 S.E.2d 164, 172 (1984).

"[E]xpert opinion testimony is required to establish proximate causation of the injury in medical malpractice actions," Cousart v. Charlotte-Mecklenburg Hosp. Auth., 209 N.C. App. 299, 303, 704 S.E.2d 540, 543 (2011), because "the exact nature and probable genesis of a particular type of injury involves complicated medical questions far removed from the ordinary experience and knowledge of laymen." Azar v. Presbyterian Hosp., 191 N.C. App. 367, 372, 663 S.E.2d 450, 453 (2008) (internal quotations omitted); see also Seraj v. Duberman, 248 N.C. App. 589, 599, 789 S.E.2d 551, 558 (2016) ("The plaintiff must present at least some evidence of a causal

- 58 -

connection between the defendant's failure to intervene and the plaintiff's inability to achieve a better ultimate medical outcome." (internal quotations omitted)).

Federal courts recognize that expert testimony is necessary to establish the element of proximate cause under North Carolina law. See, e.g., Warden v. United States, 861 F. Supp. 400, 402-03 (E.D.N.C. 1993) (holding that, under North Carolina law, a "plaintiff must present expert testimony" to prove all elements of a medical malpractice claim, including causation). However, "whether there is sufficient evidence to create a jury issue" regarding proximate cause, "as defined by state law, is controlled by federal rules." Fitzgerald v. Manning, 679 F.2d 341, 346 (4th Cir. 1982); see also Riggins, 800 F. App'x at 155 ("[W]hether there is sufficient evidence to create a jury issue regarding the element of causation is controlled by federal rules." (internal quotations omitted)).

"Under binding Fourth Circuit precedent, for the question of causation to reach the jury in a medical malpractice case, a medical expert's causation opinion must 'rise[] to the level of a "reasonable degree of medical certainty" that it was more likely that the defendant's negligence was the cause than any other cause.'" Riggins, 800 F. App'x at 155 (quoting Fitzgerald, 679 F.2d at 346). There are "two distinct requirements for a

medical expert's causation testimony to reach a jury: (1) the likelihood that defendant's conduct caused plaintiff's injury (which must be more probable than not), and (2) whether the expert expressed this 'more likely than not' opinion to a reasonable degree of medical certainty." Id. at 156-57.

Courts consider the "entire substantive evidence of causation" to determine the sufficiency of the expert's causation opinion. See Fitzgerald, 679 F.2d at 354-56 (finding that, where the expert explicitly and repeatedly refused to state that he held his opinion to a reasonable degree of medical certainty, a directed verdict for the defendant was appropriate). "[M]edical opinion that is inconsistent with the entirety of an expert's testimony is not sufficient to raise a jury question." Owens By Owens v. Bourns, Inc., 766 F.2d 145, 150 (4th Cir. 1985).

## ii. **Parties' Arguments**

First, the parties dispute whether the expert testimony demonstrates the conduct of Defendant Maldonado and Defendant Jackson +was the proximate cause of Plaintiff's injuries. Medical Defendants argue "no expert opined that missing a few doses of Coumadin would be the proximate cause of the patient later having a blood clot." (Med. Defs.' First Br. (Doc. 124) at 15.) Medical Defendants argue that "the increase in risk for a

- 60 -

blood clot from a sub-therapeutic INR cannot be quantified," and that "Plaintiff cannot establish when the blood clot formed." (Id.) Medical Defendants also argue that "[s]imply increasing the risk of something by an uncertain mathematical percentage does not establish proximate cause." (Id. at 17.) Plaintiff argues that because "[m]ultiple experts have testified that [Defendant Maldonado's] negligent actions were the proximate cause of Plaintiff's injuries," there is a genuine issue of material fact. (Pl.'s First Resp. (Doc. 137) at 12.)

Second, in response to this court's June Order reopening summary judgment, the parties dispute whether the evidence demonstrates that Plaintiff was properly anticoagulated prior to his incarceration. Medical Defendants argue that "Plaintiff never provided any specific information about his medical treatment, prescriptions, or INRs from the time of his discharge from the Coumadin Clinic in May 2012 until his incarceration at Davie other than vague testimony about exchanging tree-cutting services for Warfarin prescriptions." (Med. Defs.' Second Br. (Doc. 191) at 5-6.) Medical Defendants also argue Dr. Laber and Dr. Yoder, the proximate cause experts, did not hold their opinions to a reasonable degree of medical certainty because they assumed Plaintiff was properly anticoagulated prior to his incarceration. (Id. at 6-7.)

In response, Plaintiff argues that Dr. Laber, in a subsequent declaration, has explained that INR testing information is not necessary to offer medical opinions to a reasonable degree of medical certainty. (Pl.'s Second Resp. (Doc. 195) at 8-9.) Moreover, Plaintiff argues that "Dr. Laber has also reviewed many of Plaintiff's prior medical records demonstrating his compliance with his anticoagulation therapy regimen and his medical history which did not record any complications related to clotting events . . . ." (Id. at 9.)

### iii. Evidence of Plaintiff's Medication and INR Testing Prior to his Incarceration

In light of the parties' dispute about Plaintiff's medication records and INR testing prior to his incarceration, this court makes the following findings of fact about the admissible evidence present on the record.

First, this court does not find that Plaintiff's testimony may be used as evidence Plaintiff had regular INR testing or was receiving medication from a neighbor prior to his incarceration. Although Plaintiff argues in his brief that he "performed free tree services for a physician in the area, and, in exchange, the doctor wrote him Coumadin prescriptions and checked his INR levels," (Pl.'s First Resp. (Doc. 137) at 3-4), Plaintiff cites only his only deposition for this proposition, (id. at 3-4 (citing Pl.'s First Resp., Ex. 6 (Doc. 137-6) at 8-10, 15)), in

- 62 -

which Plaintiff stated generally that "Dr. O checked [his] blood a bunch over that period of time" and "wrote . . . out prescriptions," (Doc. 137-6 at 15). Plaintiff has not provided records indicating what his INR levels were prior to his incarceration or records of the prescriptions that this physician wrote for him.

Plaintiff's statements regarding any treatment this physician may have provided are inadmissible hearsay, as INR test results and the prescription records are out of court statements being used for the truth of the matter asserted. Fed. R. Evid. 801. Hearsay evidence that would not be admissible at trial may not be considered on a motion for summary judgment. Md. Highways Contractors Ass'n v. Maryland, 933 F.2d 1246, 1251 (4th Cir. 1991). Accordingly, this court will not consider Plaintiff's testimony regarding any treatment he may have received from his neighbor.[12]

Second, this court finds that the record from the Maplewood Clinic does not establish Plaintiff's prescribed dosage or that he was therapeutic at the time of his visit to the clinic. Plaintiff sought medical care at the Maplewood Clinic for a

---

[12] This court further notes that Plaintiff has not identified the doctor or given any indication that evidence of the prescriptions or a therapeutic INR level between May and November 2012 could be "presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2).

- 63 -

fever on June 11, 2012. (Doc. 191-1 at 4-5.) The clinic records
indicate that the Maplewood Clinic did not perform an INR test
for Plaintiff during that visit. (See id.) Instead, the
evidentiary record reflects that Plaintiff had a therapeutic INR
of 2.7 on April 16, 2012, when Plaintiff was seen by Dr. Yoder
at Wake Forest, (Doc. 124-10 ¶ 3), and a therapeutic INR of 4.2
on May 17, 2012, at North Davidson Center for Family Health,
(id. ¶ 4).

Moreover, contrary to Plaintiff's assertions that the
Maplewood records demonstrate that "the Maplewood Clinic
specifically communicated to Nurse Jackson that Mr. Gunter
should take 7mg of warfarin per day," (Pl.'s Second Resp. (Doc.
195) at 3 (emphasis added)), the only mention of Coumadin or
Warfarin in the visit summary is that Plaintiff reported taking
7 mg of Warfarin Sodium by mouth daily. The evidence presented
on the record is that the Maplewood Clinic did not write a
prescription for Plaintiff's Warfarin medication, nor did they
make a recommendation as to what would constitute an appropriate
dosage of Coumadin to maintain therapeutic INR levels. This
court finds that the only prescriptions for which there is
evidence on the record are those written by Dr. Yoder, (Doc.
124-12 at 2-3), who indicated that Plaintiff's prescribed dosage

- 64 -

prior to his incarceration was likely 6 or 7 mg daily. (See Yoder Dep. Part I (Doc. 172) at 144; Doc. 124-3 at 4.)

Third, this court finds that the medication records do not support a finding that Plaintiff had medication available to him to maintain a therapeutic regimen of Coumadin. Dr. Yoder's general practice is to give patients a thirty-day prescription with two refills. (Yoder Dep. Part I (Doc. 172) at 135.) The uncontested evidence before this court is that, after his discharge from Dr. Yoder's clinic, Plaintiff used his Coumadin prescription from Dr. Yoder to obtain thirty 5 mg pills and thirty 1 mg pills on June 25, July 24, and August 23. (Doc. 124-12 at 2-3.) Consistent with Dr. Yoder's practice, Plaintiff's prescription expired after the August 23 refill. (Id.) On October 19, 2012, Plaintiff obtained thirty 1 mg pills of Coumadin from the pharmacy. (Id. at 4.) On October 22, 2012, Plaintiff sought a refill of his 5 mg prescription, but it was denied because he was no longer a patient of the Coumadin Clinic where Dr. Yoder was a practitioner. (See Doc. 124-13 at 3.)

The pharmacy records included as an attachment to Plaintiff's Affidavit indicate that Plaintiff may have received several "emergency" doses of Coumadin, even without a valid prescription from Dr. Yoder. Taking these records in the light

- 65 -

most favorable to Plaintiff,[13] on September 11, 2012, Plaintiff received three 1 mg and one 5 mg pills. (Doc. 195-6 at 11.) On September 17, 2012, Plaintiff received five 1 mg pills and five 5 mg pills. (Id. at 11-12.) On September 25, 2012, Plaintiff received eight 5 mg pills. (Id. at 13.) On October 11, 2012, Plaintiff received five 1 mg pills and five 5 mg pills. (Id. at 14.) On October 19, 2012, Plaintiff received thirteen 5 mg pills. (Id.) On October 29, 2012, Plaintiff received fourteen 5 mg pills. (Id.) On October 31, 2012, Plaintiff received three 5 mg pills and three 1 mg pills. (Id. at 16.) On November 5, 2012, Plaintiff received five 5 mg and five 1 mg pills. (Id. at 17.) The evidence presented by Plaintiff does not reflect Plaintiff was therapeutically medicated when he was first arrested on November 6, 2012, as suggested by Dr. Sease's unrebutted affidavit. See infra n.14. More significantly, there is no evidence Plaintiff's INR levels were checked from May to November.

Based on the prescription records that have been presented on the record, this court finds that there would have been at least a few days in which Plaintiff would not have had the medication necessary to maintain a daily regimen of 6 or 7 mg.

---

[13] Several of these records indicate a "0" next to the number of pills distributed, suggesting that no pill may have been distributed. (Doc. 195-6 at 11.)

### iv. <u>Dr. Yoder's Testimony Does Not Forecast Proximate Cause</u>

This court finds that Dr. Yoder's testimony that the "missed doses in the jail were the proximate cause" of Plaintiff's blood clots, (Yoder Dep. Part II (Doc. 172-1) at 62-63), does not forecast proximate cause, as she did not testify with a reasonable degree of medical certainty.

First, this court finds that Dr. Yoder's testimony reflects impermissible speculation that Plaintiff had been properly anticoagulated prior to entering the jail. An opinion is not held to the requisite degree of medical certainty where it is grounded in "speculation or conjecture." <u>Young v. United States</u>, 667 F. Supp. 2d 554, 562 (D. Md. 2009) (citing <u>Crinkley v. Holiday Inns, Inc.</u>, 844 F.2d 156, 165 (4th Cir. 1988)); <u>see also</u> <u>Fitzgerald</u>, 679 F.2d at 356 (rejecting expert opinion evidence as insufficient where experts could not say with certainty that the negligence was a likely cause of the injury). Although expert witnesses may rely on hearsay evidence in forming an opinion if the evidence is of the kind that "experts in the particular field would reasonably rely" upon "in forming an opinion on the subject," Fed. R. Evid. 703, the Fourth Circuit has stated that this rule does not permit a court to "abdicate its responsibility to ensure that only properly admitted evidence is considered[.]" <u>Tyger Constr. Co. v. Pensacola</u>

Constr. Co., 29 F.3d 137, 143 (4th Cir. 1994); see also Sparks
v. Gilley Trucking Co., 992 F.2d 50, 54 (4th Cir. 1993) ("[A]
court may refuse to allow a generally qualified expert to
testify if his factual assumptions are not supported by the
evidence."). Thus, "[a]n expert's opinion should be excluded
when it is based on assumptions which are speculative and not
supported by the record." Tyger Constr., 29 F.3d at 143; see
also Harrison v. United States, Civil Action No. 2:07-00696,
2009 WL 36545, at *7 (S.D. W. Va. Jan. 6, 2009) (in a motion for
summary judgment on a medical malpractice claim, holding that an
expert's testimony was based on an assumption that was not
supported by the evidence on the record).

Dr. Yoder stated that her opinion assumed that Plaintiff
had been properly anticoagulated prior to entering the jail,
(Yoder Dep. Part II (Doc. 172-1) at 66), and that Plaintiff had
taken his prescribed medication "on all the other days in
November that he's not incarcerated," (id.), although she had
"no evidence to back up that assumption." (Id.) As this court
has found, however, Plaintiff's testimony, the record from the
Maplewood Clinic, and the pharmacy records do not establish that
Plaintiff's INR levels were being monitored, the dosage of
Coumadin Plaintiff was taking each day, or whether he took his
medication in a manner that would cause him to be

- 68 -

therapeutically anticoagulated. See discussion supra Part
III.B.1.c.iii. Accordingly, this court finds that Dr. Yoder's
assumptions are not supported by evidence on the record, and
thus, that she does not hold her opinions to the requisite
degree of medical certainty.

Second, this court finds that Dr. Yoder was aware that
Plaintiff's compliance prior to entering the jail would affect
his risk for clotting, but Dr. Yoder could not assess the extent
to which changing her underlying assumption about Plaintiff's
compliance would change her assessment as to whether Plaintiff
was liable for his injury:

> THE WITNESS: I don't – I don't think that there's
> a 50/50 split in blame just based on the number of
> days in a month. That's the problem with
> anticoagulation, is that one day, one week -- I mean,
> it's all about trends, and unfortunately, I don't --
> like you said, we don't have all of the data in --
>
> BY MR. LONG:
>
> Q.   Well, what percentage would he be at fault
> for -- if you're saying --
>
> A.   I don't know.
>
> Q.   -- that the jail not giving him his medicine
> on these five days is the cause of that clot, what
> percentage is he at fault for the cause of that clot
> because of his failures in adhering to - - in being
> compliant?
>
> . . . .
>
> THE WITNESS: I -- I don't know how to assess
> that.

(Yoder Dep. Part II (Doc. 172-1 at 67-68.) When counsel asked Dr. Yoder to clarify whether the jail was "more than 50 percent at fault," given that she could not assess the impact of any noncompliance by Plaintiff, (id. at 68), Dr. Yoder stated that, with regard to her medical certainty, it was "the timing that makes it suspect, because he did miss so many doses, and we do only have one INR that was not even close to a target. And then he has an onset of symptoms and this blood clot, like you said, a week after," (id. at 69 (emphasis added)).

This exchange was not the sole instance during her testimony in which Dr. Yoder indicated that she was considering the timing of Plaintiff's injury when forming her opinion and was disregarding other potential factors. In another exchange, Dr. Yoder stated, "I would say that the –- the temporal relationship of the known factors that happened in the preceding . . . three weeks prior to his hospital presentation are consistent with not being therapeutically anticoagulated." (Id. at 61 (emphasis added).) Later in her deposition, when asked to explain the basis of belief that improper anticoagulation at the jail resulted in the blood clot, Dr. Yoder stated,

> Well, he wasn't therapeutically anticoagulated in
> the jail. We know that. And we know that they didn't
> do a Lovenox bridge in order to protect him from an
> event happening down the road.

- 70 -

> And the thing is, is that an event doesn't happen
> after one missed warfarin dose, usually. It's this
> consistency of inconsistent dosing and the timing of
> the missed doses and the presentation of symptoms and
> the subsequent admission that -- that paints this
> picture that that was the precipitating event.

(Id. at 63 (emphasis added).) At other points during her deposition, Dr. Yoder described the clot resulting from the missed doses at the jail as something that "fit," (id. at 69), and the missed doses at the jail as "the straw that broke the camel's back." (Id.)

Dr. Yoder's testimony can best be characterized by the maxim post hoc, ergo propter hoc, meaning "after this, therefore because of this." This maxim denotes the fallacy of confusing correlation with causation by drawing a conclusion from a temporal relationship. See In re Lipitor (Atorvastatin Calcium) Mktg., Sales Practices & Prods. Liab. Litig., 150 F. Supp. 3d 644, 657 (D.S.C. 2015). The Fourth Circuit advises courts to proceed cautiously when using temporal relationships as evidence of causation because "the mere fact that two events correspond in time does not mean that the two necessarily are related in any causative fashion." Westberry v. Gislaved Gummi AB, 178 F.3d 257, 265 (4th Cir. 1999). An expert opinion that relies solely on temporal connections is not an opinion that is held to a reasonable degree of medical certainty. See, e.g., Rohrbough, 916 F.2d at 974 ("[A]ll Dr. Cox established was that a temporal

link existed . . . Dr. Cox did not testify that the literature supported a _causal_ link . . . .").

This court finds that Dr. Yoder's opinion was impermissibly based on speculation and conjecture such that it was not held to a reasonable degree of medical certainty. For these reasons, this court finds that Dr. Yoder's testimony does not forecast evidence of proximate causation.

### v. Dr. Laber's Testimony does not Forecast Proximate Causation

During his deposition, Dr. Laber opined that "[t]he lack of anticoagulation for the cardiac valve," was the cause of Plaintiff's blood clots for which Plaintiff was hospitalized in November/December 2012 and January 2013. (Laber Dep. (Doc. 174) at 56, 121.) However, as with Dr. Yoder's testimony, this court finds that Dr. Laber did not testify with the requisite level of medical certainty, and thus, his testimony does not forecast evidence of proximate cause.

First, this court finds that Dr. Laber's testimony was the product of conjecture. Not only did Dr. Laber state that he could not quantify the increase in risk where a patient misses three consecutive days of Coumadin, (Laber Dept. (Doc. 174) at 66-67), but Dr. Laber also opined that all patients with an MHV have at least some risk of a clot, "and that's why we give them the anticoagulation, to prevent that." (Id. at 56.) Dr. Laber

- 72 -

confirmed that he was unable to state to a reasonable degree of medical certainty when the blood clot that injured Plaintiff formed. (Id. at 55-56.) When asked how long a patient would need to be improperly anticoagulated before they would be at risk for a blood clot, Dr. Laber stated generally that, "[i]t could be anything. But the longer they remain without their proper anticoagulation, the higher the risk." (Id. at 56-57 (emphasis added).) Dr. Laber did not provide any context to explain what "higher" risk meant. Accordingly, this court finds Dr. Laber's testimony did not indicate "that it was more likely that [Defendant Maldonado's conduct] was the cause than any other cause," Owens, 766 F.2d at 150 (citing Fitzgerald, 679 F.2d at 350), and thus, if Dr. Laber, as "plaintiff's medical expert cannot form an opinion with sufficient certainty so as to make a medical judgment, there is nothing on the record with which a jury can make a sufficient certainty so as to make a legal judgment," Fitzgerald, 679 F.2d at 350-51 (internal citations and quotations omitted).

Second, Dr. Laber's testimony is insufficient to support a causal connection because, like Dr. Yoder, he relied on assumptions not supported by the evidentiary record. Dr. Laber indicated that, in forming his opinion, he assumed that Plaintiff was properly anticoagulated upon arrival at the jail

- 73 -

and that he took his medication every day upon release from the jail. (Laber Dep. (Doc. 174) at 86-87, 116-17.) Yet, Dr. Laber recognized that he had "no way" to assess whether Plaintiff took his medication every day before his incarceration, (id. at 100), that it would be "speculation" as to his INR upon arrest, (id. at 86), and that there was no way he could "quantify how many days [of medication] he missed or didn't" while not in the care of the jail, (id. at 101). "While [this court] view[s] evidence in the light most favorable to the nonmoving party . . . mere conclusory or speculative allegations are insufficient to withstand summary judgment." Riggins, 800 F. App'x at 155 (internal quotations omitted); see also Fitzgerald, 679 F.2d at 348 ("A mere possibility of such causation is not enough; and when the matter remains one of pure speculation or conjecture . . . it becomes the duty of the court to direct a verdict for the defendant."). This court finds that Dr. Laber's testimony was explicitly premised on impermissible speculation, for which there is no basis in the evidentiary record.[14] See discussion supra Part III.B.1.c.iii.

---

[14] Dr. Julie Sease, a pharmacist, reviewed medication records provided by Plaintiff's pharmacy and concluded that "Mr. Gunter most likely ran out of his Coumadin 5 mg tablets around the end of September 2012 or at least by mid-October when he called requesting a refill of those tablets." (Doc. 124-10 ¶ 8.) Given Mr. Gunter's historical dosing schedule and the
(Footnote continued)

Finally, this court finds that Dr. Laber, like Dr. Yoder, relied on the temporal connection between the blood clot and Plaintiff's incarceration as evidence of proximate cause. When asked to clarify why he "believe[d] that what happened in the jail caused everything," Dr. Laber stated, "[b]ecause of the timing, because of the documentation, because of the lack of proper care, because of the risk that this patient had because of his heart valve." (Laber Dep. (Doc. 174) at 116.) Again, correlation is not causation, and when viewed in light of Dr. Laber's other testimony, this court finds that Dr. Laber's testimony is speculative in nature. See Rohrbough, 916 F.2d at 974. For these reasons, this court finds that Dr. Laber did not testify with a reasonable degree of medical certainty and thus, his testimony does not forecast evidence of proximate cause.

---

missing medication, Dr. Sease concluded that "it is most likely that Mr. Gunter's INR value was subtherapeutic for a number of weeks before he was ever under the care of Southern Health Partners." (Id.) Dr. Sease further opined that "given that Mr. Gunter was non-adherent to Coumadin follow-up and noncompliant with his Coumadin dosing while caring for himself before his incarceration . . . the lack of bridge anticoagulation cannot be determined as the cause for Mr. Gunter's subsequent thrombosis and hospitalization . . . ." (Id. ¶ 12.) In contrast to the speculative testimony of Dr. Yoder and Dr. Laber, this court finds it notable that Dr. Sease, the only expert who did not assume that Plaintiff was properly anticoagulated upon his arrival at the jails, did not find that Defendant Maldonado's conduct was the proximate cause of Plaintiff's injuries.

Accordingly, this court finds that Plaintiff has not "come forward with specific facts showing that there is a genuine issue for trial," McLean, 332 F.3d at 718-19, and this court will grant Medical Defendants' motion for summary judgment with regard to Plaintiff's claim of Medical Malpractice against Defendant Maldonado.[15]

### 2. Plaintiff's Negligence Claim

The elements for common law negligence are similar to those for medical malpractice: The plaintiff must show (1) defendant owed a duty of care; (2) breach of that duty; (3) causation; and (4) damages. See, e.g., Parker v. Town of Erwin, 243 N.C. App. 84, 110, 776 S.E.2d 710, 729-30 (2015) (stating these elements). Medical Defendants move for summary judgment on Plaintiff's negligence claim. (Med. Defs.' First Br. (Doc. 124) at 21-22.)

### a. Duty

The parties first contest whether Medical Defendants owed a duty of care to Plaintiff. Medical Defendants argue that this court should grant summary judgment in their favor because Plaintiff's negligence claim "is actually a claim for medical

---

[15] Because this court will grant Medical Defendants' Motion for Summary Judgment as to each Defendant on other grounds, this court declines to consider Medical Defendants' arguments regarding contributory negligence, (see Med. Defs.' First Br. (Doc. 124) at 18-19), or Plaintiff's compliance with Rule 9(j), (see id. at 21).

- 76 -

malpractice," and "Plaintiff has not alleged any negligence against the Defendants that does not arise out of providing medical care." (Med. Defs.' First Br. (Doc. 124) at 22.)

Plaintiff argues that Medical Defendants' negligence arose out of the "intra-system transfer of Plaintiff from the Davie County Detention Center to the Stokes County Detention Center," in which "Plaintiff did not receive Coumadin for three days in violation of its own medical provider's order . . . ." (Pl.'s First Resp. (Doc. 137) at 19.) Plaintiff argues that Medical Defendants had a statutory duty to ensure continuity of care under N.C. Gen. Stat. § 153A-225(a)(2). (Id.) Because, Plaintiff argues, "[t]he physical transfer of paperwork and medicine between jails does not involve a specialized knowledge and skill beyond the manual dexterity," Medical Defendants committed a tort of ordinary negligence, in addition to that of medical malpractice. (Id. at 20.) Plaintiff argues, and Medical Defendants do not contest, that "[h]ad Defendants transferred Plaintiff's health records and medications properly and in such manner than [sic] ensured continuity of care, then Plaintiff would not have suffered a three-day disruption in his anticoagulation therapy," and that the disruption of medication was the proximate cause of the injuries that Plaintiff sustained. (Id. at 19.)

- 77 -

### i. Medical Defendants did not have a duty under N.C. Gen. Stat. § 153A-225

Contrary to Plaintiff's assertions, this court finds that N.C. Gen. Stat. § 153A-225(a) does not create a statutory duty for continuity of care to which Medical Defendants were bound. As this court has held, the statute's plain text binds "unit[s] that operate[s] a local confinement facility," and Medical Defendants, as agents of the state, are not bound by this duty. See discussion supra Part III.B.1.a. Accordingly, this court does not find that any violation of N.C. Gen. Stat. § 153A-225(a) can form the basis of Plaintiff's ordinary negligence claim against Medical Defendants.

### ii. Medical Defendants did owe Plaintiff an ordinary duty of care

Any statutory duty, or lack thereof, under N.C. Gen. Stat. § 153A-225(a) notwithstanding, this court finds that Plaintiff has articulated an ordinary duty of care under common law negligence principles.

Whether an action is treated as a medical malpractice action or as a common law negligence action is determined by statute. Smith v. Serro, 185 N.C. App. 524, 529, 648 S.E.2d 566, 569 (2007). A medical malpractice action is "[a] civil action for damages for personal injury or death arising out of the furnishing or failure to furnish professional services in the

- 78 -

performance of medical, dental, or other health care by a health care provider," N.C. Gen. Stat. § 90-21.11(2)(a), where "furnishing or failure to furnish professional services" arises out of a "vocation, calling, occupation, or employment involving specialized knowledge, labor, or skill, and the labor or skill involved is predominantly mental or intellectual, rather than physical or manual." Lewis v. Setty, 130 N.C. App. 606, 608, 503 S.E.2d 673, 674 (1998) (internal quotations omitted).

Unlike in a medical malpractice action, plaintiffs may sue medical providers under ordinary negligence principles when a claim "arises out of policy, management or administrative decisions," Estate of Waters v. Jarman, 144 N.C. App. 98, 103, 547 S.E.2d 142, 145 (2001), or a "physical or manual activity," rather than "specialized knowledge or skill." Lewis, 130 N.C. App. at 608, 503 S.E.2d at 674. For example, North Carolina courts have held that a hospital can be held liable under a claim of ordinary negligence for its failure to promulgate adequate safety rules relating to the handling, storage, and administration of medications, see Habuda v. Trs. of Rex Hosp., Inc., 3 N.C. App. 11, 164 S.E.2d 17 (1968), for its failure to adequately investigate the credentials of a physician selected to practice at the facility. Robinson v. Duszynski, 36 N.C. App. 103, 243 S.E.2d 148 (1978). North Carolina courts have found

that improperly removing an individual from an examination table to a wheelchair involves a "physical or manual activity," rather than "specialized knowledge or skill," and thus "falls squarely within the parameters of ordinary negligence." Lewis, 130 N.C. App. at 608, 503 S.E.2d at 674. Moreover, courts have found that "failing to supervise a patient recently treated with seizures until a responsible adult was able to care for him would also be a claim of ordinary negligence." Allen v. Cnty. of Granville, 203 N.C. App. 365, 367-68, 691 S.E.2d 124, 127 (2010).

This court finds the duty of "continuity of care" alleged by Plaintiff sounds in ordinary negligence principles. Plaintiff describes Medical Defendants' duty to include "ensur[ing] that when detainees are transferred, health records and medicine are transferred too." (Pl.'s First Resp. (Doc. 137 at 19.) Although North Carolina courts have not expressly recognized a common law duty for continuity of care as Plaintiff articulates, the duty Plaintiff articulates is similar to that in Allen v. County of Granville, in which the North Carolina Court of Appeals held that a medical center could be held liable in ordinary negligence principles where the plaintiff's mother requested the medical center not release her disabled son until she was able to pick him up. 203 N.C. App. at 365-66, 691 S.E.2d at 125. This court finds that the transfer of medication and health records

- 80 -

between jails clearly "arises out of policy, management or administrative decisions," see Jarman, 144 N.C. App. at 103, 547 S.E.2d at 145, rather than "specialized knowledge or skill," as is the case in medical malpractice actions. See Lewis, 130 N.C. App. at 608, 503 S.E.2d at 674.

Accordingly, this court disagrees with Medical Defendants' argument that Plaintiff's negligence claims are actually medical malpractice claims. (See Med. Defs.' First Br. (Doc. 124) at 22.) Having found that Plaintiff has articulated a common law duty of care, this court will consider whether the evidence presented creates a genuine dispute of material fact regarding the remaining elements of a negligence claim.

b. **Breach**

i. **Plaintiff has not forecast evidence that Defendants Junkins, Hunt, Jackson, or SHP breached a duty to provide continuity of care**

This court does not find that Plaintiff has created a genuine issue for trial that Defendants Junkins, Hunt, Jackson, or SHP breached a duty to provide continuity of care. Aside from asserting generally that Medical Defendants breached a common law duty, Plaintiff does not indicate how these defendants, in particular, breached that duty. (See Pl.'s First Resp. (Doc. 137) at 19-20.) Where Plaintiff does cite evidence that Medical Defendants breached a duty to provide continuity of care,

- 81 -

Plaintiff refers only to expert testimony regarding Defendant Maldonado's conduct, such as where Mr. Mooney opined that Defendant Maldonado failed to "make transferee facility aware of order for increased Coumadin," and "fail[ed] to ensure proper continuity of care in transfer." (Id. at 6.)

Because Plaintiff has not "come forward with specific facts showing that there is a genuine issue for trial," McLean, 332 F.3d at 719, this court will grant Medical Defendants' motion for summary judgment with regard to Plaintiff's negligence claims against Defendants Junkins, Hunt, Jackson, and SHP.

### ii. **Plaintiff has not demonstrated that Defendant Maldonado's conduct proximately caused Plaintiff's injuries**

Assuming, without finding, that Defendant Maldonado breached a duty to provide continuity of care,[16] this court finds that Plaintiff has not demonstrated that there is a genuine dispute of material fact as to proximate cause.

Under North Carolina law, a plaintiff in an ordinary negligence action must establish proximate cause through medical expert testimony when the alleged injury involves complicated medical questions. Taylor v. Shreeji Swami, Inc., 820 F. App'x

---

[16] This court declines to consider Medical Defendants' arguments that the term "intra-system transfer" should not imply additional or special duties for Medical Defendants, and instead, that this transfer should be referred to as an "inter-system transfer." (Med. Defs.' Second Br. (Doc. 191) at 7-8.)

174, 176 (4th Cir. 2020) (holding that, under North Carolina law, expert testimony is necessary to establish causation "when a plaintiff's alleged injury involves a complex medical question or manifests in a manner that is not obvious or otherwise apparent to persons without medical expertise"); Gillikin v. Burbage, 263 N.C. 317, 325, 139 S.E.2d 753, 760 (1965) (holding expert testimony is not necessary to link a blow to the hip with "plaintiff's soreness the next day and the six-inch bruise on her right hip," but it is necessary for a ruptured disc because "the subject matter . . . is so far removed from the usual and ordinary experience of the average man"); Jordan v. Glickman, 219 N.C. 388, 14 S.E.2d 40, 41–42 (1941) (finding no expert evidence necessary to show causation in negligence action where a teenager in good health was struck by a car and "hurled  . . . to the ground," resulting in visible and immediate bruising and swelling for at least four months). The necessity of expert testimony depends on "the type of injury, the alleged mechanism of the injury, the immediate appearance of symptoms, and whether the plaintiff was previously in good health and free from the kind of symptoms involved." Taylor, 820 F. App'x at 176.

As the evidence in this case demonstrates, and as the parties argue, (Pl.'s Second Resp. (Doc. 195) at 9; Med. Defs.' Second Br. (Doc. 191) at 9), Plaintiff's injuries involve

- 83 -

complex medical issues that would not be readily understandable by the layperson. Accordingly, this court finds that medical expert testimony is necessary to establish the proximate cause of Plaintiff's injuries. Because this court finds that neither Dr. Laber nor Dr. Yoder held their opinions to a reasonable degree of medical certainty, see discussion supra Part III.B.1.c, this court finds that Plaintiff has not created a genuine dispute of material fact that Defendant Maldonado's conduct was the proximate cause of Plaintiff's injury. Thus, this court will grant Medical Defendants' motion for summary judgment as to Plaintiff's negligence claims against Defendant Maldonado.[17] (Pl.'s First Resp. (Doc. 137) at 6.)

### 3. Negligent Supervision Claim against Defendant SHP

Medical Defendants move for summary judgment on Plaintiff's claim of negligent supervision against Defendant SHP. (See Second Am. Compl. (Doc. 57) ¶¶ 173-74.)

---

[17] Medical Defendants argue elsewhere in their brief that Defendant Maldonado should be dismissed because Plaintiff failed to comply with Rule 9(j) of the North Carolina Rules of Civil Procedure, which requires the certification of expert witnesses. (Med. Defs.' First Br. (Doc. 124) at 21.) Where a plaintiff asserts a claim of ordinary negligence, rather than medical malpractice, a plaintiff is not required as a matter of law to comply with Rule 9(j). See Allen, 203 N.C. App. at 366, 691 S.E.2d at 126. Thus, because this court finds that this is a claim of ordinary negligence, this court will not consider Medical Defendants' argument when determining if Defendant Maldonado is liable for negligence.

North Carolina recognizes a claim of negligent supervision against an employer where the plaintiff establishes: (1) "the specific negligent act on which the action is founded"; (2) "incompetency, by inherent unfitness or previous specific acts of negligence, from which incompetency may be inferred"; (3) "either actual notice to the master of such unfitness or bad habits, or constructive notice, by showing that the master could have known the facts had he used ordinary care in oversight and supervision"; and (4) "that the injury complained of resulted from the incompetency proved." Medlin v. Bass, 327 N.C. 587, 591, 398 S.E.2d 460, 462 (1990) (internal citations, quotations, and emphasis omitted).

Medical Defendants argue that this court should grant summary judgment in favor of Medical Defendants because Plaintiff has not established "incompetency or unfitness of the medical providers and no notice of such by SHP." (Med. Defs.' First Br. (Doc. 124) at 23.) They also argue that Defendants Maldonado and Junkins are independent contractors whom Defendant SHP does not supervise, and thus, this cause of action "fails as a matter of law." (Id.)

Plaintiff argues in response that "[a] genuine dispute exists as to whether SHP was negligent in its supervision and enforcement of training on its policies, procedures and

- 85 -

protocols." (Pl.'s First Resp. (Doc. 137) at 20.) Plaintiff

argues that "[s]pecific acts of negligence, including medical

malpractice, ordinary negligence, and corporate negligence" as

discussed in support of Plaintiff's other claims suffice as

evidence for the first two elements of the negligent supervision

claim. (Id.) Plaintiff argues that SHP delegated its duty to

implement SHP policy and to ensure adherence with such policies

to Defendant Junkins, and that Defendant Junkins "had

constructive knowledge that lack of oversight would produce

failures in policy adherence and supervision," which ultimately

resulted in Plaintiff's injuries. (Id. at 21.) Similarly,

Plaintiff argues that SHP delegated its responsibility to

supervise medical staff at the jails to Defendant Maldonado, who

had "either actual or constructive knowledge that nurses Jackson

and Hunt failed to ensure that Plaintiff was being treated with

the appropriate standard of care given his heart condition."

(Id.) Plaintiff argues that "[i]t is immaterial whether

Defendants Maldonado and . . . Junkins were independent

contractors" because "[p]roviding medical care to inmates is

. . . a non-delegable duty." (Id. (citing Medley v. N.C. Dep't

of Corr., 330 N.C. 837, 842, 412 S.E.2d 654, 657 (1992)).

This court finds that Plaintiff has not presented evidence that creates a genuine issue of material fact regarding negligent supervision of Defendants Hunt or Jackson.

First, this court has found as a matter of law that a reasonable jury could not find, based on the evidence presented, that Defendants Hunt or Jackson were negligent. (See discussion supra III.B.2.b.) Thus, Plaintiff has not established a specific negligent act on which this claim of negligent supervision could be founded. Second, Plaintiff has not presented any evidence that Defendants Hunt and Jackson were incompetent. Plaintiff cites deposition testimony by Defendants Jackson and Hunt, as well as Jennifer Hairsine, a leader at Southern Health Partners, for the proposition that they were not adequately trained or supervised, (Pl.'s First Resp. (Doc. 137) at 20-21 (citing Doc. 137-1 at 6-7; Doc. 137-2 at 3; Doc. 137-3 at 4-6)), but this court finds that this testimony merely establishes that Defendants Hunt and Jackson were aware of Defendant SHP's policies, (see Doc. 137-2 at 3; Doc. 137-3 at 4-6). Third, Plaintiff has not presented any evidence that Defendants Maldonado or Junkins had constructive or actual notice that Defendants Hunt and Jackson were incompetent. (See Pl.'s First Resp. (Doc. 137).)

Moreover, contrary to Plaintiff's assertions that Defendant SHP had a nondelegable duty to provide medical care to inmates and thus, is responsible for the conduct of independent contractors, this court finds as a matter of law that Defendant SHP cannot be held liable for the conduct of Defendants Maldonado and Junkins. Plaintiff does not contest that Defendants Maldonado and Junkins were independent contractors. (Pl.'s First Resp. (Doc. 137) at 21.) Under North Carolina law, an employer is generally not liable for the negligent acts of an independent contractor. Gordon v. Garner, 127 N.C. App. 649, 658, 493 S.E.2d 58, 63 (1997). Although Plaintiff is correct that some duties may be nondelegable, including the duty to provide medical care to inmates, the case cited by Plaintiff, Medley v. North Carolina Dep't of Correction, expressly couches this duty in terms of a "state's nondelegable duty to provide medical care for inmates." 330 N.C. at 845, 412 S.E.2d at 659 (emphasis added). Similarly, the modern statute Plaintiff has previously cited as creating a duty to provide medical care to inmates, N.C. Gen. Stat. § 153A-225(a), creates a nondelegable duty on sheriffs operating county jails to provide medical services to jail inmates, not agents of the state, such as Defendant SHP. See discussion supra Part III.B.1.a. For these reasons, this court finds that Defendant SHP is not liable as a

matter of law for the negligence of its independent contractors in providing medical care to inmates.

Accordingly, this court will grant Medical Defendants' motion for summary judgment with regards to Plaintiff's claims of negligent supervision.

### 4. <u>Plaintiff's False Imprisonment Claim</u>

Medical Defendants move for summary judgment on Plaintiff's claim of False Imprisonment under North Carolina law. (Med. Defs.' First Br. (Doc. 124) at 23.) In his response to Medical Defendants' motion, Plaintiff "concedes that this claim for false imprisonment against the Medical Defendants fails as a matter of law, with no effect on the claim as it stands against the other Defendants to this lawsuit." (Pl.'s First Resp. (Doc. 137) at 22.) Accordingly, this court will grant Medical Defendants' motion with regard to Plaintiff's claim of False Imprisonment.

### 5. <u>Plaintiff's Torture and Intentional Infliction of Emotional Distress Claim</u>

Medical Defendants move for summary judgment on Plaintiff's claim of Torture and Intentional Infliction of Emotional Distress. (Med. Defs.' First Br. (Doc. 124) at 23.) Plaintiff "concedes that the claim for torture/intentional infliction of emotional distress against the Medical Defendants fails as a

matter of law, with no effect on the claim as it stands against the other Defendants to this lawsuit." (Pl.'s First Resp. (Doc. 137) at 22.) Accordingly, this court will grant Medical Defendants' motion as to Plaintiff's claim of Torture and Intentional Infliction of Emotional Distress.

### 6. **Plaintiff's Claim under 42 U.S.C. § 1983**

Medical Defendants also move for summary judgment on Plaintiff's claim of a violation of 42 U.S.C. § 1983, (Med. Defs.' First Br. (Doc. 124) at 20), in which Plaintiff alleges that Medical Defendants were deliberately indifferent to his medical needs. (See Second Am. Compl. (Doc. 57) ¶¶ 184-87). Medical Defendants argue the evidence does not create a genuine dispute of material fact that they acted with the requisite intent for a § 1983 claim. (Med. Defs.' First Br. (Doc. 124) at 20-21.) Plaintiff argues that because Medical Defendants delayed providing Coumadin, despite knowing that Plaintiff had a mechanical heart valve, Medical Defendants acted with the requisite intent. (Pl.'s First Resp. (Doc. 137) at 16-18.)

In Estelle v. Gamble, the Supreme Court held that prison officials violate the Eighth Amendment when they are deliberately indifferent to the serious medical needs of their prisoners. 429 U.S. 97, 104-05 (1976). "Pretrial detainees are entitled to at least the same protection under the Fourteenth

Amendment as are convicted prisoners under the Eighth

Amendment." Young v. City of Mount Ranier, 238 F.3d 567, 575

(4th Cir. 2001) (footnote omitted).

Pretrial detainees alleging they have been subjected to

unconstitutional conditions of confinement must satisfy a two-

pronged test: First, they must allege that the deprivation

alleged was "objectively, sufficiently serious." Scinto v.

Stansberry, 841 F.3d 219, 225 (4th Cir. 2016) (citing Farmer v.

Brennan, 511 U.S. 825, 834 (1994)) (internal quotations

omitted). "To be sufficiently serious, the deprivation must be

extreme – meaning that it poses a serious or significant

physical or emotional injury," id. (internal quotations

omitted), and "is so obvious that even a lay person would easily

recognize the necessity for a doctor's attention." Iko v.

Shreve, 535 F.3d 225, 241 (4th Cir. 2008) (internal quotations

omitted).

Second, pretrial detainees must show that prison officials

acted with deliberate indifference, meaning that "the official

knew of and disregarded an excessive risk to inmate health or

safety." Scinto, 841 F.3d at 225 (citing Farmer, 511 U.S. at

837) (internal quotations, and modifications omitted). "[A]n

inadvertent failure to provide adequate medical care" does not

satisfy the standard, and thus, mere negligence in diagnosis or

treatment is insufficient. Estelle, 429 U.S. at 105-06; see also
Farmer, 511 U.S. at 835 (holding that deliberate indifference
requires a showing of "more than mere negligence [but] is
satisfied by something less than acts or omissions for the very
purpose of causing harm or with knowledge that harm will
result"). Disagreement between an inmate and medical staff
regarding the proper course of treatment is not a basis for
relief. Russell v. Sheffer, 528 F.2d 318, 319 (4th Cir. 1975).
Instead, "officials evince deliberate indifference by acting
intentionally to delay or deny the prisoner access to adequate
medical care or by ignoring an inmate's known serious medical
needs." Sharpe v. S. Carolina Dep't of Corr., 621 F. App'x 732,
733 (4th Cir. 2015) (citing Estelle, 429 U.S. at 104-05); see
also Smith v. Smith, 589 F.3d 736, 739 (4th Cir. 2009) (finding
a plaintiff stated a claim for deliberate indifference where a
nurse had destroyed the order which would have enabled a patient
to receive necessary medical treatment).

This court finds that there is not a genuine dispute of
material fact regarding whether Medical Defendants were
deliberately indifferent to Plaintiff's medical needs. Plaintiff
cites that the Fourth Circuit's opinion in Sosebee v. Murphy,
797 F.2d 179 (4th Cir. 1986) for the proposition that even a
short delay in treating a life-threatening condition can rise to

the level of deliberate indifference. (Pl.'s First Resp. (Doc. 137) at 17.) In Sosebee, the Fourth Circuit held that the record was "replete with evidence from which a jury could rationally find that the guards on duty were aware of [the plaintiff]'s serious condition and intentionally abstained from seeking medical help." 797 F.2d at 182. This evidence included testimony that prison guards joked about the plaintiff's visibly poor physical state for several hours and threatened all prisoners with solitary confinement if they continued to request that the plaintiff receive medical assistance. Id.

The facts in Sosebee are distinguished from those in the matter presently before this court. Taken in the light most favorable to Plaintiff, the evidence presented is that Medical Defendants responded to Plaintiff's medical needs and provided treatment. Even taking the facts in the light most favorable to Plaintiff, the undisputed facts are that Defendant Jackson collected medical information from Plaintiff about his providers and pharmacy when he was not released from Davie County Jail on November 7, 2012, (Pl.'s First Resp. (Doc. 137) at 4); contacted Defendant Maldonado to establish a treatment plan, (id. at 4-5); worked within established protocols to obtain Plaintiff's medication from a pharmacy, (id.); and administered that medication to Plaintiff on a regular basis as directed by

- 93 -

Defendant Maldonado (Id.) Defendant Maldonado ordered an INR test and changed Plaintiff's medication dosage when he learned that Plaintiff's INR levels were subtherapeutic. (Id. at 5.) Finally, Defendant Hunt immediately began providing medication to Plaintiff when she returned to work. (Id. at 6.)

There is no evidence on the record that Medical Defendants intended to prevent or delay Plaintiff from receiving medical treatment or that Medical Defendants ignored his medical needs. That Plaintiff disagrees with the treatment he received or that a different course of treatment might have led to a better medical outcome, (see id. at 17), is not evidence of any subjective intent by Medical Defendants to deprive Plaintiff of medical treatment. "Medical malpractice does not become a constitutional violation merely because the victim is a prisoner." Estelle, 429 U.S. at 106. Accordingly, this court finds that a reasonable jury could not find that Medical Defendants were deliberately indifferent to Plaintiff's condition and will grant Medical Defendants' motion for summary judgment as to Plaintiff's § 1983 claims.

## IV.  CONCLUSION

For the reasons set forth above,

**IT IS THEREFORE ORDERED** that this court's Memorandum Opinion and Order dated March 23, 2021, (Doc. 178), is **STRUCK.**

- 94 -

**IT IS FURTHER ORDERED** that Medical Defendants' Motion to Strike the Affidavit of Michael Teal, (Doc. 142), is **GRANTED.**

**IT IS FURTHER ORDERED** that Medical Defendants' Motion to Strike the Affidavits of David Ray Gunter, Tammy J. Banas, and Francis M. Hinson, IV, and the Declaration of Damian Laber, (Doc. 197), is **GRANTED** as to the Laber Declaration, **DENIED** as to Banas Affidavit, and **GRANTED IN PART AND DENIED IN PART** as to the Gunter Affidavit and the Hinson Affidavit.

**IT IS FURTHER ORDERED** that Medical Defendants' Motion for Summary Judgment, (Doc. 123), and Medical Defendants' Motion for Summary Judgment on Reconsidered Issues, (Doc. 191), are **GRANTED.**

A judgment reflecting this Memorandum Opinion and Order will be entered contemporaneously herewith.

This the 17th day of September, 2021.

_____
United States District Judge